**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------- x
                                                        :
In re:                                   :                 Chapter 11
                                                        :
SIENNA BIOPHARMACEUTICALS, INC.,         :                 Case No. 19-12051 (_____)
                                                        :
                 Debtor.¹                :
                                                        :
------------------------------------------------------- x
```

**DECLARATION OF FREDERICK C. BEDDINGFIELD III IN SUPPORT**
**OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY RELIEF**

I, Frederick C. Beddingfield III, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I am the President and Chief Executive Officer of Sienna Biopharmaceuticals, Inc., the debtor and debtor in possession in the above-captioned chapter 11 case (the "**Debtor**").  I am authorized to submit this declaration (this "**First Day Declaration**") on behalf of the Debtor.

2.     I am the Debtor's founder and have served as its President and Chief Executive Officer since January 2016 and as a member of its board of directors since August 2015.  Prior to assuming my current position with the Debtor, I served as the Chief Medical Officer of Kythera Biopharmaceuticals, Inc. from March 2013 until October 2015, and as Vice President and Global Therapeutic Area Head, Dermatology and Aesthetics of Allergen, Inc. from August 2005 until March 2013.  I am a board-certified dermatologist and dermatologic surgeon and a Clinical Associate Professor of Medicine/Dermatology at the University of California, Los Angeles School of Medicine, where I have been on the faculty and seeing patients since 2003.

---

¹     The last four digits of the Debtor's federal tax identification number are 4627.  The Debtor's mailing address is 30699 Russell Ranch Road, Suite 140, Westlake Village, California 91362.

3.      As President and Chief Executive Officer of the Debtor, I am responsible for overseeing the Debtor's operations, business, and financial affairs.  As a result of my tenure with the Debtor, my review of public and non-public documents, and my discussions with other members of the Debtor's management team, I am generally familiar with the Debtor's business, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtor's employees or retained advisers that report to me in the ordinary course of my responsibilities.  References to the Bankruptcy Code (as defined below), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

4.      On the date hereof (the "**Petition Date**"), the Debtor commenced with the United States Bankruptcy Court for the District of Delaware (the "**Court**") a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtor will continue to operate its business and manage its properties as a debtor in possession.

5.      I submit this First Day Declaration on behalf of the Debtor in support of the Debtor's (a) voluntary petition for relief and (b) certain "first-day" pleadings (collectively, the "**First Day Pleadings**"), which have been filed contemporaneously herewith.  The Debtor has filed the First Day Pleadings to minimize the adverse effects of the commencement of its chapter 11 case on its operations and its various constituents.  I have reviewed the Debtor's petition and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtor's business and to successfully maximize the value of the Debtor's estate.

6.      Part I of this First Day Declaration provides an overview of the Debtor's business, corporate history and structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtor's financial performance and the events leading to the Debtor's chapter 11 filing.  Part II sets forth the relevant facts in support of the First Day Pleadings.

**PART I**

7.      The Debtor is a clinical-stage biopharmaceutical and medical device company focused on bringing unconventional scientific innovations to patients whose lives are burdened by disease.  The Debtor, through its accomplished management team and skilled employees, leverages deep knowledge and experience in drug and medical device development across multiple therapeutic areas with a view towards building a unique, diversified, multi-asset portfolio of therapies in inflammation and immunology that target select pathways in specific tissues, with an initial focus on one of the most important "immune" tissues, the skin.

8.      Utilizing its novel Topical by Design$^{TM}$ ("**TBD**") platform, the Debtor has developed, and is currently advancing through clinical trials, multiple product candidates, all of which are designed to address chronic inflammatory skin diseases and other dermatologic and aesthetic conditions.  The lead candidate from the TBD platform, SNA-120, is a first-in-class inhibitor of Tropomyosin receptor kinase A (TrkA), which the Debtor is developing for the treatment of psoriasis, as well as the associated pruritus (itch).  The second candidate from the TBD platform, SNA-125, is a dual Janus kinase 3 (JAK3)/TrkA inhibitor, which the Debtor is developing for the treatment of atopic dermatitis and psoriasis and the associated itch, and which has also demonstrated positive results in gastrointestinal applications, including in the treatment of inflammatory bowel disease.  The Debtor is also currently developing products under its Topical Photoparticle Therapy$^{TM}$ ("**TPT**") platform, including SNA-001, a silver photoparticle

technology which is designed to be used in conjunction with commercial lasers to reduce unwanted light-pigmented hair and treat acne.

9.    As a clinical-stage biopharmaceutical and medical device company, the Debtor historically has invested a significant portion of its efforts and financial resources in research and development activities and has not generated any revenue from product sales to date.  The Debtor also has engaged in strategic merger and acquisition activity to expand its product candidate portfolio and, in December 2016, entered into a Share Purchase Agreement (the "**SPA**") with Creabilis plc ("**Creabilis**"), pursuant to which the Debtor acquired the entire issued share capital of Creabilis and the TBD platform, including the SNA-120 and SNA-125 product candidates, in exchange for cash, equity, and certain contingent payments (triggered upon the achievement of certain product development and approval milestones).  To fund these activities, the Debtor has relied on equity issuances, debt offerings, and term loans.  More recently, in June 2018, the Debtor entered into the Prepetition Credit Agreement with the Prepetition Lender (each, as defined below), which subsequently was amended in January 2019 to, among other things, impose additional liquidity requirements on the Debtor.

10.    As discussed in greater detail below, while the Debtor has continued to make progress in developing and advancing its key product candidates, including, notably, obtaining positive top-line results from a Phase 2b study of SNA-120 in December 2018, its liquidity position has declined, and it will not be able to continue advancing its product candidates absent additional funding.  At the same time, the Debtor's ability to attract such additional funding, as well as its overall liquidity position, has been challenged by a looming liquidity trigger tied to minimum available cash under the Prepetition Credit Agreement, a declining stock price, and certain contingent payments owed to the former Creabilis shareholders

pursuant to the SPA, which are due upon the commencement of Phase 3 clinical trials for SNA-120.  In light of these considerations, and in an effort to preserve and maximize value for stakeholders and to create a platform through which necessary funding may be obtained to continue the Debtor's important research and development, the Debtor determined to commence this chapter 11 case.

## I.      COMPANY AND BUSINESS OVERVIEW

### A.      Corporate History and Structure

11.      The Debtor was founded as a Delaware corporation under the name Sienna Labs Inc. on July 27, 2010.  In February 2016, the Debtor changed its name to Sienna Biopharmaceuticals, Inc.  On December 6, 2016, the Debtor acquired Creabilis, a company incorporated in England and Wales, which was subsequently converted to Creabilis Holdings Limited ("**Creabilis Holdings**").

12.      Creabilis Holdings presently serves as a holding company for the Debtor's other non-Debtor affiliates and has no operations.  Sienna Biopharmaceuticals S.A. ("**Sienna S.A.**"),[2] a company incorporated in Luxembourg and the wholly-owned direct subsidiary of Creabilis Holdings, holds a substantial portion of the Debtor's intellectual property related to SNA-120 acquired in the Creabilis acquisition, and is in effect an intellectual property holding vehicle with limited administrative operations.  Sienna Biopharmaceuticals S.r.l. ("**Sienna S.r.l**."), a company incorporated in Italy and the wholly-owned direct subsidiary of Sienna S.A., formerly served as the early-stage research arm of the Debtor; however, the Debtor is in the process of completing the wind down of this entity; as of the Petition Date, this entity does not have any employees or meaningful continuing operations.  Creabilis UK Limited

---

[2]    Sienna Biopharmacueticals S.A. was previously named Creabilis S.A.

("**Creabilis UK**" and, together with Creabilis Holdings, Sienna S.A., and Sienna S.r.l., the "**Non-Debtor Foreign Subsidiaries**"), a company incorporated in England and Wales, is also a wholly-owned subsidiary of Sienna S.A.; this entity has not had recent assets or operations and the Debtor began steps to dissolve this entity prior to the Petition Date.  An organizational chart showing the Debtor and the Non-Debtor Foreign Subsidiaries is attached hereto as Exhibit A.

13.     On August 1, 2017, the Debtor completed an initial public offering of its common stock and was listed on The NASDAQ Global Select Market (the "**NGSM**") under the symbol "SNNA."[3]  As of August 6, 2019, there were 30,907,542 common shares outstanding, 24,340,556 of which are held by Cede & Co. and are publicly traded.  As of August 28, 2019, the Debtor also had approximately 2.64 million shares associated with stock options, approximately 1.05 million in restricted stock units, and warrants for 535,714 shares outstanding.

## B.     Overview of Operations

14.     As stated above, the Debtor is a clinical-stage biopharmaceutical and medical device company focused on bringing innovations in biotechnology to the discovery, development, and commercialization of first-in-class, targeted, topical products in medical dermatology and aesthetics.  The Debtor's objective is to develop a unique, diversified, multi-asset pipeline of topical therapies that enhance the health, appearance, and quality of life of dermatology and aesthetics patients.  The Debtor is led by a management team with extensive experience in product development and commercialization at several leading dermatology, aesthetics, and biotechnology companies.

---

[3]   As reported in the Debtor's Form 8-K filed on August 14, 2019 with the Securities and Exchange Commission (the "**SEC**"), on August 9, 2019, the Debtor received notice from The Nasdaq Stock Market that for the last 30 consecutive business days, the closing bid price for the Debtor's common stock was below $1.00 per share, which is the minimum required closing bid price for continued listing on the NGSM pursuant to Listing Rule 5400(a)(1).  This notice has no immediate effect on the Debtor's listing or trading of its common stock.

15.    Biopharmaceutical and medical device development are highly speculative undertakings and involve a substantial degree of risk.  The biopharmaceutical and medical device industries generally, and the dermatology and aesthetics markets specifically, are acutely competitive, subject to rapid change, and significantly affected by new product introductions, results of clinical research, corporate combinations, actions by regulatory bodies, changes by public and private payers, and other factors.  While the Debtor is presently advancing several promising product candidates under its proprietary TBD and TPT platforms, these have not yet been approved for sale, and the Debtor has not generated any revenue to date.

16.    Since its inception, the Debtor has incurred significant operating losses and has an accumulated deficit as a result of ongoing efforts to develop its product candidates, including conducting nonclinical and clinical trials and providing general and administrative support for these operations.  The Debtor had an accumulated deficit of approximately $184.1 million and approximately $159.4 million as of June 30, 2019 and December 31, 2018, respectively.  The Debtor had net losses of approximately $8.3 million and approximately $24.6 million for the three and six months ended June 30, 2019, and approximately $20.2 million and approximately $37.3 million for the three and six months ended June 30, 2018, respectively.  The Debtor had net cash used in operating activities of approximately $21.2 million and approximately $30.2 million for the six months ended June 30, 2019 and 2018, respectively.

17.    The Debtor's significant cash burn and lack of available revenue has necessitated multiple rounds of debt and equity financings, which are discussed in greater detail below.  More recently, the Debtor's liquidity position has become increasingly strained due to a lack of fresh capital sources and certain other factors, such that the Debtor does not have sufficient available capital to support its ongoing operations and, in particular, fund the initiation

of its planned Phase 3 pivotal clinical trials for SNA-120 or further advance the development of SNA-125. The Debtor has also been seeking a strategic partner to maximize the value of SNA-001 and its TPT platform after announcing positive top-line results from three pivotal clinical trials involving SNA-001 in February 2019. Accordingly, on August 5, 2019, the Debtor retained Cowen and Company, LLC ("**Cowen**") as an independent financial advisor to assist in exploring capital raising opportunities to enable the advancement of SNA-120 and SNA-125, in addition to a wide range of financial and strategic alternatives, ultimately with a view towards maximizing value.

### 1.    *Headquarters, Employees, and Manufacturing Activities*

18.    The Debtor leases its corporate headquarters, which is an approximately 7,000 square foot facility located in Westlake Village, California.[4] The Debtor's headquarters houses the Debtor's research and development, business development, financing, information technology, supply chain, commercial, and administrative activities. As of the Petition Date, the Debtor had 18 full-time employees, all of which are based in the Debtor's headquarters. The Debtor also regularly utilizes contract workers to provide a variety of services, which the Debtor engages directly. None of the Debtor's employees are represented by a labor union.

19.    The Debtor engages third parties to conduct its nonclinical studies and clinical trials and for manufacturing and supply of its product candidates. The Debtor does not have any internal manufacturing capabilities.

### 2.    *Intellectual Property*

20.    The Debtor's business depends, in large part, on its ability to obtain and maintain proprietary protection for its products and technologies. To this end, as of the Petition

---

[4]    The Debtor also leases an additional approximately 6,000 square feet of space at this location, which it subleases to Task Guru, LLC.

Date, the Debtor owns or has an exclusive license in certain fields of use to over 250 patents and patent applications in the United States and internationally.  As described in further detail below, the Debtor's intellectual property is unencumbered; however, it is subject to a negative pledge and certain contingent rights to payment under the Prepetition Credit Agreement.

21.     The Debtor's patent portfolio includes patents and patent applications that are directed at its TBD platform, including SNA-120 and SNA-125 (collectively, the "**TBD IP**"). As of the Petition Date, the TBD IP includes six issued United States patents and 112 issued international patents, as well as 21 pending United States patent applications and 16 pending international patent applications.  The TBD IP is owned by the Debtor and certain of the Non-Debtor Foreign Subsidiaries (principally Sienna S.A.) and generally expires between 2026 and 2032.

22.     The Debtor's patent portfolio also includes patent and patent applications that are directed at its TPP platform, including SNA-001 (collectively, the "**TPP IP**").  As of the Petition Date, the TPP IP includes 21 issued United States patents and 71 issued international patents, as well as five pending United States patent applications and 24 pending international patent applications.  Certain of the TPP IP relating to the production of silver nanoplates used in SNA-001 is owned by nanoComposix, Inc. and is exclusively licensed to the Debtor, and the remaining TPP IP is owned by the Debtor and certain of the Non-Debtor Foreign Subsidiaries. The TPP IP generally expires between 2031 and 2033.

23.     The Debtor also protects its brand through various trademark rights.  As of the Petition Date, the Debtor owns 53 registered trademarks around the world, as well as 16 United States and 120 international trademark applications.

C.    **Equity Financings**

24.    Over the course of 2018 and 2019, the Debtor engaged in several efforts to raise additional capital to support the advancement of its product candidates.  On August 3, 2018, the Debtor entered into a sales agreement (the "**Sales Agreement**") with Cowen, pursuant to which the Debtor may sell from time to time, at its option, up to $75.0 million of the Debtor's common stock through an "at-the-market" equity offering program (the "**ATM Offering Program**") under which Cowen is acting as sales agent.  The same day, the Debtor filed a Form S-3 Registration Statement (the "**Shelf Registration Statement**") with the SEC covering the offering of up to $250.0 million of common stock, preferred stock, debt securities, warrants, purchase contracts, and units.  The Shelf Registration Statement included a prospectus covering the offering, issuance, and sale of up to $75.0 million of the Debtor's common stock from time to time through the ATM Offering Program.  The Shelf Registration Statement became effective on August 14, 2018.  The shares to be sold under the Sales Agreement may be issued and sold pursuant to the Shelf Registration Statement.

25.    During the year ended December 31, 2018, the Debtor issued 340,307 shares of its common stock through the ATM Offering Program and received net proceeds of approximately $5.0 million, after deducting commissions of $0.2 million and other offering expenses of $0.4 million.  During the three and six months ended June 30, 2019, the Debtor issued an additional 329,588 shares of its common stock through the ATM Offering Program and received net proceeds of approximately $0.4 million, after deducting commissions of $18,000 and other offering expenses of $0.1 million.

26.    On February 20, 2019, the Debtor entered into an underwriting agreement (the "**Underwriting Agreement**") with Cowen and BMO Capital Markets Corp., as representatives of the several underwriters named therein (collectively, the "**Underwriters**"),

pursuant to which the Debtor agreed to issue and sell 8.0 million shares of its common stock to the Underwriters (the "**Offering**"). The shares were sold at a public offering price of $2.50 per share, and were purchased by the Underwriters from the Debtor at a price of $2.35 per share. Under the terms of the Underwriting Agreement, the Company granted the Underwriters the option, for 30 days, to purchase up to 1.2 million additional shares of common stock at the public offering price. On February 22, 2019, the Offering closed and the Debtor completed the sale and issuance of 9.2 million shares of common stock, which included 1.2 million shares pursuant to the Underwriters' option to purchase additional shares, and received net proceeds of approximately $21.4 million, after deducting the Underwriters' discounts, commissions, and estimated offering expenses payable by the Debtor.

### D.    Summary of Prepetition Debt[5]

27.    The Debtor is party to that certain Loan and Security Agreement, dated as of June 29, 2018 (as the same has been and may be further amended, restated, supplemented, or otherwise modified from time to time, the "**Prepetition Credit Agreement**" and, together with all other loan documents, security instruments, and other documents related to, referenced in, or executed in connection with the Prepetition Credit Agreement, the "**Prepetition Credit Documents**"), with Silicon Valley Bank (the "**Prepetition Lender**"), pursuant to which the Prepetition Lender originally provided the Debtor with access to term loans in an aggregate principal amount of up to $40.0 million (the "**Prepetition Facility**"). On June 29, 2018, the Debtor drew down on the Prepetition Facility in an aggregate principal amount of $30.0 million,

---

[5]    Capitalized terms used but not otherwise defined in this section of this First Day Declaration shall have the meanings ascribed to such terms in the Prepetition Credit Documents.

which is repayable in monthly installments until July 1, 2023, including an interest-only period through July 31, 2020.[6]

28.     On January 28, 2019, the Debtor and the Prepetition Lender entered into an amendment to the Prepetition Credit Agreement, pursuant to which the Debtor's total access to the Prepetition Facility was reduced to $30.0 million, and, if the Debtor's unrestricted cash on deposit with the Prepetition Lender falls below the greater of (a) $30.0 million, or (b) the sum of (i) $15.0 million plus (ii) the Debtor's six month cash burn, tested monthly as of the last day of each month, then the Debtor has the option to (y) prepay the Prepetition Facility in denominations of $15.0 million (plus accrued and unpaid interest, the final payment fee with respect to the portion of the Prepetition Facility being repaid, and the prepayment fee with respect to the pro rata portion of the Prepetition Facility being prepaid in excess of $15.0 million) or (z) immediately cash secure not less than the lesser of the outstanding balance or $15.0 million of the principal balance of all outstanding indebtedness under the Prepetition Facility (the "**Minimum Cash Covenant**").  The Debtor may prepay the outstanding principal balance of the Prepetition Facility in whole but not in part, subject to a prepayment fee ranging from 1.0% to 3.0% of any amount prepaid, depending upon when the prepayment occurs.  The Prepetition Credit Agreement also provides for a final payment fee equal to 6.50% of the total amount advanced, due upon the earliest of maturity, acceleration, prepayment, or termination of the Prepetition Credit Agreement.  In connection with this amendment, the Debtor issued to the Prepetition Lender and its affiliate, Life Science Loans II, LLC, warrants to purchase an aggregate of 535,714 shares of the Debtor's common stock at an exercise price of $2.80 per

---

[6]   Interest accrues on the Prepetition Facility at a per annum rate of the greater of (a) the Wall Street Journal prime rate plus 2.5% and (b) 7.25%.  As of June 30, 2019, the interest rate was 8.0%.

share.  In addition, a prepayment fee ranging from 1-3% may be payable in connection with an optional prepayment of the Prepetition Facility.

29.     In the period leading up to the Petition Date, the Debtor engaged with the Prepetition Lender regarding the continued consensual use of the Prepetition Collateral.  In connection with such discussions, and as a condition to the Prepetition Lender's consent, the Debtor made a payment to the Prepetition Lender in the amount of $21.3 million, consisting of $20.0 million in principal and $1.3 million on account of the final payment fee (the "**Prepetition Loan Payment**"), which such Prepetition Loan Payment was made on September 16, 2019.  The Prepetition Lender also agreed to waive the prepayment fee on the Prepetition Loan Payment in an amount equal to $400,000.

30.     As of the Petition Date, the principal amount outstanding under the Prepetition Credit Documents is approximately $10.0 million (together with all debt, principal, interest, fees, Bank Expenses, the Prepayment Fee, the Final Payment, and other amounts owed to the Prepetition Lender by the Debtor pursuant to the Prepetition Credit Documents relating to the loans provided thereunder, the "**Prepetition Loan Obligations**").  To secure the Prepetition Loan Obligations, and pursuant to the Prepetition Credit Documents, the Debtor granted to the Prepetition Lender security interests in and liens on certain assets of the Debtor as described in the Prepetition Credit Documents (the "**Prepetition Liens**" and the "**Prepetition Collateral**").[7]

31.     Notably, the Prepetition Collateral excludes the Debtor's Intellectual Property, in any medium, of any kind or nature whatsoever, owned or acquired by the Debtor, or

---

[7]   The Prepetition Collateral includes all goods, Accounts (including health-care receivables), Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles (subject to certain exclusions), commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets of the Debtor, whether owned or acquired, wherever located.

in which the Debtor holds or acquires any right or interest in.  The Debtor's Intellectual Property is unencumbered; however, the Intellectual Property is subject to a negative pledge and the Prepetition Collateral includes all Accounts and General Intangibles that consist of rights to payment and proceeds from the sale, licensing, or disposition of all or any part of the Intellectual Property.[8]

32.     As of the Petition Date, the Debtor estimates that its unsecured obligations total approximately $2.5 million.

## II.     EVENTS LEADING TO CHAPTER 11 FILING

### A.     Prepetition Restructuring Efforts

33.     On December 3, 2018, the Debtor announced its long-awaited top-line results from a Phase 2b study of SNA-120, the Debtor's lead product candidate developed using its proprietary TBD platform.  This Phase 2b study, in mild-to-moderate psoriasis patients with at least moderate itch, was designed to assess the efficacy and safety of SNA-120 on itch (primary endpoint), as well as the underlying psoriasis (secondary endpoints).  In this study, subjects treated with SNA-120 achieved statistical significance, compared to vehicle, on important pre-specified regulatory endpoints of psoriasis disease severity.  Subjects treated with SNA-120 also experienced a meaningful reduction in itch, although the result did not reach statistical significance against vehicle.

34.     Around this time, the Debtor began implementation of a corporate restructuring plan to focus its resources on SNA-120, which included a significant reduction in force.  As reported in the Debtor's Form 8-K filed with the SEC on January 2, 2019, the Debtor

---

[8]     The Prepetition Credit Agreement provides that, to the extent that a judicial authority holds that a security interest in the Intellectual Property is necessary to have a security interest in such right of payment, then the Prepetition Collateral is to include the Intellectual Property, to the extent necessary to secure the Prepetition Lender's right to payment.

expected that the restructuring would reduce its planned operating expenses by approximately 50%, excluding one-time charges of approximately $0.8 million related to employee benefits and severance charges, and would be completed by the end of the first quarter of 2019. In connection with this organizational restructuring, the Debtor terminated approximately 20 employees, or approximately 34% of its workforce, with the intent to streamline operations and make more efficient use of cash. As of March 31, 2019, the Debtor had completed the activities associated with the restructuring plan and all related payments had been made. In September 2019, the Debtor terminated an additional six employees in an effort to further streamline operations and reduce go-forward operating costs.

**B.    Debtor's Constrained Liquidity, Prepetition Credit Agreement Amendment, and SPA Contingent Payments**

35.    Despite the Debtor's substantial prepetition organizational restructuring efforts, its liquidity position continued to erode throughout the course of 2019. The Minimum Cash Covenant in the Prepetition Credit Agreement requires that, among other things, the Debtor maintain unrestricted cash on deposit with the Prepetition Lender in the total amount of the greater of (a) $30.0 million, or (b) the sum of (i) $15.0 million plus (ii) the Debtor's six month cash burn, as described in greater detail above, and the Debtor's cash balance fell below the Minimum Cash Covenant threshold in the days prior to the Petition Date. The Debtor's ability to attract additional funding to bolster its liquidity position has been further challenged by a declining stock price, which has limited its ability to raise funds through the sale of equity securities, including pursuant to the ATM Offering Program. In addition, the Debtor has certain contingent payments coming due to the former Creabilis shareholders pursuant to the SPA. Specifically, under the SPA, the Debtor will become obligated to issue $18.0 million in shares of its common stock to the former Creabilis shareholders upon the commencement of the first Phase

3 clinical trial of SNA-120.  This amount could rise to as much as $53.0 million, consisting of an aggregate of $25.0 million in cash and $28.0 million in shares of common stock, upon achieving certain additional milestones.[9]

36.    These factors have left the Debtor needing significant additional liquidity to continue its research and development operations.  In particular, while the Debtor has already resolved all operational and procedural items in connection with its planned initiation of Phase 3 pivotal clinical trials for SNA-120,[10] and now stands ready to commence such trials in the second half of 2019 as originally planned, the Debtor determined that additional funding would be required to move forward due to uncertainties regarding the Minimum Cash Covenant and the Debtor's continued ability to use cash under the Prepetition Facility.  At the same time, the Debtor has been seeking a strategic partner to maximize the value of SNA-001 and its TPT platform following the announcement of positive top-line results from three pivotal clinical trials involving SNA-001 in February 2019.

37.    After full consideration of the Debtor's potential strategic and financial alternatives, it became clear that there were no viable out-of-court refinancing or restructuring options available to pursue.  Faced with a lack of viable financing options, dwindling liquidity and the requirements of the Minimum Cash Covenant, and the overhang of significant future milestone payments under the Creabilis SPA, after extensive discussions with its advisors, the Debtor determined that commencing this chapter 11 case was the best available option to preserve and maximize value for stakeholders.

---

[9]    For the avoidance of doubt, the Debtor has satisfied all milestone achievement obligations under the Creabilis SPA to date.  The qualifying conditions for these additional milestone payments have not yet been met.

[10]    Over the course of 2019, the Debtor engaged with the United States Food and Drug Administration regarding Phase 3 trial design for SNA-120, which has been agreed upon, and secured material supply to be used in connection therewith.

C.      **Debtor's Strategic Alternatives and Sale Process**

38.      As noted above, in early August 2019, the Debtor retained Cowen to, among other things, (a) assist the Debtor in analyzing its business, operations, properties, financial condition, and prospects, (b) assist the Debtor in analyzing and considering financing alternatives and strategies, (c) assist the Debtor in identifying financial and strategic institutional investors or other investors interested in participating in a transaction with the Debtor, and (d) advise the Debtor as to potential mergers or acquisitions and the sale or other disposition of any of the Debtor's business or assets.

39.      After a review of the Debtor's potential strategic and financial alternatives, the Debtor directed Cowen to commence a process and pursue a potential transaction for the Debtor.   Accordingly, prior to the Petition Date, Cowen engaged in communications with a number of parties regarding a potential transaction with the Debtor and such efforts remain ongoing.   Given the responses that Cowen has received to date from certain interested parties, the Debtor is confident that Cowen will be successful in locating a purchaser or strategic partner in the near future, thus enabling the Debtor to emerge from bankruptcy and continue its business operations as a going concern.

## PART II

40.      In furtherance of its objective of a value-maximizing restructuring process, the Debtor is seeking approval of the First Day Pleadings and related orders (the "**Proposed Orders**"), and is respectfully requesting that the Court enter the Proposed Orders granting the relief requested in the First Day Pleadings.   For the avoidance of doubt, the Debtor is seeking authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Pleadings.

41.     I have reviewed each of the First Day Pleadings and Proposed Orders, and all exhibits thereto, or have otherwise had their contents explained to me, and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in the First Day Pleadings (a) is vital to ensuring that the Debtor may transition into, and continue operating within, chapter 11, with minimal business disruptions or loss of productivity or value and (b) constitutes a critical element in the Debtor being able to successfully maximize value the value of its estate for the benefit of all stakeholders.

## I.     FIRST DAY PLEADINGS

### A.     Cash Collateral Motion

42.     Pursuant to the *Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, (IV) Modifying Automatic Stay, and (V) Granting Related Relief* (the "**Cash Collateral Motion**"), the Debtor is seeking entry of interim and final orders (a) authorizing the use of Cash Collateral (as defined in section 363(a) of the Bankruptcy Code), (b) authorizing the Debtor to provide adequate protection as specified therein in favor of the Prepetition Lender to secure the Prepetition Liens in connection with the Debtor's use of Cash Collateral in which the Prepetition Lender has an interest, and any diminution in value of the Prepetition Lender's interest in the Prepetition Collateral, and (c) pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), scheduling a final hearing on the Cash Collateral Motion.  Importantly, the Prepetition Lender has consented to the Debtor's use of the Cash Collateral.

43.     If the Cash Collateral Motion is not approved and the Debtor does not obtain authorization to use the Cash Collateral, I believe that the Debtor will suffer immediate and irreparable harm.  Without the use of the Cash Collateral, the Debtor will not have the

liquidity to conduct its business as a going concern or the ability to maximize value for the benefit of all stakeholders in this chapter 11 case. The Debtor does not have and has not had access to the Cash Collateral since the commencement of this chapter 11 case. The Debtor urgently needs funds to make payroll, pay operating costs, and fund other expenditures that are critical to the Debtor's continued viability and ability to maximize value for the benefit of all stakeholders.

44.     As described above, it is vital to the success of the Debtor's restructuring efforts that it immediately obtain access to the Cash Collateral. The preservation of the Debtor's business and the Debtor's ability to maximize value heavily depend upon the expeditious approval of the use of the Cash Collateral for general working capital purposes. Absent the Court's approval of the relief sought in the Cash Collateral Motion, the Debtor faces a substantial risk of severe disruption to its business operations.

45.     Prior to the Petition Date, the Debtor engaged with the Prepetition Lender and together the parties reached an agreement for the consensual use of the Cash Collateral as described in the Cash Collateral Motion. I understand that the Prepetition Lender's consent was conditioned upon, among other things, the Prepetition Loan Payment. I understand further that, in connection with these negotiations, the Prepetition Lender agreed to waive a prepayment fee on the Prepetition Loan Payment in an amount equal to $400,000.

46.     The Debtor's request for use of the Cash Collateral is limited to budgeted expenses reasonably calculated to maximize the value of the Debtor's assets and the realization on the Prepetition Collateral. The Debtor, with the assistance of its financial advisors, has prepared a budget (the "**Budget**"), a copy of which is attached as Exhibit 1 to the Interim Order, which is attached to the Cash Collateral Motion as Exhibit A, which shows the Debtor's

forecasted receipts and disbursements from the Petition Date through December 13, 2019. Under the Budget, the Debtor intends to use the Cash Collateral, among other things, (a) to pay (i) the costs of administration of this chapter 11 case, (ii) payroll expenses, (iii) postpetition trade amounts, and (iv) various prepetition claims paid in the ordinary course that are the subject of other First Day Pleadings, as authorized by the Court, (b) as working capital, (c) to fund critical business operations conducted by the Debtor, (d) to pay amounts in connection with the KEIP and KERP (each, as defined below), subject to approval of the Court, and (e) for other general corporate purposes.  The Prepetition Lender has consented to the Debtor's use of the Cash Collateral in accordance with the Budget.

47.      Absent approval of the relief requested in the Cash Collateral Motion authorizing the Debtor to use the Cash Collateral in accordance with the Budget, the Debtor will have insufficient funds available to operate its business, administer this chapter 11 case, and maximize value for all stakeholders.

48.      The Debtor believes that the terms and conditions of its use of the Cash Collateral, including the provision of adequate protection as described in the Cash Collateral Motion, are appropriate and reasonable and that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances.  Moreover, the Prepetition Lender has consented to the Debtor's use of the Cash Collateral conditioned upon such adequate protection as set forth in the Cash Collateral Motion.  Accordingly, the Debtor is seeking authorization to use the Cash Collateral on the terms set forth in the Budget.

49.      As noted above and set forth in the budget, as of the Petition Date, the Debtor had approximately $11.0 million of cash on hand.  The adequate protection liens being granted pursuant to the Cash Collateral Motion cover both the Prepetition Collateral and, to the

extent permissible under existing contracts, the Debtor's intellectual property, which was not part of the Prepetition Collateral.  I believe that the Debtor's intellectual property has significant value on its own.

50.    A substantial amount of the Debtor's assets are encumbered under the Prepetition Facility.  Therefore, it would be impossible to operate the Debtor's business and conduct this chapter 11 case absent authorization to use the Cash Collateral.  If the Court does not authorize the use of the Cash Collateral, the Debtor's operations would likely cease, which would adversely affect the value of the Debtor's estate to the detriment of all stakeholders.  In particular, the Debtor's employees would be severely harmed, as their employment would be terminated in the event the Debtor is unable to use the Cash Collateral.

51.    For the foregoing reasons, I believe that authorizing the Debtor to use the Cash Collateral, as consensually agreed upon with the Prepetition Lender, is in the best interests of the Debtor, its estate, its creditors, and all parties in interest.

**B.    Cash Management Motion**

52.    Pursuant to the *Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Authorizing Continuation of Existing Deposit Practices, (III) Approving Continuation of Certain Ordinary Course Intercompany Transactions with Non-Debtor Foreign Subsidiaries, and (IV) Granting Related Relief* (the "**Cash Management Motion**"), the Debtor is seeking entry of interim and final orders (a) authorizing, but not directing, the Debtor to continue to maintain and use its existing cash management system, including maintenance of existing bank accounts, checks, and business forms, (b) granting the Debtor a waiver of certain bank account and related requirements of the Office of the United States Trustee (the "**U.S. Trustee**") for the District of Delaware to the

extent that such requirements are inconsistent with the Debtor's practices under its existing cash management system, (c) authorizing, but not directing, the Debtor to continue to maintain and use its existing deposit practices, and (d) approving the continuation of certain ordinary course intercompany transactions with the Non-Debtor Foreign Subsidiaries.

1. ***Debtor's Cash Management System and Bank Accounts***

53.     In the ordinary course of its business, the Debtor maintains a cash management system (the "**Cash Management System**") that is integral to the operation and administration of its business and the businesses of the Non-Debtor Foreign Subsidiaries. I believe that the Cash Management System provides significant benefits to the Debtor and the Non-Debtor Foreign Subsidiaries by, among other things, enabling the Debtor to (a) monitor and control all of the Debtor's cash receipts and disbursements, (b) identify the cash requirements of the Debtor and the Non-Debtor Foreign Subsidiaries, (c) transfer cash as needed to respond to the cash requirements of the Debtor and the Non-Debtor Foreign Subsidiaries, and (d) track all intercompany transfers.

54.     The Cash Management System is managed by the Debtor at its headquarters in Westlake Village, California, where it oversees the administration of its bank accounts to effect the collection, disbursement, and movement of cash across the Debtor's corporate structure.  The Debtor's oversight of the Cash Management System (as well as the cash management systems of the Non-Debtor Foreign Subsidiaries) facilitates accurate cash forecasting and reporting and the monitoring of the collection and disbursement of funds to and from the Debtor Bank Accounts and the Non-Debtor Foreign Subsidiary Bank Accounts (each, as defined below).

55.     I believe that the Cash Management System is organized in a way that respects the cash funding and operating needs of the Debtor and the Non-Debtor Foreign

Subsidiaries. A diagram depicting the Cash Management System, including ordinary course transfers between the Debtor and the Non-Debtor Foreign Subsidiaries, is attached to the Cash Management Motion as <u>Exhibit C</u>. The Debtor manages the cash needs of the Non-Debtor Foreign Subsidiaries and oversees the consolidated system, as described in greater detail below.

56.    As of the Petition Date, the Debtor maintains three bank accounts (the "**<u>Debtor Bank Accounts</u>**") in the United States. The Non-Debtor Foreign Subsidiaries maintain two bank accounts (the "**<u>Non-Debtor Foreign Subsidiary Bank Accounts</u>**" and, together with the Debtor Bank Accounts, the "**<u>Bank Accounts</u>**").

57.    The Debtor Bank Accounts consist of (a) a restricted cash account (Account No. 4271) (the "**<u>Collateral Account</u>**"), (b) an operating account (Account No. 3773) (the "**<u>Operating Account</u>**"), and (c) a sweep account (Account No. 3396) (the "**<u>Sweep Account</u>**"). The Debtor Bank Accounts are held in the United States at the Prepetition Lender, which is a member of the Federal Deposit Insurance Corporation (the "**<u>FDIC</u>**") and has executed the approved Uniform Depository Agreement with the U.S. Trustee for the District of Delaware. All funds in the Debtor Bank Accounts are denominated in U.S. Dollars.

58.    There are two Non-Debtor Foreign Subsidiary Bank Accounts. The first is an account in Italy at Banca Intermobiliare di Investimenti e Gestioni S.p.A. (the "**<u>Italy Account</u>**"), held in the name of Sienna S.r.l. The second is an account in Luxembourg at ING Luxembourg S.A. (the "**<u>Luxembourg Account</u>**"), held in the name of Sienna S.A.. The funds in these accounts are denominated in Euros. Creabilis Holdings and Creabilis UK do not currently have bank accounts.

59.     A schedule of the Bank Accounts is attached to the Cash Management

Motion as <u>Exhibit D</u>.  As reflected in <u>Exhibit D</u>, each of the Debtor Bank Accounts is held in the

name of the Debtor and the Non-Debtor Foreign Subsidiary Bank Accounts are held in the

names of Sienna S.r.l. and Sienna S.A., as applicable.

2.      ***Cash Collection and Distribution Process***

a.      <u>**Debtor Bank Accounts**</u>

60.     I understand that the Sweep Account currently holds approximately $11.0

million.  In the ordinary course of business, the Debtor transfers cash from the Sweep Account to

the Operating Account where it is used to fund the Debtor's operations.  The cash in the Sweep

Account also represents the majority of the Debtor's invested cash.  All but a minimal amount[11]

of the funds in the Sweep Account are invested by the Prepetition Lender in a money market

fund selected by the Debtor that holds U.S. Treasury bills, notes, and other obligations issued or

guaranteed by the U.S. Treasury.  The investment relationship between the Debtor and the

Prepetition Lender is governed by a Cash Sweep Program Account Agreement pursuant to which

the Prepetition Lender receives approximately 6% of the monies earned from all investment

gains.

61.     Funds from the Sweep Account are transferred to the Debtor's Operating

Account where they are disbursed as necessary via check, wire, EFT or ACH to pay all operating

costs of the Debtor, including payroll,[12] vendors, suppliers, lease parties, professionals, and the

Debtor's taxing authorities.   The Operating Account is also utilized to pay the Debtor's

---

[11]   As set forth below, a minimum daily balance of $250,000 is not invested.

[12]   TriNet HR Corporation ("**TriNet**") issues payroll checks on the Debtor's behalf.  TriNet directly debits the Debtor's Operating Account in advance of processing payroll which is primarily done by direct deposit to employees' bank accounts.  The amount taken out of the Operating Account is for gross payroll billings, which includes net payroll, taxes, benefits, 401k matching, and administrative fees.

responsibilities under the Prepetition Credit Agreement[13] and all expenses incurred by the Non-Debtor Foreign Subsidiaries. The Operating Account is funded so that it maintains a daily balance of $250,000, and is replenished from the Sweep Account at the end of each day. All excess funds (e.g., funds not used to pay the Debtor's expenses or used to maintain the $250,000 Operating Account balance) and funds received by the Debtor (e.g., public offering proceeds, funds from the Sales Agreement, etc.) are transferred from the Operating Account to the Sweep Account. All monies, other than the investment gains and investment related fees associated with the Sweep Account, flow though the Operating Account.

62.     The Collateral Account is a restricted cash account that maintains a balance of $181,211.20. The funds in the Collateral Account are held as collateral for the benefit of the Prepetition Lender under a letter of credit (the "**Letter of Credit**") the Prepetition Lender issued in favor of the Teachers Insurance and Annuity Association of America, which is the Debtor's landlord under its office lease (the "**Landlord**"). Moreover, the use of the cash in the Collateral Account is restricted and all interest generated by the account is transferred to the Operating Account when earned. The interest is then either used to offset bank related fees owed to the Prepetition Lender or transferred to the Sweep Account. The funds in the Collateral Account will revert to the Debtor in the event the Letter of Credit is not called prior to its expiration.

## b.     Non-Debtor Foreign Subsidiary Bank Accounts and Transactions with Non-Debtor Foreign Subsidiaries

63.     The Debtor funds the operations of the Non-Debtor Foreign Subsidiaries. All monies transferred to Sienna S.A. and Sienna S.r.l. were transferred from the Debtor Bank

---

[13]   All fees due to the Prepetition Lender under the Prepetition Credit Agreement are directly debited by the Prepetition Lender from the Operating Account.

Accounts (the Operating Account) to the Non-Debtor Foreign Subsidiary Bank Accounts (the Luxembourg Account or Italy Account, as applicable), with all down-streamed funds accounted for as capital contributions from the Debtor.[14]  The Debtor directly pays for expenses incurred by Creabilis Holdings and Creabilis UK via its Operating Account.  Because the Debtor and Non-Debtor Foreign Subsidiaries do not generate revenue from product sales, monies have not been up-streamed to the Debtor from the Non-Debtor Foreign Subsidiaries.

64.     Funds from the Debtor are down-streamed to Sienna S.A. to pay for Sienna S.A.'s limited operational expenses, which include, among other things, office rent, administrative fees, audit fees, taxes and tax advisory fees, research and development fees, and bank charges.  Generally, such funds were transferred from the Debtor's Operating Account to the Luxembourg Account two times a year, and held in the Luxembourg Account to be used on an as needed basis.  The operational requirements of Sienna S.A. are handled by Vistra (Luxembourg) S.a.r.l. ("**Vistra**"), a third-party service provider that, among other things, processes Sienna S.A.'s monthly bills, fulfills Sienna S.A.'s regulatory filings, oversees third-party audits of the company, and assists with corporate governance matters.  Vistra is reimbursed by funds down-streamed from the Debtor Bank Accounts.  I have been informed that, over the preceding 12 month period, the Debtor transferred approximately $80,000 to the Luxembourg Account to fund the expenses incurred by Sienna S.A.  As of the Petition Date, I understand that the Luxembourg Account has a balance of approximately $25,000.

65.     As noted above, Sienna S.r.l. is an Italian entity that historically served as the early-stage of the Debtor.[15]  Sienna S.r.l. also held certain intellectual property related to

---

[14]   The Debtor has access to the Luxembourg Account to approve payments made by Sienna S.A.  The Debtor does not have access to the Italy Account.

[15]   Sienna S.r.l. discovered SNA-120 and SNA 125, both of which are products from the TBD platform.

SNA-125.  As stated above, prior to the Petition Date, the Debtor began the process of winding down Sienna S.r.l.'s operations and transferring its intellectual property assets to the Debtor.  In connection therewith, prior to the Petition Date, Sienna S.r.l. assigned its intellectual property assets to the Debtor and terminated its leases, contracts, and operations.  As of the Petition Date, I understand that the wind down of Sienna S.r.l. is substantially complete and the Debtor intends to dissolve the entity in due course.[16]  The Debtor estimates that the remaining costs relating to the wind down and dissolution of Sienna S.r.l. are expected to be approximately $860,000 (the "**Italy Dissolution Costs**"), principally on account of Italian tax liabilities associated with the transfer of the intellectual property held at Sienna S.r.l. to the Debtor, vendor payables, legal costs associated with the dissolution, and, most notably, certain employee severance obligations that are required to be paid under applicable Italian law.  Other than the Italy Dissolution Costs, the Debtor expects that no additional cash will be needed to fund Sienna S.r.l.  As of the Petition Date, I understand that the Italy Account has a balance of approximately $800,000.

66.    As stated above, Creabilis Holdings and Creabilis UK have no operations, and Creabilis UK is in the process of being wound down.[17]  Notwithstanding the lack of operations at Creabilis Holdings and Creabilis UK, these entities incur nominal taxes and fees for entity maintenance, which include fees associated with tax returns, accounting, and corporate governance.  All such fees are paid directly by the Debtor as they come due.  I have been

---

[16]  The Debtor historically transferred funds in the ordinary course from its Operating Account to the Italy Account to cover the costs associated with Sienna S.r.l.'s operations (*e.g.*, closing out research commitments for early stage new product research started in 2018, payroll, and corporate governance expenses (rent, accounting, travel, etc.)).  Generally, such funds were transferred three times a year, and held in the Italy Account to be used on an as needed basis.  In addition, the Debtor has transferred funds in connection with the wind down process.  Year to date, the Debtor has funded approximately $1.706 million to the Italy Account.  The bulk of these funds are associated with the Italy Dissolution Costs.  Going forward, the Debtor expects expenditures to complete the wind down and dissolution of this entity to be modest.

[17]  It is expected that the dissolution of Creablis UK will be completed over the next few months, and substantially all of the costs associated with the dissolution have been incurred and paid.  The Debtor intends to fund the remaining costs of the dissolution (if any).

informed that, over the past 12 months, the amount paid by the Debtor to fund Creabilis

Holdings and Creabilis UK was approximately $17,000.[18]

67.    The Debtor is seeking authority, in its sole discretion, to continue to make

payments in the ordinary course of business to the Non-Debtor Foreign Subsidiaries postpetition

(including the Italy Dissolution Costs) if the Debtor determines that it is in the best interests of

its estate to protect the consolidated value of the enterprise.  It is my understanding that all

postpetition payments made to the Non-Debtor Foreign Subsidiaries (aside from the Italy

Dissolution Costs) will be minimal given the limited operations of the entities.

### 3.    *Continued Use of Cash Management System and Debtor Bank Accounts*

68.    I believe that the Cash Management System is an ordinary course,

customary, and essential business practice, the continued use of which is essential to the Debtor's

business operations during this chapter 11 case and its goal of maximizing value for the benefit

of all stakeholders.  To require the Debtor to adopt a new cash management system at this critical

stage would be expensive, impose needless administrative burdens, and cause undue disruption.

Any disruption in the collection and disbursement of funds as currently implemented would

adversely (and perhaps irreparably) affect the Debtor's ability to maximize estate value.

Moreover, such a disruption would be wholly unnecessary because the Cash Management

System provides a valuable and efficient means for the Debtor (and the Non-Debtor Foreign

Subsidiaries) to address its cash management requirements.  Furthermore, to the best of my

knowledge, the Debtor Bank Accounts are at a financially stable institution insured in the United

States by the FDIC, which has also executed the approved Uniform Depository Agreement with

the U.S. Trustee for the District of Delaware.  In addition, the Sweep Account includes money

---

[18]   The Debtor pays a single accounting firm to manage the costs associated with Holdings and Creabilis UK.

market fund holdings, which are invested in U.S. Treasury bills, notes, and other obligations issued or guaranteed by the U.S. Treasury.  For the aforementioned reasons, maintaining the existing Cash Management System without disruption is in the best interests of the Debtor, its estate, the Non-Debtor Foreign Subsidiaries, and all interested parties.  Accordingly, the Debtor is requesting that it be allowed to maintain and continue to use the Cash Management System, including maintenance of its existing Debtor Bank Accounts.

       69.    As part of the relief requested in the Cash Management Motion, and to ensure that its transition into chapter 11 is as smooth as possible, the Debtor is seeking an order authorizing the Debtor to (a) maintain and continue to use the Debtor Bank Accounts, including but not limited to those accounts listed on Exhibit D to the Cash Management Motion, in the same manner and with the same account numbers, styles, and document forms as are currently employed, (b) deposit funds in and withdraw funds from the Debtor Bank Accounts in the ordinary course (including, without limitation, sending funds to and receiving funds from the Non-Debtor Foreign Subsidiary Bank Accounts (as applicable)) by all usual means, including checks, wire transfers, drafts, and electronic fund transfers or other items presented, issued, or drawn on the Debtor Bank Accounts, (c) pay ordinary course bank fees and investment related fees in connection with the Debtor Bank Accounts, including prepetition fees, (d) perform its obligations under the documents and agreements governing the Debtor Bank Accounts, and (e) for all purposes, treat the Debtor Bank Accounts as accounts of the Debtor in its capacity as debtor in possession.

       70.    If the relief requested in the Cash Management Motion is granted, I have been informed that the Debtor will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by the Debtor prior to the Petition Date, other than

those authorized by the Court.  To prevent the possible inadvertent payment of prepetition claims against the Debtor, except those otherwise authorized by the Court, the Debtor will work closely with the bank at which the Debtor Bank Accounts are maintained (the "**Bank**") to ensure appropriate procedures are in place to prevent checks issued by the Debtor prepetition from being honored absent the Court's approval and to ensure that no third-party with automatic debit capabilities is able to debit amounts attributable to the Debtor's prepetition obligations.

71.     The Debtor is requesting that if the Bank implements such handling procedures and then honors a prepetition check or other item drawn on any account that is the subject of the Cash Management Motion (a) at the direction of the Debtor to honor such prepetition check or item, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of a good faith error made despite implementation of reasonable item handling procedures, that it not be deemed to be liable to the Debtor or to its estate on account of such prepetition check or other item being honored postpetition.  I believe that such flexibility is necessary to induce the Bank to continue providing cash management services to the Debtor.

72.     The Debtor is further requesting that the Bank be authorized to deduct from the appropriate Debtor Bank Accounts the Bank's fees and expenses, including all investment related fees and expenses (the "**Bank Fees and Expenses**"), and that no liens on any Debtor Bank Accounts take priority over the Bank Fees and Expenses except as set forth in any deposit agreements between the Debtor and the Bank.

73.     Additionally, because the Debtor Bank Accounts are held at a bank that is a party to a Uniform Depository Agreement with the U.S. Trustee for the District of Delaware, within 15 days of the date of entry of the Interim Order or the Final Order granting the Cash

Management Motion, the Debtor will (a) contact the Bank, (b) provide the Bank with the Debtor's employer identification numbers, and (c) identify its account as held by a debtor in possession in a bankruptcy case and provide the case number.

74.    In the interest of maintaining the continued and efficient operation of the Cash Management System during the pendency of this chapter 11 case, the Debtor is requesting that the Bank be authorized and directed to continue to administer, service, and maintain the Debtor Bank Accounts as such accounts were administered, serviced, and maintained prepetition, without interruption and in the ordinary course (including making deductions for Bank Fees and Expenses), and, when requested by the Debtor in its sole discretion, to honor any and all checks, drafts, wires, electronic fund transfers, or other items presented, issued, or drawn on the Debtor Bank Accounts on account of a claim against the Debtor arising on or after the Petition Date.

75.    The Debtor is further requesting that it be authorized to implement such reasonable changes to the Cash Management System as the Debtor may deem necessary or appropriate, including, without limitation, closing any of the Debtor Bank Accounts and opening any additional bank accounts following the Petition Date (the "**New Accounts**") wherever the Debtor deems that such accounts are needed or appropriate and whether or not the banks in which the accounts are opened are designated approved depositories in the District of Delaware. I understand that, notwithstanding the foregoing, any New Accounts that the Debtor opens will be at banks that have executed a Uniform Depository Agreement with the U.S. Trustee for the District of Delaware, or at such banks that are willing to immediately execute such an agreement, and any New Account that the Debtor opens in the United States will be (a) at the existing Bank or with a bank that is organized under the laws of the United States of America or any state therein and that is insured by the FDIC or the Federal Savings and Loan Insurance Corporation

and (b) designated a "Debtor in Possession" account by the relevant bank.  The Debtor is requesting that the relief sought in the Cash Management Motion extend to any New Accounts and that any order approving the Cash Management Motion provide that the New Accounts are deemed to be Debtor Bank Accounts that are similarly subject to the rights, obligations, and relief granted in such order.  I understand that the Debtor will provide the U.S. Trustee with prompt notice of any Debtor Bank Accounts that it closes or New Accounts that it opens.  In furtherance of the foregoing, the Debtor is also requesting that the relevant bank be authorized to honor the Debtor's request to open or close (as the case may be) such Debtor Bank Account(s) or New Account(s).

**4.    *Continued Use of Existing Checks and Business Forms***

76.    To minimize expenses to its estate, the Debtor is seeking authorization to continue using all checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtor's status as debtor in possession; *provided, however*, that in the event the Debtor generates new checks during the pendency of this chapter 11 case other than from its existing stock of checks, such checks will include a legend referring to the Debtor as "Debtor in Possession" and provide the corresponding bankruptcy case number.  The Debtor is also seeking authority to use all correspondence and other business forms (including, without limitation, letterhead, purchase orders, and invoices) without reference to the Debtor's status as a debtor in possession.

77.    I believe that changing the Debtor's existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtor's estate. Further, such changes would disrupt the Debtor's business operations and would not confer any benefit upon parties that deal with the Debtor.  For example, changing the Debtor's existing checks, correspondence, and other business forms will not provide a benefit to the parties that

transact with the Debtor as these parties will have received notice of the bankruptcy filing, and they may indirectly bear the costs of such changes to the extent they are creditors of the Debtor. For these reasons, the Debtor is requesting that it be authorized to use its existing check stock, correspondence, and other business forms without being required to place the label "Debtor in Possession" on any of the foregoing.

### 5.    *Waiver of Certain Requirements of U.S. Trustee*

78.    The Debtor is further requesting, pursuant to sections 105(a) and 363 of the Bankruptcy Code, that the Court grant a waiver of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with (a) the Debtor's existing practices under the Cash Management System or (b) any action taken by the Debtor in accordance with any order granting the Cash Management Motion or any other order entered in this chapter 11 case.  I understand that, in order to supervise the administration of chapter 11 cases, the U.S. Trustee has established certain operating guidelines for debtors-in-possession.  I have been informed that these requirements (the "**UST Requirements**") require chapter 11 debtors to, among other things:  (a) close all existing bank accounts and open new debtor in possession bank accounts, (b) establish one debtor in possession account for all estate monies required for the payment of taxes, including payroll taxes, (c) maintain a separate debtor in possession account for cash collateral, and (d) obtain checks for all debtor in possession accounts that bear (i) the designation "Debtor In Possession," (ii) the bankruptcy case number, and (iii) the type of account.  It is my understanding that the UST Requirements are designed to demarcate clearly prepetition transactions and operations from postpetition transactions and operations, and to prevent the inadvertent postpetition payment of prepetition claims.  As noted above, I believe that (a) the Debtor will be able to work with the Bank to ensure that this goal of separation between the prepetition and postpetition periods is observed and (b) enforcement of

certain of these UST Requirements would disrupt the Debtor's operations and impose a financial burden on the Debtor's estate.

79.    Because the Debtor's Cash Management System is integral to the operation and administration of its business and the businesses of the Non-Debtor Foreign Subsidiaries, I believe that requiring the Debtor to meet the UST Requirements to close all existing bank accounts and open new debtor in possession accounts would impose a significant burden on the Debtor.

80.    Further, requiring the Debtor to abide by the UST Requirements to establish a specific debtor in possession account for tax payments (including payroll taxes) and to deposit to such accounts sufficient funds to pay any tax liability (when incurred) associated with the Debtor's payroll and other tax obligations is not necessary here.  I believe that the sole Debtor can pay its tax obligations most efficiently from its existing Operating Account in accordance with its existing practices, and the U.S. Trustee will have the ability to monitor the flow of funds into and out of such account from the Debtor's monthly operating reports.  The creation of new debtor in possession accounts designated solely for tax obligations would therefore be unnecessarily burdensome.

81.    In addition, I believe that it is unnecessary to require the Debtor to abide by the UST Requirement to establish specific debtor in possession accounts for cash collateral. It is my understanding that, as set forth in the Cash Collateral Motion, the Debtor has provided significant safeguards to ensure that parties with security interests in the Debtor's cash collateral are adequately protected, and that such parties have been provided with notice of the proposed use of such cash collateral.

### 6.   *Continued Deposit Practices*

82.    As part of the Cash Management System, the Debtor routinely deposits into and holds funds in the Debtor Bank Accounts (the "**Deposit Practices**").  The Debtor is requesting (a) authorization to continue to deposit funds in accordance with existing practices under the Cash Management System, subject to any reasonable changes the Debtor may implement to the Cash Management System, and (b) a waiver of the deposit requirements of section 345(b) of the Bankruptcy Code, on an interim basis, to the extent that such requirements are inconsistent with the Deposit Practices.  For the avoidance of doubt, to the extent any of the Debtor Bank Accounts may be classified as investment accounts, or to the extent any of the Debtor's routine deposits into Debtor Bank Accounts may be regarded as investment activity, the Debtor is seeking authorization to continue to deposit funds into such Debtor Bank Accounts in accordance with existing practices, notwithstanding the requirements of section 345(b) of the Bankruptcy Code.

### 7.   *Funds in Non-Debtor Foreign Subsidiary Bank Accounts*

83.    The Debtor is requesting authority to allow, at its discretion, all funds deposited in the Non-Debtor Foreign Subsidiary Bank Accounts prior to the Petition Date to remain in the Non-Debtor Foreign Subsidiary Bank Accounts used by Sienna S.A. and Sienna S.r.l., as applicable, rather than seeking the transfer of any such funds from the Non-Debtor Foreign Subsidiary Bank Accounts to one or more of the Debtor Bank Accounts.

### 8.   *Maintenance and Continuance of Intercompany Transaction*

84.    As noted above, in the ordinary course, cash is transferred from the Debtor Bank Accounts to the Non-Debtor Foreign Subsidiary Bank Accounts for the payment of expenses and operating costs (the "**Intercompany Transactions**") of the Non-Debtor Foreign

Subsidiaries.   All such deposits and payments are reflected on the books and records of the Debtor.

85.    The Debtor is seeking authority to pay for or otherwise reconcile prepetition Intercompany Transactions if the Debtor, in its sole discretion, deems such payment or reconciliation necessary and in the best interests of the Debtor's estate and other parties in interest.  Additionally, the Debtor is seeking authority, in its sole discretion, to set off prepetition obligations arising out of the Intercompany Transactions.   Finally, the Debtor is seeking authority, in its sole discretion, to continue to engage in Intercompany Transactions postpetition in the ordinary course of business.

86.    The Debtor maintains records of all fund transfers and can ascertain, trace, and account for Intercompany Transactions.   I believe that continued funding of the Intercompany Transactions is in the best interests of the Debtor's estate and its stakeholders because, among other things, discontinuing the Intercompany Transactions may jeopardize the Debtor's ability to (a) maintain the intellectual property held by Sienna S.A. (held through Creabilis Holdings), (b) finalize the wind down of Sienna S.r.l. in an orderly fashion so as to avoid the need for foreign insolvency proceedings and to avoid claims that may interfere with the transfer of Sienna S.r.l.'s intellectual property to the Debtor, or (c) continue the dissolution of Creabilis UK.

### C.    Employee Wage and Benefits Motion

87.    Pursuant to the *Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Pay and Honor Prepetition Compensation and Benefit Obligations and (B) Maintain and Continue Compensation and Benefit Programs and (B) Granting Related Relief* (the "**Employee Wage and Benefits Motion**"), the Debtor is seeking entry of interim and final orders (a) authorizing, but not directing, the Debtor to (i) pay and honor prepetition

obligations incurred or related to its employee compensation and benefit programs and all related fees and costs, including the PEO Fees (as defined below) and any other amounts owed to third-party administrators (collectively, the "**Compensation and Benefit Obligations**"), and (ii) maintain, continue, alter, modify, or discontinue the compensation and benefit programs in the ordinary course of business.

### 1.    *Debtor's Workforce*

88.    The Debtor currently employs 18 full-time employees (the "**Employees**"), all of whom are salaried and work at the Debtor's headquarters in Westlake Village, California. As stated above, none of the Employees are unionized, and the Debtor is not a party to any collective bargaining agreement.  The Debtor has a co-employer relationship with TriNet, a professional employer organization (together with its affiliates, the "**PEO**"), which I understand serves as the legal employer of the Employees for administrative purposes and handles certain human-resources related functions, including payroll and employee benefits for the Employees.[19] Although the Debtor maintains control and oversight over the Employees' day-to-day job responsibilities and requirements, I understand and believe that the PEO provides the Debtor with critical support and allows the Debtor to realize cost savings by eliminating the need to employ additional human resources professionals and reducing the cost of participating in certain benefit programs as compared to participating in those programs without a third-party intermediary like the PEO.

89.    The Debtor also regularly utilizes the services of contract workers (the "**Contract Workers**" and, together with the Employees, the "**Workforce**") to fill certain critical and immediate business needs of the Debtor and provide the Debtor with the necessary

---

[19]   Employees at the Vice President level and above (the "**Executives**") are retained pursuant to individual employment agreements with the Debtor.  All other Employees are retained on an offer letter basis.

flexibility to meet its operational needs in a cost-effective manner.  The Contract Workers provide clinical and non-clinical operational support, as well as financial, legal, and administrative services, as needed.  The Debtor typically works with between five and 15 Contract Workers at any given time, depending on the status of current operations, which include certain former Employees that the Debtor terminated pursuant to the Workforce Reductions (as defined below) that have been brought back on a part-time independent contractor basis.

90.    As stated above, in January 2019, the Debtor began implementation of a corporate restructuring plan to refocus its resources on its lead product candidate, reduce operational costs, and preserve capital, pursuant to which the Debtor terminated 20 Employees (the "**January Workforce Reduction**").    In September 2019, the Debtor terminated an additional six Employees in an effort to further streamline operations and reduce go-forward operating costs (the "**September Workforce Reduction**" and, together with the January Workforce Reduction, the "**Workforce Reductions**").  I have been informed that the Debtor incurred approximately $0.8 million and $0.7 million in employee benefits and severance-related costs in connection with the January Workforce Reduction and September Workforce Reduction, respectively, all of which was paid prior to the Petition Date.[20]  In addition to the Workforce Reductions, I understand that several of the Debtor's Employees voluntarily resigned in the period leading up to the Petition Date.

91.    I believe that the Debtor's remaining Workforce is critical to its business and efforts to maximize value in this chapter 11 case.  As evidenced by the Workforce

---

[20]    As discussed in greater detail below, the Debtor covers the cost of COBRA (as defined below) benefits for terminated Employees pursuant to the Severance Plan or the Executive Severance (each, as defined below). Although all severance obligations in connection with the Workforce Reductions were paid in full prior to the Petition Date, the Debtor has certain remaining obligations to cover COBRA costs with respect to certain employees terminated in connection with the September Workforce Reduction, which the Debtor is requesting authority to honor in the ordinary course.

Reductions, the Debtor has made significant efforts to minimize cash burn and to ensure that the remaining Workforce comprises personnel vital to the Debtor's efforts in this chapter 11 case. I believe that the Debtor's success depends, to a significant extent, upon its ability to retain qualified personnel, and the loss of certain Employees or Contract Workers would impede the Debtor's efforts to maximize value in this chapter 11 case.  I understand and believe that replacing the Workforce would be difficult for the Debtor as certain individuals have an essential working knowledge of the Debtor's business and significant specialized scientific and regulatory knowledge with respect to the Debtor's assets and development programs.   Moreover, I understand and believe that there are limited individuals in the Debtor's industry with the breadth of skills and experience required to successfully develop and gain regulatory approval of biopharmaceutical products and medical devices.   Consequently, I believe that the loss of the Debtor's Workforce at this critical juncture would have a materially adverse impact on the Debtor's business and threaten the Debtor's ability to maximize value for the benefit of all stakeholders in this chapter 11 case.

## 2. *Wages, Salaries, and Other Compensation*

92.     The Debtor maintains various compensation and benefits programs (collectively, the "**Compensation and Benefits Programs**") and pays administrative fees, including PEO Fees, in connection therewith.  The Compensation and Benefits Programs consist of the following:  (a) Employee Wage Obligations, (b) Non-Employee Obligations, (c) Bonus Programs, (d) PTO Policy, (e) Withholding Obligations, (f) Health and Welfare Plans, (g) Retirement Plan, (h) Severance Plan, and (i) Reimbursable Expense Policy and Corporate Credit Cards (each, as defined and discussed in greater detail below).

### a. <u>Employee Wage Obligations</u>

93.     In the ordinary course of business, I understand that the Debtor pre-funds

the PEO for wages and salaries owed to the Employees (the "**Employee Wage Obligations**") and the PEO, in turn, administers and delivers the Employee Wage Obligations to the Employees. Employees are paid "current" on a semi-monthly basis on the 15th and last day of each month (or, if such day is a holiday or weekend, on the immediately preceding business day). The PEO typically direct debits the Debtor's bank account two days in advance for the amount of the gross payroll, including Employee Wage Obligations and Withholding Obligations (discussed below).

94.     As part of the Debtor's efforts to retain key personnel leading up to the commencement of this chapter 11 case and in light of the added responsibilities falling to the Debtor's remaining Employees following the Workforce Reductions, the Debtor provided salary increases to certain Employees prior to the Petition Date. I have been informed that the Debtor estimates that its average semi-monthly gross wage obligations will be approximately $167,000 taking into account the salary increases and the Workforce Reductions, which I understand and believe is significantly lower than the Debtor's prior average semi-monthly gross payroll. I understand that, as of the Petition Date, the Debtor estimates that the aggregate amount owed on account of accrued and unpaid prepetition Employee Wage Obligations is approximately $20,000.

### b.      <u>Non-Employee Obligations</u>

95.     As noted above, the Debtor utilizes Contract Workers for the performance of services critical to the Debtor's operations, who are engaged directly by the Debtor. The Debtor incurs costs for the services provided by the Contract Workers (the "**Contract Worker Obligations**"), which are typically paid through monthly invoices submitted directly to the Debtor. I have been informed and believe that the Contract Worker Obligations generally are not expected to exceed $30,000 in any given month, but will fluctuate

based on the particular need for the various services that these Contract Workers provide. I understand that, as of the Petition Date, the Debtor estimates that the aggregate amount owed on account of accrued and unpaid prepetition Contract Worker Obligations is approximately $25,000.

96.    The Debtor also pays the fees of certain individuals serving on the Debtor's Board of Directors (the "**Board**") and certain corporate advisors (collectively, the "**Board and Advisory Fees**" and, together with the Contract Worker Obligations, the "**Non-Employee Obligations**"), in each case, in the ordinary course of business. I have been informed that the Debtor pays approximately $115,000 in aggregate Board and Advisory Fees ($78,000 to Board members and $37,000 to corporate advisors) on a quarterly basis. I understand that, as of the Petition Date, the Debtor does not owe any amounts on account of accrued and unpaid prepetition Board and Advisory Fees.[21]

### c.    Bonus Programs

97.    The Debtor maintains a performance-based cash bonus program for Employees (the "**Cash Bonus Program**")[22] and equity incentive plans (collectively, the "**Equity Incentive Plans**"), and also historically maintained an employee stock purchase plan (the "**ESPP**" and, together with the Cash Bonus Program and the Equity Incentive Plans, the "**Bonus Programs**"), which are described in greater detail below. The Debtor is seeking authority to continue the Bonus Programs solely to the extent necessary to honor equity awards issued prior to the Petition Date; however, it is ***not*** seeking authority to make future cash bonus

---

[21]    I have been informed that, prior to the Petition Date, the Debtor funded Board and Advisory Fees owed for the third quarter of 2019 (i.e., through September 30, 2019). I understand that the Debtor's next ordinary course payment on account of Board and Advisory Fees is expected to occur in December in connection with such obligations for the fourth quarter of 2019.

[22]    Executive Employees are eligible to receive separate bonuses and incentives pursuant to their respective employment agreements (the "**Executive Bonuses**").

or equity awards (although it reserves the right to seek such relief in the future).  ***Instead***, prior to the Petition Date, the Debtor made certain retention payments to Executive Employees pursuant to a management retention plan (the "**MRP**"), and the Debtor's Board approved (but no payments were made pursuant to) a key employee incentive plan for Executive Employees (the "**KEIP**") and a key employee retention plan for non-Executive Employees (the "**KERP**"[23] and, together with the MRP and KEIP, the "**Incentive Plans**"); I understand that the Debtor intends to seek Court authority to implement the KEIP and KERP on a postpetition basis pursuant to a separate motion (the "**KEIP/KERP Motion**"), which will contain the relevant details of the Incentive Plans.[24]  Subject to Court approval of the KEIP and KERP, I understand that such plans will replace future Executive Bonuses, awards under the Cash Bonus Program, the cash portion of the Executive Severance, and the Severance Plan on a postpetition basis for participating Employees.

98.    As noted above, the Debtor maintains a Cash Bonus Program.  I have been informed that, as of the Petition Date, all bonuses under the Cash Bonus Program for 2018 have been paid in full, and no amounts are outstanding on account of the Cash Bonus Program.  As noted above, the Debtor is not requesting authority to make future awards under the Cash Bonus Program (although it is reserving the right to seek such relief in the future).

99.    The Debtor also maintains Equity Incentive Plans, which I believe are structured to incentivize award recipients to deliver superior performance to the Debtor at no cost to the Debtor's creditors.  The Equity Incentive Plans provide for a variety of stock-based

---

[23]  Certain prepetition payments were made to covered employees pursuant to the KERP.

[24]  For the avoidance of doubt, the Debtor does not intend to seek Court approval of the MRP payments as all such payments were made prior to the Petition Date, but has included a description herein to provide a fulsome overview of the Incentive Plans.  The MRP payments are subject to a full or partial vesting clawback in the event a recipient voluntarily leaves the Debtor or is terminated for cause prior to applicable vesting milestones.

compensation awards, including stock options,[25] stock appreciation rights, restricted stock awards, restricted stock unit awards, and other stock-based awards, which are designed to align Employee and director interests with the interests of the Debtor's financial stakeholders by linking compensation to the Debtor's performance.  I understand that equity awards granted under the Equity Incentive Plans vest based on the terms in the respective equity award agreements, which generally provide for vesting over a number of years or based on performance milestones.  I have been informed that, as of the Petition Date, there were approximately 4.22 million shares of common stock subject to outstanding awards granted under the Equity Incentive Plans in the aggregate.  As noted above, the Debtor does not intend to make further awards under the Equity Incentive Plans postpetition, rather the Debtor is seeking authority only to continue the Equity Incentive Plans to the extent necessary to administer prior awards and to honor such outstanding awards in the ordinary course of business.

100.    The Debtor also historically maintained an ESPP, which enabled participating Employees to purchase the Debtor's stock at pre-specified time periods with funds withheld from the Employee's paychecks; however, in light of this chapter 11 case, I understand that the Debtor does not intend to continue the ESPP.  Accordingly, I understand that the Debtor is seeking relief with respect to the ESPP solely to the extent necessary to facilitate return of employee contributions for purchases of securities that will not be issued under the ESPP.

### d.    PTO Policy

101.    The Debtor, through the PEO, maintains a paid time-off policy for Employees (the "**PTO Policy**"), which is comprised of vacation, holiday, parental leave,

---

[25] On August 1, 2019, in connection with the Debtor's efforts to retain key Employees, the Debtor's Board approved a repricing of outstanding stock options of current Employees, certain corporate advisors, and certain key consultants that were previously granted, reducing the exercise price of such stock options to $0.71, the closing price of the Debtor's common stock as of August 6, 2019.

bereavement, sick days, and other personal leave.  In the ordinary course of business, the Debtor compensates its Employees for accrued and unused days upon an Employee's termination. I have been informed that, as of the Petition Date, the Debtor estimates that it owes approximately $437,000 on account of accrued and unpaid prepetition PTO Policy obligations.

### e. **Withholding Obligations**

102.    I understand that, for each applicable pay period, the PEO deducts certain amounts directly from Employees' paychecks, including, without limitation, (a) garnishments, child support and service charges, and similar deductions and (b) other pre- and after-tax deductions payable pursuant to certain of the Health and Welfare Plans discussed below, such as an Employee's share of healthcare benefits and insurance premiums, 401(k) contributions, legally-ordered deductions, and miscellaneous deductions (collectively, the "**Deductions**"), and the PEO forwards such amounts to various third-party recipients.  I have been informed that, on average, the monthly Deductions are approximately $32,000 in the aggregate.

103.    I understand that the PEO is also required by law to withhold from the Employee Wage Obligations amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "**Employee Payroll Taxes**") and to remit such amounts to the applicable taxing authorities.  In addition, the PEO is required to make matching payments for, among other things, Social Security and Medicare taxes and to pay, based on a percentage of gross payroll, state, and federal unemployment insurance, employment training taxes, and state disability insurance contributions (collectively, the "**Employer Payroll Taxes**" and, together with the Employee Payroll Taxes, the "**Payroll Taxes**" and, collectively with the Deductions, the "**Withholding Obligations**").  I have been informed that the average monthly amount of Payroll Taxes is approximately $106,000 in the aggregate.

104.    As of the Petition Date, I understand that the Debtor does not have any accrued and unpaid prepetition Withholding Obligations.[26]

**f.        Health and Welfare Plans**

105.    Through the PEO, the Debtor offers several health and welfare benefit plans (the "**Health and Welfare Plans**") for Employees, including, but not limited to, (a) medical care, dental care, and vision care, and applicable coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**"), (b) medical and dependent care flexible spending accounts, (c) short-term and long-term disability insurance, and (d) life and accidental death and dismemberment insurance.  The Health and Welfare Plans are provided through insurance programs and policies that are obtained directly by the PEO, which are funded by the Debtor and Employee contributions.  I have been informed that, on average, the Debtor pays approximately $21,500 per month on account of the Health and Welfare Plans, all of which is funded through the PEO.  I understand that, as of the Petition Date, the Debtor does not have any accrued and unpaid prepetition costs under the Health and Welfare Plans.

**g.        Retirement Plan**

106.    The Debtor maintains a retirement savings plan for Employees pursuant to section 401(k) of the Internal Revenue Code (the "**Retirement Plan**"), which is administered by Transamerica Retirement Solutions, LLC ("**Transamerica**").  I understand that Employees participating in the Retirement Plan may contribute up to the federal statutory cap of $19,000 per year (or $25,000 per year for Employees age 50 or over).  I understand that the Debtor matches

---

[26]  I have been informed that prior to the Petition Date, the Debtor was audited by the California Employment Development Department ("**CEDD**") and assessed $439,982.37 based upon CEDD's determination that certain non-Employees of the Debtor, including, among others, members of the Board and certain corporate advisors, are employees of the Debtor and that the Debtor underwithheld certain taxes and other amounts as a result.  I understand that the Debtor disputes this assessment in its entirety and is not seeking authority to pay any related amounts pursuant to this Motion.

100% of contributions by its Employees to the Retirement Plan up to 4% of an Employee's salary, subject to a maximum of $11,200. The cost of administering the Retirement Plan is included in the PEO fees, and the Debtor's matching contributions are paid to the PEO as part of its semi-monthly gross payroll, with the PEO being responsible for remitting the matching contributions to Transamerica. I have been informed that, on average, the Debtor incurs approximately $4,600 per payroll period on account of matching contributions to the Retirement Plan. I understand that, as of the Petition Date, the Debtor does not have any accrued and unpaid prepetition costs under the Retirement Plan.

### h.      Severance Plan

107.      The Debtor maintains a severance plan for non-Executive Employees (the "**Severance Plan**"), pursuant to which eligible Employees receive a single lump sum cash payment equal to ten weeks of the Employee's base salary, plus COBRA coverage for a corresponding amount of time. Executives receive severance benefits under their individual employment agreements, which generally provide for lump sum payment of six months' salary for Vice Presidents and twelve months' salary for the Chief Executive Officer (and are higher in the case of a change of control), as well as COBRA coverage for a corresponding amount of time (the "**Executive Severance**").[27] As previously noted, the Debtor has paid all prepetition obligations on account of the Severance Plan and Executive Severance to Employees terminated in connection with the Workforce Reductions; however, I have been informed that the former Employees affected by the September Workforce Reduction are entitled to reimbursement from

---

[27] For the avoidance of doubt, approval of the Key Employee Plans will result in forfeiture of Executive Severance for current Executives and does not apply to Executives terminated prior to the Petition Date. Accordingly, the Debtor is seeking authority to continue to honor its Executive Severance obligations, including reimbursement for COBRA coverage, to Executives terminated prior to the Petition Date.

the Debtor for COBRA coverage, which the Debtor is seeking authority to honor in the ordinary course of business.

### i.    Reimbursable Expense Policy and Corporate Credit Cards

108.    In the ordinary course of business, the Debtor reimburses Employees for certain approved, legitimate expenses incurred within the scope of their employment, including expenses for air travel, lodging, meals, parking, rental cars and location transportation, cellular phones, and certain other business related expenses ("**Reimbursable Expense Policy**").

109.    I understand that the Debtor's policy requires Employees seeking reimbursement to submit an expense report and supporting documentation within three months of when the expense is incurred, which will be approved subject to review by the Employee's supervisor.    Expenses submitted after three months and requests for an exception to the Reimbursable Expense Policy require approval of the Corporate Controller.    In all cases, reimbursement is contingent on the Debtor's determination that the charges are for legitimate, reimbursable business expenses.    The Debtor makes weekly reimbursements to Employees on account of reimbursable expenses.    I have been informed that, on average, the Debtor estimates that it incurs approximately $20,000 per month on account of the Reimbursable Expense Policy; however, this number generally fluctuates from month-to-month.

110.    I have been informed that approximately four Employees incur expenses through the use of corporate credit cards (the "**Corporate Credit Cards**") that the Debtor maintains with Silicon Valley Bank ("**SVB**").    The Debtor remits the requisite payments incurred on the Corporate Credit Cards directly to SVB via online banking on a monthly basis.    I have been informed that, on average, the reimbursements on account of the Corporate Credit Cards are approximately $25,000 per month.

111.    I understand and believe that is difficult for the Debtor to determine the exact amount of reimbursable expenses outstanding as of the Petition Date because, among other things, Employees may have expenses that they have yet to submit to the Debtor for reimbursement.  I have been informed that, as of the Petition Date, the Debtor estimates that the total amount of accrued and unpaid prepetition amounts owed to Employees and SVB on account of the Reimbursable Expense Policy and the Corporate Credit Cards is $10,000.

**3.    *PEO Fees and Insurance Costs***

112.    In the ordinary course business, the Debtor uses the services provided by the PEO to administer its payroll and employee plans, benefits, policies, and programs (the "**PEO Fees**").  I have been informed and believe that the PEO Fees consist of a monthly service fee that is equal to approximately $142 per Employee and administrative charges necessary to manage the benefits provided by the PEO.  Annually, the Debtor incurs approximately $1,700 in PEO Fees.  The Debtor pays the PEO Fees to the PEO on a semi-monthly basis and does not have any accrued and unpaid prepetition PEO Fees as of the Petition Date.

113.    The Debtor also maintains policies for workers' compensation insurance and employment practices liability insurance through the PEO, which provide coverage of up to $1 million and $2 million, respectively.  The premiums and other fees for such insurance policies are in addition to the PEO Fees paid by the Debtor to the PEO for its services and are based on a percentage of wages, which is approximately 0.6%.

**D.    Epiq Retention Application**

114.    Pursuant to the *Application of Debtor for Entry of Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of Petition Date* (the "**Epiq Retention Application**"), the Debtor is seeking entry of an order appointing Epiq Corporate    Restructuring,    LLC    ("**Epiq**")    as    claims    and    noticing    agent

(the "**Claims and Noticing Agent**") in the chapter 11 case, effective as of the Petition Date, to assume full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in this chapter 11 case.  It is my understanding that the Debtor's selection of Epiq to act as the Claims and Noticing Agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)*, in that the Debtor has obtained and reviewed engagement proposals from at least two other Court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, I understand that, based on all engagement proposals obtained and reviewed, Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.

115.    Although the Debtor has not yet filed its schedules of assets and liabilities, it anticipates that there will be in excess of 200 entities to be noticed.  In view of the number of anticipated claimants and the complexity of the Debtor's business, I understand that the appointment of a claims and noticing agent is required by Local Rule 2002-1(f), and I believe that it is otherwise in the best interests of both the Debtor's estate and its creditors.

E.    **Equity Trading Motion**

116.    Pursuant to the *Motion of Debtor for Entry of Interim and Final Orders (I) Establishing Notice and Hearing Procedures for Trading of Sienna Equity Securities and (II) Granting Related Relief* (the "**Equity Trading Motion**"), the Debtor is seeking entry of interim and final orders (a) establishing notice and hearing procedures that must be satisfied before certain transfers of the Debtor's equity securities or of any beneficial interest therein may be deemed effective and (b) allowing for a hearing with respect to the prospective application of such procedures if the Debtor raises a timely objection.

117.    The Debtor has recently incurred, and is currently incurring, significant net operating losses ("**NOLs**") within the meaning of Section 172(c) of Title 26 of the United

States Code, the Internal Revenue Code of 1986, as amended ("**IRC**").  The Debtor estimates that, as of December 31, 2018, it has federal NOLs of approximately $48.8 million, state NOLs of approximately $11.2 million, and foreign NOLs of approximately $41.3 million, as well as certain federal research and development tax credit carryforwards totaling approximately $2.9 million (collectively, the "**Tax Attributes**").  Pursuant to the Equity Trading Motion, the Debtor is seeking authorization to protect and preserve its valuable Tax Attributes, which may be available to offset future taxable income and are assets of the estate.

118.    Specifically, I am informed and believe that unrestricted trading of the Debtor's equity securities could adversely affect the Debtor's Tax Attributes if too many 5% or greater blocks of the Debtor's equity securities are created or too many shares are added to or sold from such blocks, such that, together with previous trading by any person or entity holding (or deemed to hold) 5% or more of the common stock of the Debtor (the "**Substantial Shareholders**") at any time during the preceding three-year or shorter period, as applicable (the "**Testing Period**"), an "ownership change" within the meaning of IRC Section 382 is triggered prior to consummation and outside of the terms of a confirmed chapter 11 plan.

119.    Upon information and belief, the Debtor needs the ability to monitor and object to changes in ownership of its equity securities to preserve flexibility in crafting a plan of reorganization that qualifies for relief under one of the special bankruptcy provisions and, thus, maximize the Debtor's ability to reduce federal income taxes by offsetting its income earned after reorganization with Tax Attributes.

120.    Therefore, the Debtor is seeking to establish notice and hearing procedures regarding the trading of its equity securities that must be complied with before such trades or transfers become effective.  If no trading restrictions regarding equity securities are imposed by

the Court, upon information and belief, unrestricted trading or transfers of equity securities could severely limit or even eliminate the Debtor's ability to use its Tax Attributes, a valuable asset of the Debtor's estate, and could have significant negative consequences for the Debtor, its estate, and the chapter 11 process.

121.    Upon information and belief, absent granting the relief requested in the Equity Trading Motion, the Debtor could be irreparably harmed by the mere filing of the Equity Trading Motion.  Upon information and belief, if the Debtor filed the Equity Trading Motion in accordance with the usual notice procedures set forth in the Bankruptcy Rules, it is likely that a flurry of trading in stock of the Debtor could immediately follow.  Parties holding such stock might rush to transfer their stock before the restrictions on such trading are imposed by the Court.  Upon information and belief, such trading would put the Tax Attributes in jeopardy and would therefore be counterproductive to the Debtor's objectives in seeking the relief sought in the Equity Trading Motion.  Accordingly, I believe that there is an immediate need to establish the notice and hearing provisions regarding trading in equity securities in the Debtor, as detailed in the Equity Trading Motion.

### F.    Insurance Motion

122.    Pursuant to the *Motion of Debtor for Entry of Order (I) Authorizing Debtor to (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder and (B) Renew, Revise, Extend, Supplement, Change, or Enter Into New Insurance Policies and (II) Granting Related Relief* (the "**Insurance Motion**"), the Debtor is seeking entry of an order authorizing, but not directing, the Debtor to (a) maintain its existing Insurance Policies (as defined below) and pay on an interrupted basis all premiums, deductibles, administration costs, Broker Fees (as defined below) and other related fees and costs arising thereunder or in connection therewith that are paid by the Debtor in the ordinary course of

business (the "**Insurance Obligations**"), including any prepetition Insurance Obligations, and (b) renew, revise, extend, supplement, change the Insurance Policies, or enter into new insurance policies as needed.

123.    As described in the Insurance Motion, in the ordinary course of business, the Debtor maintains numerous insurance policies with various insurance providers that provide coverage for, among other things, general commercial liability, business personal property, business automobile liability, umbrella liability, directors' and officers' liability, fiduciary liability, privacy and data liability, pollution liability, goods in transit, and employee benefits liability (collectively, the "**Insurance Policies**"), as summarized in Exhibit B to the Insurance Motion.  I have been informed and believe that, in 2019, the Debtor has incurred and paid a total of approximately $1,863,175[28] in the aggregate in premiums and other Insurance Obligations under the terms of its existing Insurance Policies.  In addition, the Debtor may make retroactive adjustments in the ordinary course of business with respect to one or more of the Insurance Policies, as applicable.  I understand that all premiums due and owing for the Insurance Policies have been paid in full and, accordingly, there are no outstanding amounts that have accrued prepetition and are unpaid on account thereof.

---

[28]  This amount does not include costs attributable to the "tail" coverage for the Debtor's directors' and officers' liability insurance policy (the "**D&O Tail Coverage**"), which the Debtor purchased prior to the Petition Date. The D&O Tail Coverage provides for a 6-year extended reporting period for claims based on wrongful acts committed or allegedly committed prior to a sale of substantially all of the Debtor's assets, a change in control, or the effective date of a plan of reorganization in this chapter 11 case.  I have been informed that the Debtor paid $5,042,004.85 in the aggregate in net premiums for the D&O Tail Coverage, and that there are no amounts outstanding on account of the D&O Tail Coverage as of the Petition Date.

124.    The Debtor employs Marsh & McLennan Insurance Agency LLC (the "**Broker**") to assist with the procurement and negotiation of its Insurance Policies.  The Broker provides services to and receives compensation (the "**Broker Fees**") from the Debtor for such services.  The Broker Fees are generally determined based on a disclosed percentage of the insurance premiums, which ranges from approximately 15% to 20% depending on the Insurance Policy, and are included in the premiums paid on account of the Insurance Policies.  For certain of the Insurance Policies, such as those providing coverage for directors' and officers' liability, the Broker Fees are subject to a discount in the form of a rebate.  I understand that, as of the Petition Date, there are no outstanding amounts of Broker Fees.

125.    The Insurance Policies are essential to the ongoing operation of the Debtor's business.  In many cases, the coverage provided under the Insurance Policies is essential for preserving the value of the Debtor's assets and such coverage is required by various regulations, laws, and contracts that govern the Debtors' business operations.  Accordingly, for the reasons set forth herein and in the Insurance Motion, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in compliance with contractual and regulatory requirements and to safeguard the value of its estate.

### G.    Tax Motion

126.    Pursuant to the *Motion of Debtor for Entry of Order (I) Authorizing Payment of Prepetition Taxes and Fees and (II) Granting Related Relief* (the "**Tax Motion**"), the Debtor is seeking entry of an order authorizing, but not directing, the Debtor to pay, in its sole discretion, any prepetition tax and fee obligations, including, without limitation, income taxes, franchise taxes, property taxes, sales and use taxes, regulatory and licensing fees, annual report taxes, and any other types of taxes, fees, assessments, or similar charges and any penalty,

interest, or similar charges in respect of such taxes (collectively, the "**Taxes and Fees**"), including any prepetition Taxes and Fees subsequently determined upon audit or otherwise, to the Taxing Authorities (as defined below).

127.    Prior to the Petition Date, the Debtor incurred an assortment of Taxes and Fees that are remitted periodically to certain federal, state, provincial, and local taxing, regulatory, and other governmental authorities in the United States, including, without limitation, those listed on Exhibit B to the Tax Motion (collectively, the "**Taxing Authorities**").   I have been informed that, in 2018, the Debtor paid approximately $356,157 on account of Taxes and Fees.

128.    Although, as of the Petition Date, I believe that the Debtor was substantially current in the payment of assessed and undisputed Taxes and Fees, certain Taxes and Fees attributable to the prepetition period are not yet due.  It is my understanding that certain prepetition Taxes and Fees may not be due until the applicable monthly, quarterly, or annual payment dates—in some cases not until next year.  As of the Petition Date, I believe that there are no Taxes and Fees that will become due and payable to the Taxing Authorities in the ordinary course of business in the next 30 days.

129.    I believe that the continued payment of the Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtor's estate, thereby promoting its prospects for a value-maximizing chapter 11 process.  It is my understanding that, if such obligations are not timely paid, the Debtor will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws, including whether (a) the obligations are priority, secured, or unsecured in nature, (b) the obligations are proratable or fully

prepetition or postpetition, and (c) penalties, interest, attorneys' fees and costs can continue to accrue on a postpetition basis and, if so, whether such penalties, interest, attorneys' fees, and costs are priority, secured, or unsecured in nature.

130.     Moreover, I have been advised that certain of the Taxes and Fees may be considered to be obligations as to which the Debtor's officers and directors may be held directly or personally liable in the event of nonpayment.  In such events, I believe that collection efforts by the Taxing Authorities would provide obvious distractions to the Debtor and its officers and directors in their efforts to maximize value in this chapter 11 case.  Accordingly, I believe that the relief requested in the Tax Motion is necessary and in the best interests of the Debtor, its estate, and creditors.

**H.     Utilities Motion**

131.     Pursuant to the *Motion of Debtor for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (II) Approving Proposed Adequate Assurance of Payment, (III) Establishing Procedures for Resolving Requests for Additional Assurance of Payment, and (IV) Granting Related Relief* (the "**Utilities Motion**"), the Debtor is seeking entry of interim and final orders (a) prohibiting the Utility Providers (as defined below) from altering, refusing, or discontinuing utility services to, or discriminating against, the Debtor on account of any outstanding amounts for services rendered prepetition, (b) determining that adequate assurance of payment for postpetition Utility Services (as defined below) has been furnished to the Utility Providers providing services to the Debtor, and (c) establishing procedures for resolving future requests by any Utility Provider for additional adequate assurance of payment.

132.     The Debtor receives utility services from various utility providers (each, a "**Utility Provider**" and collectively, the "**Utility Providers**"), for, among other things,

electricity, water, gas, telecommunication and telephone services, internet, waste removal, and other similar services (collectively, the "**Utility Services**").[29]   The Utility Providers include, without limitation, the entities set forth on the list attached to the Utilities Motion as Exhibit C (the "**Utility Providers List**").  I have been informed that the Debtor incurred expenses totaling approximately $3,800 each month on account of all Utility Services provided by the Utility Providers in 2019.

133.    I believe that the Debtor's receipt of uninterrupted Utility Services is vital to the Debtor's continued business operations and, consequently, to the success of the chapter 11 case.  Therefore, I believe that the relief requested in the Utilities Motion is necessary and in the best interests of the Debtor, its estate, and creditors.

## II.    CONCLUSION

134.    The Debtor's ultimate goal in this chapter 11 case is to maximize value for the benefit of all stakeholders.  In the near term, however, the Debtor's immediate objective is to maintain a business-as-usual atmosphere during the early stage of this chapter 11 case, with as little interruption or disruption to the Debtor's operations as possible.  I believe that, if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving this objective and maximizing value for the benefit of all stakeholders will be substantially enhanced.

*[Remainder of page left intentionally blank]*

---

[29]   Pursuant to that certain Office Lease, dated May 10, 2016 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Lease**"), by and between the Landlord and the Debtor, payments due on account of electricity, gas, water, and waste removal are paid by the Debtor to the Landlord for distribution to the appropriate Utility Provider.  For the avoidance of doubt, the Utility Provider List does not include any Utility Provider paid through the Landlord.  The Debtor reserves the right to amend or supplement the Utility Service List to include any Utility Provider omitted.  The Debtor will continue to remit payment to the Landlord for such utility services postpetition.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.


Dated: September 16, 2019
            Westlake Village, California


                                        */s/ Frederick C. Beddingfield*_____
                                        Frederick C. Beddingfield III
                                        President and Chief Executive Officer
                                        Sienna Biopharmaceuticals, Inc.

**EXHIBIT A**

**Organizational Chart**



**\*Sienna Biopharmaceuticals, Inc.**
a corporation incorporated in the State of Delaware, USA,
registered under File Number 4853292
Registered Address:  C/O The Corporation Trust Company
1209 Orange Street, Wilmington, DE 19801 (USA)

100%

**Creabilis Holdings Limited** (UK)
(formerly Creabilis plc)
a private company incorporated in England and Wales
registered under Number 08561309
Registered Address:  Camburgh House, 27 New Dover
Road, Canterbury, Kent, CT1 3DN

100%

**Sienna Biopharmaceuticals S.A.**
(Name change effective July 5, 2018 - formerly Creabilis S.A.) a company
incorporated in Luxembourg, registered under B143397
Registered Address: 14 rue Edward Steichen, L-2540 Luxembourg

100%

**Sienna Biopharmaceuticals S.r.l.**
*(Name change effective May 4, 2017 - formerly Creabilis
Therapeutics S.r.l.)* a company incorporated in Italy,
Registered under 08661490014
Registered Address: Via Ribes 5,
10010 Colleretto Giacosa, Italy

100%

**Creabilis UK Limited**
a private company incorporated in England and Wales,
registered under Number 07609144
Registered Address:  Camburgh House, 27 New Dover
Road, Canterbury, Kent, CT1 3DN

*Sienna Biopharmaceuticals, Inc. is a public company listed on the NASDAQ  stock exchange.

Last Updated: 7/5/2018