## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------  x
                                                   :
In re:                                             :   Chapter 11
                                                   :
SIENNA BIOPHARMACEUTICALS, INC.,                   :   Case No. 19-12051 (MFW)
                                                   :
            Debtor.[1]                             :
                                                   :   Ref. Docket Nos. 142 and 205
-------------------------------------------------  x
```

## NOTICE OF SUCCESSFUL BIDDER

PLEASE TAKE NOTICE that on October 22, 2019, Sienna Biopharmaceuticals, Inc., the debtor and debtor in possession in the above-captioned chapter 11 case (the "**Debtor**"), filed the *Motion of Debtor for Entry of Order (I)(A) Establishing Bidding Procedures, Assumption and Assignment Procedures, and Stalking Horse Procedures for Sale of Substantially All Assets, (B) Scheduling Auction and Sale Hearing, and (C) Approving Form and Manner of Notice Thereof, (II) Approving Sale of Substantially All Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (III) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 142] (the "**Bidding Procedures Motion**").

PLEASE TAKE NOTICE that on November 13, 2019, the Court entered an order approving the Bidding Procedures Motion [Docket No. 205] (the "**Bidding Procedures Order**").[2]

PLEASE TAKE FURTHER NOTICE that in accordance with the Bidding Procedures Order, the Debtor held an Auction for the sale of certain of its assets on **December 5, 2019 at 10:00 a.m. (prevailing Eastern Time)** at the office of Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022.  The Auction concluded at approximately 12 p.m. (prevailing Eastern Time) on December 5, 2019.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Bidding Procedures Order, promptly following the Debtor's selection of the Successful Bid and the conclusion of the Auction, the Debtor is required to file with the Bankruptcy Court a notice identifying the Successful Bidder (the "**Notice of Successful Bidder**").

PLEASE TAKE FURTHER NOTICE that the Successful Bidder for the Topical Photoparticle Therapy™ assets, a/k/a SNA 001 (as more specifically set forth in the applicable

---

[1]    The last four digits of the Debtor's federal tax identification number are 4627.  The Debtor's mailing address is 30699 Russell Ranch Road, Suite 140, Westlake Village, California 91362.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order or the Bidding Procedures, as applicable.

definitive documents, the "**Purchased Assets**"), is Sebacia, Inc., and the Backup Bidder is Dr. Mitchel P. Goldman.  To date, the Debtor has not received bids for, and does not plan to seek approval of a sale of, its other assets at the Sale Hearing.

PLEASE TAKE FURTHER NOTICE that copies of the Successful Bid and the proposed sale order approving the Successful Bid are attached as **Exhibit A-1 and A-2**, respectively.

PLEASE TAKE FURTHER NOTICE that the Debtor will seek Bankruptcy Court approval of the Sale at the Sale Hearing, which is scheduled to commence on **December 10, 2019 at 10:30 a.m. (prevailing Eastern Time)** before the Honorable Mary F. Walrath, United States Bankruptcy Judge for the District of Delaware, at the Bankruptcy Court, 824 N. Market Street, 5th Floor, Courtroom 4, Wilmington, Delaware 19081.  The Sale Hearing may be adjourned or rescheduled without notice.  Presentation of a Successful Bid does not constitute the Debtor's acceptance of such bid.  The Debtor will have accepted the terms of a Successful Bid only when such bid has been approved by the Court.

Dated: December 5, 2019
       Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

 */s/ Kara Hammond Coyle*

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:   (302) 571-1253
Email:       mnestor@ycst.com
             kcoyle@ycst.com

- and -

**LATHAM & WATKINS LLP**

Peter M. Gilhuly (admitted *pro hac vice*)
Ted A. Dillman (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:  (213) 485-1234
Facsimile:   (213) 891-8763
Email:       peter.gilhuly@lw.com
             ted.dillman@lw.com

*Counsel for Debtor and Debtor in Possession*

2

**<u>Exhibit A-1</u>**

**EXECUTION VERSION**

---

ASSET PURCHASE AGREEMENT

by and between

SIENNA BIOPHARMACEUTICALS, INC.

and

SEBACIA, INC.

Dated as of December 5, 2019

---

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ...................................................................................................1

    1.1    Definitions................................................................................................1
    1.2    Construction.............................................................................................9
    1.3    Incorporation of Recitals.......................................................................10

ARTICLE II PURCHASE AND SALE ...............................................................................10

    2.1    Purchase and Sale of Assets...................................................................10
    2.2    Excluded Assets.....................................................................................11
    2.3    Assumed Liabilities ...............................................................................12
    2.4    Excluded Liabilities ...............................................................................13
    2.5    Executory Contracts ..............................................................................14

ARTICLE III PURCHASE PRICE; DEPOSIT ...................................................................14

    3.1    Purchase Price........................................................................................14
    3.2    Deposit ...................................................................................................14
    3.3    Allocation...............................................................................................15
    3.4    Withholding ...........................................................................................15

ARTICLE IV THE CLOSING .............................................................................................15

    4.1    Time and Place of the Closing...............................................................15
    4.2    Deliveries by the Seller.........................................................................15
    4.3    Deliveries by the Buyer ........................................................................16

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE SELLER ........................16

    5.1    Organization and Good Standing...........................................................16
    5.2    Authorization of Agreement ..................................................................17
    5.3    Conflicts; Consents of Third Parties......................................................17
    5.4    Taxes......................................................................................................17
    5.5    Title to Assets; Sufficiency of Assets; Real Property............................18
    5.6    Intellectual Property...............................................................................18
    5.7    Litigation...............................................................................................19
    5.8    Compliance with Laws ..........................................................................19
    5.9    Insurance................................................................................................19
    5.10    Financial Advisors.................................................................................20

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER...............................20

    6.1    Organization and Good Standing...........................................................20
    6.2    Authorization of Agreement ..................................................................20

i

6.3     Conflicts; Consents of Third Parties ...................................................................20
6.4     Financial Ability. ....................................................................................................21
6.5     Litigation.................................................................................................................21
6.6     Financial Advisors ..................................................................................................21
6.7     No Prior Activities ..................................................................................................21
6.8     Solvency; Surviving Corporation Post-Closing .....................................................21
6.9     Purchased Assets "AS IS;" Certain Acknowledgements .......................................22

ARTICLE VII COVENANTS OF THE PARTIES ....................................................................23

7.1     Access to Information ..............................................................................................23
7.2     Conduct of the Business Pending the Closing ........................................................23
7.3     Regulatory Approvals ..............................................................................................24
7.4     Further Assurances...................................................................................................24
7.5     Confidentiality .........................................................................................................24
7.6     Preservation of Records ..........................................................................................24
7.7     Publicity ...................................................................................................................25
7.8     Tax Matters ..............................................................................................................25
7.9     Transfer of Purchased Assets ..................................................................................25
7.10    Overbid Procedures; Adequate Assurance ..............................................................26

ARTICLE VIII CONDITIONS TO CLOSING ..........................................................................27

8.1     Conditions Precedent to Obligations of Buyer .......................................................27
8.2     Conditions Precedent to Obligations of the Seller..................................................27
8.3     Frustration of Closing Conditions ...........................................................................28

ARTICLE IX TERMINATION; WAIVER...................................................................................28

9.1     Termination...............................................................................................................28
9.2     Procedure and Effect of Termination.......................................................................30
9.3     Extension; Waiver ....................................................................................................30

ARTICLE X MISCELLANEOUS PROVISIONS .......................................................................31

10.1    Expenses ..................................................................................................................31
10.2    Amendment and Modification .................................................................................31
10.3    Survival ....................................................................................................................31
10.4    Notices .....................................................................................................................31
10.5    Assignment ..............................................................................................................32
10.6    Severability ..............................................................................................................32
10.7    Governing Law .........................................................................................................32
10.8    Acknowledgement and Release ...............................................................................33
10.9    Submission to Jurisdiction; WAIVER OF JURY TRIAL .....................................33
10.10   Counterparts.............................................................................................................34
10.11   Incorporation of Schedules and Exhibits ................................................................34
10.12   Entire Agreement .....................................................................................................34
10.13   Remedies...................................................................................................................34

10.14    Bulk Sales or Transfer Laws ................................................................34
10.15    Mutual Drafting; Headings; Information Made Available ....................................34
10.16    Schedules ................................................................................35
10.17    No Third Party Beneficiaries ............................................................35

US-DOCS\111662347.4

Schedules:

| | |
|---|---|
| Schedule 1.1(a) | Excluded Insurance Policies |
| Schedule 1.1(b) | Permitted Liens |
| Schedule 2.2(l) | Other Excluded Assets |
| Schedule 2.5(a) | Assumed Contracts and Leases |
| Schedule 5.4(c) | Taxes (Audits) |
| Schedule 5.5(a) | Tangible Personal Property |
| Schedule 5.5(b) | Real Property Leases |
| Schedule 5.6(a) | Registered Intellectual Property |
| Schedule 5.6(c) | Licensed Intellectual Property |
| Schedule 5.6(d) | Acquired Program IP Infringement |
| Schedule 5.6(e) | Intellectual Property Infringement |
| Schedule 5.7 | Litigation |
| Schedule 5.8 | Legal Compliance |
| Schedule 5.9 | Material Insurance Policies |

Exhibits:

| | |
|---|---|
| Exhibit A | Form of Assumption Agreement |
| Exhibit B | Form of Bill of Sale and Assignment Agreement |
| Exhibit C | Form of Intellectual Property Assignment Agreement |

US-DOCS\111662347.4

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made and entered into as of December 5, 2019 by and among Sienna Biopharmaceuticals, Inc., a Delaware corporation (the "Seller"), and Sebacia, Inc. (the "Buyer").

## RECITALS

WHEREAS, the Seller filed a voluntary petition for relief commencing a case (the "Chapter 11 Case") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (Case No. 19-12051) on September 16, 2019 (the "Petition Date"), and is operating and managing its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, the Buyer desires to purchase from the Seller, and the Seller desires to sell to the Buyer, the Purchased Assets, and the Buyer desires to assume from the Seller the Assumed Liabilities, in each case pursuant to the terms and subject to the conditions set forth herein and further subject to any Orders of the Bankruptcy Court in the Chapter 11 Case.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1 <u>Definitions</u>. A defined term has its defined meaning throughout this Agreement and in each Exhibit and Schedule to this Agreement, regardless of whether it appears before or after the place where it is defined. As used in this Agreement, the following terms have the meanings specified below:

"Accounts Receivable" means any and all accounts receivable, notes receivable and other amounts receivable owed to the Seller (whether current or non-current), together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all actions pertaining to the collection of amounts payable, or that may become payable, to the Seller on or prior to the Closing Date.

"Acquired Program Assets" means all assets related to the Topical Photoparticle Therapy$^{TM}$ (TPT) platform, including the product candidate identified as SNA-001 and the development, advancement, or exploitation thereof.

"Acquired Program IP" means all Intellectual Property and Intellectual Property Rights (including the goodwill of the Seller) as of the Closing relating to the Acquired Program Assets and any and all right, title and interest in and to the Licensed Intellectual Property, including all Acquired Program Registered IP.

1

"Acquired Program Registered IP" means all Acquired Program IP that, as of the date hereof, is registered, filed or issued under the authority of, with or by any Governmental Body, including all Patents, Copyrights, Marks and all applications of the foregoing.

"Affiliate" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such specified Person.  For purposes of this definition, "control" (and any similar term) means the power of one or more Persons to direct, or cause the direction of, the affairs of another Person by reason of ownership of voting stock or by contract or otherwise.

"Agreement" has the meaning given to such term in the Preamble hereto.

"Allocation" has the meaning given to such term in Section 3.3.

"Alternative Transaction" means (i) one or more sales, transfers, or other dispositions of all or substantially all of the Purchased Assets to any Person (or group of Persons), whether in one transaction or a series of transactions, or (ii) any recapitalization transaction, or plan of reorganization or liquidation involving all or substantially all of the Purchased Assets, in each case, other than to the Buyer or an Affiliate of the Buyer.

"Assumed Agreements" has the meaning given to such term in Section 2.1(j).

"Assumed Contracts and Leases Schedule" has the meaning given to such term in Section 2.5(a).

"Assumed Liabilities" has the meaning given to such term in Section 2.3.

"Assumed Real Property Leases" has the meaning given to such term in Section 2.1(k).

"Assumption Agreement" means one or more Assumption and Assignment Agreements to be executed and delivered by the Buyer and the Seller at the Closing, substantially in the form of Exhibit A.

"Auction" has the meaning set forth in Section 7.10.

"Avoidance Actions" means any and all preference or avoidance claims or actions which a trustee, a debtor-in-possession or other appropriate party in interest may assert on behalf of the Seller or its bankruptcy estate under applicable Law, including actions arising under Chapter 5 of the Bankruptcy Code.

"Backup Bidder" has the meaning given to such term in Section 7.10.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*, as amended.

"Bankruptcy Court" has the meaning given to such term in the Recitals hereto.

"Bankruptcy Exceptions" has the meaning set forth in Section 5.2.

US-DOCS\111662347.4

"<u>Bidding Procedures and Sale Motion</u>" means the *Motion of Debtor for Entry of Order (I)(A) Establishing Bidding Procedures, Assumption and Assignment Procedures, and Stalking Horse Procedures for Sale of Substantially All Assets, (B) Scheduling Auction and Sale Hearing, and (C) Approving Form and Manner of Notice Thereof, (II) Approving Sale of Substantially All Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (III) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief*, filed on October 22, 2019 [Docket No. 142].

"<u>Bidding Procedures Order</u>" means *Order (I)(A) Establishing Bidding Procedures, Assumption and Assignment Procedures, and Stalking Horse Procedures for Sale of Substantially All Assets, (B) Scheduling Auction and Sale Hearing, and (C) Approving Form and Manner of Notice Thereof; (II) Approving Sale of Substantially All Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (III) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief*, entered on November 13, 2019 [Docket No. 205].

"<u>Bill of Sale</u>" means one or more Bill of Sale and Assignment Agreements to be executed and delivered by the Seller to the Buyer at the Closing, substantially in the form of <u>Exhibit B</u>.

"<u>Business Day</u>" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized to be closed.

"<u>Buyer</u>" has the meaning given to such term in the Preamble hereto.

"<u>Cash Purchase Price</u>" has the meaning given to such term in <u>Section 3.1</u>.

"<u>Chapter 11 Case</u>" has the meaning given to such term in the Recitals hereto.

"<u>Closing</u>" has the meaning given to such term in <u>Section 4.1</u>.

"<u>Closing Date</u>" has the meaning given to such term in <u>Section 4.1</u>.

"<u>Closing Payment</u>" has the meaning given to such term in <u>Section 3.1</u>.

"<u>Code</u>" means the United States Internal Revenue Code of 1986, as amended.

"<u>Confidentiality Agreement</u>" has the meaning given to such term in <u>Section 7.5</u>.

"<u>Contract</u>" means any lease, contract, deed, mortgage, license or other legally enforceable agreement or instrument.

"<u>Credit Facility</u>" means that certain Loan and Security Agreement, dated as of June 29, 2018 (as amended, restated, supplemented or otherwise modified from time to time), by and between the Seller and Silicon Valley Bank, and the loans made pursuant thereto.

"<u>Cure Payments</u>" means the amount required to be paid with respect to each Contract to cure all defaults under such Contract, whether arising before or after the Petition Date, to the extent

required by section 365 of the Bankruptcy Code and to otherwise satisfy all requirements imposed by section 365 of the Bankruptcy Code in order to effectuate, pursuant to the Bankruptcy Code, the assumption by the Seller and assignment to Buyer of each such Contract.

"Deposit" means the cash deposit of $50,000.00 delivered by the Buyer on December 2, 2019 pursuant to the Bidding Procedures Order.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Assets" has the meaning given to such term in Section 2.2.

"Excluded Insurance Policies" means all director and officer, fiduciary, employment practices and similar insurance policies maintained by or on behalf of the Seller, including those listed on Schedule 1.1(a), and all proceeds, refunds, prepayments, or other amounts related thereto, whenever arising.

"Excluded Liabilities" has the meaning given to such term in Section 2.4.

"Final Order" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending or (ii) if an appeal, writ of certiorari new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; *provided*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

"GAAP" means generally accepted accounting principles in the United States, consistently applied.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, European Union, multi-national or other supra-national, national, federal, regional, state or local or any agency, instrumentality, authority, department, commission, board or bureau thereof, or any court, arbitrator, arbitration panel or similar judicial body.

"Indebtedness" means (i) any indebtedness of the Seller for money borrowed, (ii) any indebtedness of the Seller evidenced by a note, bond, debenture or other similar instrument or debt security, (iii) all accrued and unpaid interest, premiums, penalties and other fees and expenses (if

any) relating to indebtedness that is referred to in clauses (i) and (ii) above, (iv) any indebtedness of a Person of a type that is referred to in clauses (i) through (iii) above and which is guaranteed by the Seller, (v) all obligations in respect of letters of credit, bankers' acceptances and similar facilities issued for the account of the Seller (but solely to the extent drawn and not paid), and (vi) all obligations of the Seller as lessee that are capitalized in accordance with GAAP.

"Intellectual Property" means (i) all inventions (whether patentable or unpatentable and whether or not reduced to practice), know-how, technology, technical data, trade secrets, confidential business information, manufacturing and production processes and techniques, research and development information, preclinical and clinical data and information, safety data and pharmacovigilance data, financial, marketing and business data, pricing and cost information, business and marketing plans, advertising and promotional materials, customer, distributor, reseller and supplier lists and information, correspondence, records, and other documentation, and other proprietary information of every kind, in each case, excluding any rights in respect of any of the foregoing that comprise or are protected by Patents (collectively, "Trade Secrets"); (ii) all computer software (including source and object code), firmware, development tools, files, records, technical drawings and related documentation, data and manuals; (iii) all databases and data collections; and (iv) all copies and tangible embodiments of the foregoing (in whatever form or medium).

"Intellectual Property Rights" means any and all of the following rights (anywhere in the world, whether statutory, common law or otherwise and whether now known or hereafter existing under the Laws of any jurisdiction): (i) patents and patent applications, including continuations, divisionals, continuations in part, reissues or reexaminations, renewals, extensions, provisionals and patents issuing thereon (collectively, "Patents"), (ii) trademarks, service marks, trade dress, logos, corporate names, trade names and Internet domain names, together with the goodwill associated with any of the foregoing, and all applications and registrations therefor (collectively, "Marks"), (iii) copyrights, copyrights registrations, copyright applications, works of authorship and moral rights (collectively, "Copyrights"), (iv) Trade Secrets and other Intellectual Property, (v) all claims and causes of action arising out of or related to any past, current or future infringement, misappropriation, interference or violation of any of the foregoing; and (vi) any rights equivalent or similar to any of the foregoing.

"Inventory" means all inventory relating to the Acquired Program Assets and owned by the Seller, including raw materials, active pharmaceutical ingredients, components, devices, packaging, commodities, work in progress, registration batches, and finished products, regardless of where said Inventory resides.

"IP Assignment Agreement" means one or more Intellectual Property Assignment Agreements to be executed and delivered by the Seller to the Buyer at the Closing, substantially in the form of Exhibit C.

"Knowledge of the Seller" means, as to a particular matter, the knowledge, without obligation of inquiry, of Dr. Frederick C. Beddingfield III, Mr. Alexander Azoy, and Mr. Timothy K. Andrews.

5

"Law" means any law, common law, statute, code, ordinance, rule, regulation or Order, of any Governmental Body.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, charges, complaints, investigations or other proceedings (public or private) by or before a Governmental Body.

"Liability" means any claim (as defined in section 101(5) of the Bankruptcy Code), debt (as defined in section 101(12) of the Bankruptcy Code), liability or obligation (whether direct or indirect, absolute or contingent, asserted or unasserted, due or to become due, accrued or unaccrued or liquidated or unliquidated).

"Licensed Intellectual Property" means all Intellectual Property and Intellectual Property Rights licensed to the Seller by third parties pursuant to the Assumed Agreements.

"Lien" has the meaning set forth in section 101(39) of the Bankruptcy Code, including any lien, pledge, mortgage, deed of trust, security interest, easement, servitude or other similar encumbrance.

"Material Adverse Effect" means any event, condition, circumstance, development, or change or effect that, individually or in the aggregate with all other events, changes, conditions, circumstances, developments and effects, has had a material adverse effect on the Purchased Assets and the Assumed Liabilities, taken as a whole, except, for any such events, changes, conditions, circumstances, developments or effects (or the results thereof) resulting from or attributable to: (i) the announcement of the signing of this Agreement or the pendency of the transactions contemplated hereby, (ii) changes in Law or interpretations thereof by any Governmental Body, (iii) changes in GAAP or generally accepted accounting principles in other jurisdictions, (iv) changes in general economic conditions, currency exchange rates or United States or international debt or equity markets, (v) events or conditions generally affecting the industry or markets in which the Seller operate, (vi) national or international political or social conditions or any national or international hostilities, acts of terror or acts of war; or (vii) any effect resulting from the filing of the Chapter 11 Case and reasonably anticipated effects thereof; provided that, in the case of clauses (iv) through (vi), such events, changes, conditions, circumstances, developments or effects shall be taken into account in determining whether any such material adverse effect has occurred to the extent that any such events, changes, conditions, circumstances, developments or effects have a material and disproportionate adverse effect on the Purchased Assets and the Assumed Liabilities, taken as a whole, as compared to other similarly situated businesses.

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, directive, determination or award made, issued or entered by or with any Governmental Body of competent jurisdiction, whether preliminary, interlocutory or final.

"Outside Backup Date" has the meaning given to such term in Section 7.10.

"Outside Date" means December 13, 2019, or such other date as is mutually agreed upon by the Buyer, the Seller, and Silicon Valley Bank in writing.

6

"Permits" means all franchises, permits, certificates, clearances, approvals and authorizations of or with any Governmental Body held, used by, or made by, the Seller in connection with the activities relating to the Acquired Program Assets.

"Permitted Liens" means, in each case, to the extent related to the Purchased Assets or the Assumed Liabilities: (a) liens for Taxes, special assessments or other governmental charges not yet due and payable or that are being contested in good faith; (b) statutory liens and rights of set-off of landlords, banks, carriers, warehousemen, mechanics, repairmen, workmen, customs brokers or agencies, suppliers and materialmen, and other Liens imposed by Law, in each case, incurred in the ordinary course of business or the amount or validity of which is being contested in good faith; (c) deposits and pledges securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits (other than valid obligations incurred in respect of any defined benefit pension plan), (ii) the performance of bids, tenders, leases, Contracts (other than for payment of money), statutory obligations, licenses and other similar obligations, or (iii) obligations on performance, surety or appeal bonds; (d) licenses of or other grants of rights to use Intellectual Property; (e) Laws now or hereafter in effect relating to real property, easements and similar Liens that do not have a Material Adverse Effect on the current use by the Seller of such real property subject thereto by the Seller in any material respect; (f) statutory liens creating a security interest in favor of landlords with respect to property of the Seller that do not interfere with the current use of such leased real property by the Seller in any material respect; (g) Liens that do not materially and adversely interfere with the current operation of the Acquired Program Assets, taken as a whole; (h) Liens securing Indebtedness as disclosed in the Financial Statements or that will be terminated in connection with Closing; (i) purchase money Liens and Liens securing rental payments under capital lease arrangements or title of a lessor under a capital or operating lease; (j) Liens contained, set forth in or related to the Assumed Agreements or the Assumed Real Property Leases; (k) any Liens arising from applicable Laws of general application that do not interfere with the current operation of the Acquired Program Assets or the Purchased Assets; (l) any Liens effecting the landlords or ground lessors underlying interest in any of the Real Property Leases and/or the underlying interests in land from time to time, provided that such Liens do not interfere with the current use of such real property subject thereto by the Seller in any material respect; (m) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business; (n) Liens arising by operation of law under Article 2 of any state's Uniform Commercial Code (or successor statute) in favor of a seller of goods or buyer of goods; (o) Liens set forth on Schedule 1.1(b); and (p) Liens that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

"Person" means any individual, corporation, partnership, limited partnership, limited liability company, syndicate, group, trust, association or other organization or entity or Governmental Body. References to any Person include such Person's successors and permitted assigns.

"Petition Date" has the meaning given to such term in the Recitals hereto.

"Post-Closing Tax Period" means any Tax period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

7

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and that portion of any Straddle Period ending on the Closing Date.

"Property Taxes" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"Purchase Price" has the meaning given to such term in Section 3.1.

"Purchased Assets" has the meaning given to such term in Section 2.1.

"Real Property Leases" means all leases, subleases and other occupancy Contracts with respect to real property to which the Seller is a party.

"Representatives" means, with respect to a particular Person, any director, officer, manager, employee or other authorized representative of such Person or its Subsidiaries, including such Person's attorneys, accountants, financial advisors and operational advisors.

"Sale Hearing" means the hearing at which the Bankruptcy Court considers approval of the Sale Order.

"Sale Order" means the Order of the Bankruptcy Court in form and substance reasonably acceptable to the Buyer that, among other things, (i) approves, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by the Seller of this Agreement, (B) the sale of the Purchased Assets to the Buyer free and clear of all Liens (other than Permitted Liens) on the terms set forth herein, and (C) the performance by the Seller of their respective obligations under this Agreement; (ii) authorizes the Seller to assume and assign to the Buyer the Assumed Agreements and the Assumed Real Property Leases; and (iii) finds that Buyer is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code.

"Schedules" means the schedules attached hereto.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the United States Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Seller" has the meaning given to such term in the Preamble hereto.

"Seller SEC Reports" means all reports, schedules, forms, statements or other documents required to be filed by the Seller under the Securities Act or the Exchange Act, as the case may be, since January 1, 2019.

"Straddle Period" means any Tax period beginning before or on the Closing Date and ending after the Closing Date.

"Subsidiary" means, with respect to any Person, (a) any corporation or similar entity of which at least 50% of the securities or interests having, by their terms, ordinary voting power to elect members of the board of directors, or other persons performing similar functions with respect

to such corporation or similar entity, is held, unless specifically noted otherwise, directly or indirectly by such Person and (b) any partnership, limited liability company or similar entity of which (i) such Person is a general partner or managing member or (ii) such Person possesses, unless specifically noted otherwise, directly or indirectly, a 50% or greater interest in the total capitalization or total income of such partnership, limited liability company or similar entity.

"Successful Bidder" means the bidder who shall have submitted the highest or otherwise best bid at the conclusion of the Auction in accordance with the Bidding Procedures Order.

"Tax" means (i) all foreign, federal, state or local taxes, charges, fees, imposts, levies or other assessments in any jurisdiction, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, capital gains, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and similar charges of any kind whatsoever imposed by a Governmental Body, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (i).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements filed or required to be filed in respect of any Taxes and any schedules or attachments thereto.

"Taxing Authority" means any Governmental Body charged with the administration of any applicable Law relating to Taxes, including the imposition, assessment or collection of Taxes.

"Transaction Documents" means this Agreement, the Assumption Agreement, the Bill of Sale, the IP Assignment Agreement, and any other Contract or document to be entered into by the parties hereto at or in furtherance of the Closing.

"Transfer Taxes" has the meaning given to such term in Section 7.8(b).

1.2     Construction.  The terms "hereby," "hereto," "hereunder" and any similar terms as used in this Agreement refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used.  The terms "including," "includes" or similar terms when used herein shall mean "including, without limitation." The meaning of defined terms shall be equally applicable to the singular and plural forms of the defined terms, and the masculine gender shall include the feminine and neuter genders, and vice versa, unless expressly indicated otherwise.  Any reference to any federal, state, provincial, local or foreign statute or Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  Any reference herein to "days" shall mean calendar days, unless Business Days are expressly specified.  Unless otherwise indicated, references to (a) Articles, Sections, Schedules and Exhibits refer to Articles, Sections, Schedules and Exhibits of and to this Agreement and (b) references to $ (dollars) are to United States Dollars.  The word "or" when used in this Agreement is not meant to be exclusive unless expressly indicated otherwise.  Except as otherwise specified herein the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.  Terms not otherwise defined herein shall have the meanings ascribed to them in the Bankruptcy Code, unless the context requires otherwise.

US-DOCS\111662347.4

1.3    Incorporation of Recitals.  The Recitals set forth herein are incorporated into the Agreement by reference as an agreement among the parties hereto.

## ARTICLE II
## PURCHASE AND SALE

2.1    Purchase and Sale of Assets.  Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, the Seller shall sell, assign, convey, transfer and deliver to the Buyer, and the Buyer shall, by the Buyer's payment of the Purchase Price, purchase and acquire from the Seller, all of the Seller's right, title and interest, free and clear of all Liens (other than Assumed Liabilities and Permitted Liens), in and to all of the properties, rights, interests and other tangible and intangible assets of the Seller relating primarily to the Acquired Program Assets (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP) (collectively, the "Purchased Assets"); provided, however, that the Purchased Assets shall not include any Excluded Assets.  Without limiting the generality of the foregoing, the Purchased Assets shall include all of the Seller's right, title and interest in and to the following (except to the extent listed or otherwise included as an Excluded Asset):

(a)    the Acquired Program Assets;

(b)    the Acquired Program IP;

(c)    all Accounts Receivable related solely to the Acquired Program Assets;

(d)    without duplication of the above, all royalties, advances, prepaid assets, security and other deposits, prepayments and other current assets relating to the Acquired Program Assets, the Assumed Agreements and the Assumed Real Property Leases, of the Seller as of the Closing (but excluding all interests in, and prepaid amounts related to, the Excluded Insurance Policies, all prepaid assets relating to Contracts that are not Assumed Agreements or Assumed Real Property Leases as of the Closing, and any other Excluded Asset);

(e)    all of the rights and benefits accruing under all Permits, all deposits and prepaid expenses related primarily to the Acquired Program Assets held by third parties and/or, to the extent transferable, any Governmental Body;

(f)    to the extent transferable, all current and prior insurance policies of the Seller that relate to the Purchased Assets or Assumed Liabilities, and all rights and benefits of any of the Seller of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, but excluding all interests in the Excluded Insurance Policies;

(g)    any rights, demands, claims, credits, allowances, rebates (including any vendor or supplier rebates), or rights of setoff (other than against the Seller) arising out of or relating to any of the Purchased Assets as of the Closing (but excluding all interests in, or amounts related to, the Excluded Insurance Policies);

(h)    any rights, claims or causes of action as of the Closing of the Seller relating to or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases,

10

counterparties to licenses, and counterparties to any Assumed Agreement or Assumed Real Property Lease primarily in respect of the Acquired Program Assets arising out of events occurring on or prior to the Closing Date, excluding Avoidance Actions;

(i)     all claims (including claims for past infringement or misappropriation of the Acquired Program IP) and actions (other than, in each case, to the extent related primarily to Excluded Assets or Excluded Liabilities) of the Seller as of the Closing against Persons other than the Seller (regardless of whether or not such claims and causes of action have been asserted by the Seller) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, possessed by the Seller as of the Closing (regardless of whether such rights are currently exercisable) to the extent related primarily to the Purchased Assets;

(j)     all Contracts related primarily to the Acquired Program Assets assumed by the Seller and assigned to the Buyer pursuant to Section 2.5, other than the Real Property Leases (the "Assumed Agreements");

(k)     all Real Property Leases assumed by the Seller and assigned to the Buyer pursuant to Section 2.5 (the "Assumed Real Property Leases");

(l)     all books, records, information, files, data and plans (whether written, electronic or in any other medium), and similar items relating primarily to the Acquired Program Assets as of the Closing (except as otherwise described in Section 2.2);

(m)     all Inventory, supplies, materials and spare parts of the Seller as of the Closing (including all rights of the Seller to receive such Inventory, supplies, materials and spare parts that are on order), in each case, relating primarily to the Acquired Program Assets;

(n)     all items of machinery, equipment, furniture, fixtures, leasehold improvements (to the extent of the Seller's rights to any leasehold improvements under the Assumed Real Property Leases) and other tangible personal property and fixed assets owned by the Seller as of the Closing related primarily to the Acquired Program Assets; and

(o)     all goodwill associated with the Acquired Program Assets, including all goodwill associated with the Acquired Program IP owned by the Seller.

2.2     Excluded Assets.  Notwithstanding any provision herein to the contrary, the Purchased Assets shall not include any of the properties, rights, interests and other tangible and intangible assets of the Seller not relating primarily to the Acquired Program Assets, including any of the following (collectively, the "Excluded Assets"):

(a)     all cash, cash equivalents, bank or other deposits or similar cash items of the Seller as of the Closing;

(b)     the Seller's rights under this Agreement and the other Transaction Documents, and all consideration payable or deliverable to the Seller pursuant to the terms and provisions hereof or thereof;

11

(c)     all rights, claims and causes of action of the Seller against any director or officer of the Seller and all Excluded Insurance Policies and interests in, and amounts related to, the Excluded Insurance Policies;

(d)     any prepaid Tax, Tax receivable, Tax refund, or Tax credit of the Seller;

(e)     all Avoidance Actions;

(f)     any records, documents or other information relating to current or former employees of the Seller, and any materials containing information about employees, disclosure of which would violate an employee's reasonable expectation of privacy;

(g)     the Seller's (i) minute books and other corporate books and records relating to its organization and existence, (ii) books and records relating to Taxes of the Seller, including Tax Returns filed by or with respect to the Seller, and (iii) books, records, information, files, data and plans (whether written, electronic or in any other medium), and similar items relating to any Excluded Assets or Excluded Liabilities;

(h)     any Contracts of any Seller relating to Indebtedness; and any Contracts between the Seller, on the one hand, and any equity holder of the Seller (including any Person who has the right to acquire equity of Seller, whether as the result of an exchange, conversion, exercise, or otherwise) in such Person's capacity as an equity holder of Seller, on the other hand (including any stock purchase, shareholders', registration rights or similar agreements), except to the extent included in the Assumed Agreements or Assumed Real Property Leases;

(i)     any Contracts, together with all prepaid assets relating to such Contracts, of the Seller (including employment Contracts), other than the Assumed Agreements and the Assumed Real Property Leases;

(j)     all rights, claims and causes of action of the Seller against Persons and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, of the Seller (regardless of whether such rights are currently exercisable), in each case to the extent related primarily to any Excluded Assets or Excluded Liabilities;

(k)     any shares of capital stock or other equity interests of the Seller, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of any of the Seller; and

(l)     the Seller's right, title and interest to the other assets, if any, set forth in Schedule 2.2(l) (which may be amended with the mutual agreement of the parties hereto at any time prior to Closing).

2.3     Assumed Liabilities.  On the Closing Date, the Buyer shall execute and deliver to the Seller the Assumption Agreement pursuant to which the Buyer shall assume and agree to pay, perform and discharge when due the Assumed Liabilities.  For purposes of this Agreement, "Assumed Liabilities" means only the following Liabilities (to the extent not paid or discharged prior to the Closing):

12

(a)    all Liabilities and obligations arising from the ownership, possession or use of the Purchased Assets and the operation of the Acquired Program Assets, in each case from and after the Closing, it being understood that Liabilities and obligations arising from the ownership, possession or use of the Purchased Assets or the operation of the Acquired Program Assets prior to the Closing, other than Cure Payments, shall not constitute Assumed Liabilities regardless of when the obligation to pay such Liabilities and obligations arises;

(b)    the Liabilities of the Seller arising under the Assumed Agreements and the Assumed Real Property Leases;

(c)    all Cure Payments; and

(d)    Taxes to the extent payable by the Buyer pursuant to Section 7.8.

2.4    Excluded Liabilities.  Notwithstanding anything to the contrary in this Agreement, the parties hereto expressly acknowledge and agree that the Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities whatsoever of the Seller, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities and Permitted Liens (all such Liabilities and Liens that the Buyer is not expressly assuming being referred to collectively as the "Excluded Liabilities"). Without limiting the foregoing, the Buyer shall not be obligated to assume, and does not assume, and hereby disclaims all the Excluded Liabilities, including the following Liabilities of any of the Seller or of any predecessor of any of the Seller:

(a)    all Taxes imposed on the Seller, including Taxes imposed on the Seller under Treasury Regulations Section 1.1502-6 and similar provisions of state, local or foreign Tax Law, other than Taxes to the extent payable by the Buyer pursuant to Section 7.8;

(b)    all Liabilities, except those that transfer to Buyer pursuant to applicable Law, arising out of, relating to, or with respect to current and former employees of the Seller (including Liabilities under or relating to the Seller's employee benefit plans);

(c)    all Liabilities relating to Excluded Assets;

(d)    all Liabilities arising from or related to any claim, action, arbitration, audit, hearing, investigation, suit, litigation or other proceeding (whether civil, criminal, administrative, investigative, or informal and whether pending or threatened or having any other status) against the Seller or any of its respective Affiliates, or related to the Purchased Assets or the Assumed Liabilities, pending or threatened or with respect to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing Date;

(e)    all Liabilities to any equity holder of the Seller; and

(f)    Except to the extent included in the Assumed Liabilities, any Liability arising from or related to the operation or condition of the Purchased Assets prior to the Closing or facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing.

2.5     <u>Executory Contracts</u>.

(a)     <u>Schedule 2.5(a)</u> sets forth the Seller's good-faith estimate of the Cure Payments with respect to each Assumed Agreement and Assumed Real Property Lease (the "<u>Assumed Contracts and Leases Schedule</u>").  The Buyer may, from time to time, amend or revise the Assumed Contracts and Leases Schedule in order to remove any Non-Real Property Contract or Real Property Lease to or from such Schedule up to one (1) Business Day prior to the Closing Date, in which case such Non-Real Property Contract or Real Property Lease shall constitute an Excluded Asset and shall <u>not</u> constitute an Assumed Agreement or Assumed Real Property Lease, as applicable.

(b)     At the Closing (or such later date as the Bankruptcy Court may establish) the Seller shall assume and assign to the Buyer the Assumed Agreements and Assumed Real Property Leases, in each case pursuant to section 365 of the Bankruptcy Code and the Sale Order, subject to provision by the Buyer of adequate assurance as may be required under section 365 of the Bankruptcy Code and payment of the Cure Payments in respect of Assumed Agreements and Assumed Real Property Leases as contemplated hereby.

(c)     The Buyer shall be responsible for demonstrating adequate assurance of future performance as may be required under section 365 of the Bankruptcy Code.

(d)     Payment of all Cure Payments for each Assumed Agreement and Assumed Real Property Lease shall be the sole responsibility of the Buyer, irrespective of the aggregate amount of such Cure Payments (whether reflected on the Assumed Contracts and Leases Schedule or otherwise) and shall be paid by Buyer as promptly as practicable following the assumption and assignment of each such Assumed Agreement or Assumed Real Property Lease.

**ARTICLE III**
**PURCHASE PRICE; DEPOSIT**

3.1     <u>Purchase Price</u>.

(a)     In consideration for the Purchased Assets, and subject to the terms and conditions of this Agreement, at the Closing, the Buyer shall pay in accordance with <u>Section 3.1(b)</u> an aggregate amount equal to the $1,700,000.00 (the "<u>Cash Purchase Price</u>"), and the Buyer shall assume the Assumed Liabilities by executing the Assumption Agreement(s) (together with the Cash Purchase Price, the "<u>Purchase Price</u>")

(b)     At the Closing, the Buyer shall pay or caused to be paid to the Seller, by wire transfer of immediately available funds to an account designated by the Seller prior to the Closing, an amount in cash equal to the Cash Purchase Price less the Deposit (the "<u>Closing Payment</u>").

3.2     <u>Deposit</u>.  On or about the date hereof, the Buyer provided the Deposit to the Seller in accordance with the Bidding Procedures Order.  The Deposit shall be administered in accordance with the Bidding Procedures Order and applied to the Purchase Price or returned to the Buyer in accordance with the terms hereof and the Bidding Procedures Order.

14

3.3    <u>Allocation</u>.  The Buyer shall, within ninety (90) days following the Closing Date, deliver to the Seller an allocation of the Cash Purchase Price (and the Assumed Liabilities, to the extent properly taken into account under the Code) among the Purchased Assets (the "<u>Allocation</u>") in accordance with section 1060 of the Code and the Treasury regulations promulgated thereunder (and any similar provision of state, local or foreign Law, as appropriate).  Within thirty (30) days following the Seller's receipt of the Allocation, the Seller may notify and provide the Buyer with any comments to the Allocation.  The Buyer shall include any reasonable comments to the Allocation so provided by the Seller.  The parties hereto agree to file all Tax Returns (including the filing of Form 8594 with their United States federal income Tax Return for the taxable year that includes the date of the Closing) consistent with the Allocation unless otherwise required by applicable Law.  In administering the Chapter 11 Case, neither the Seller nor the Bankruptcy Court shall be required to apply the Allocation in determining the manner in which the Purchase Price should be allocated as between the Seller, its estate, or creditors thereof.

3.4    <u>Withholding</u>.  The Buyer shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to Seller or any other Person such amounts as Buyer is required to deduct and withhold under the Code, or any Tax Law, with respect to the making of such payment.  Before making any such deduction or withholding, the Buyer shall provide any party on behalf of which such deduction or withholding is proposed to be made with ten (10) days advance written notice of the intention to make such deduction or withholding, which notice shall include the authority, basis and method of calculation for the proposed deduction or withholding, and the Buyer will cooperate with any reasonable request from such party to obtain reduction of or relief from such deduction or withholding.  To the extent that amounts are so withheld and paid to the applicable Governmental Body, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

**ARTICLE IV**
**THE CLOSING**

4.1    <u>Time and Place of the Closing</u>.  Upon the terms and subject to the satisfaction of the conditions contained in <u>ARTICLE VIII</u> of this Agreement, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated by this Agreement (the "<u>Closing</u>") shall take place at 10:00 a.m. (Eastern time) at the offices of Latham & Watkins LLP, 355 South Grand Avenue, Los Angeles, California 90071-1560**,** no later than the first (1st) Business Day following the date on which the conditions set forth in <u>ARTICLE VIII</u> have been satisfied or, to the extent permitted, waived by the applicable party in writing (other than conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permitted, waiver of such conditions at or prior to the Closing), or at such other place and time as the Buyer and the Seller may mutually agree.  The date on which the Closing actually occurs is herein referred to as the "<u>Closing Date</u>."  For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:01 a.m. (Eastern time) on the Closing Date.

4.2    <u>Deliveries by the Seller</u>.  At or prior to the Closing, the Seller shall deliver the following to the Buyer:

(a)     the Bill of Sale, duly executed by the Seller;

(b)     the Assumption Agreement, duly executed by the Seller;

(c)     the IP Assignment Agreement, duly executed by the applicable Seller;

(d)     such other instruments of assignment or conveyance duly executed by the applicable Seller as shall be reasonably requested or reasonably necessary to transfer the Purchased Assets to the Buyer in accordance with this Agreement; and

(e)     the certificate contemplated by <u>Section 8.1.</u>

4.3     <u>Deliveries by the Buyer</u>.  At or prior to the Closing, the Buyer shall deliver the following to the Seller:

(a)     the Closing Payment;

(b)     certified copies of the resolutions duly adopted by the Buyer's board of directors authorizing the execution, delivery and performance of this Agreement and each of the other transactions contemplated hereby, as well as any other approvals required for Buyer to consummate the transactions contemplated hereby;

(c)     the Assumption Agreement and the IP Assignment Agreement, duly executed by the Buyer;

(d)     such other instruments of assumption duly executed by the Buyer as shall be reasonably requested by the Seller or reasonably necessary for the Buyer to assume the Assumed Liabilities and otherwise effectuate the transactions contemplated hereby, in each case in accordance with this Agreement; and

(e)     the certificate contemplated by <u>Section 8.2.</u>

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Subject to any information (a) contained, or incorporated by reference, in any Seller SEC Report, or (b) set forth in the disclosure schedules delivered by the Seller to Buyer prior to the execution of this Agreement (the "<u>Schedules</u>"), the Seller hereby represents and warrants to the Buyer (which representations and warranties shall expire as of the Closing Date) that:

5.1     <u>Organization and Good Standing</u>.  The Seller is a corporation or other entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, formation or organization.  The Seller is duly qualified or authorized to do business as a foreign corporation or entity and is in good standing under the laws of each jurisdiction in which the conduct of its business or the ownership or leasing of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

16

5.2     Authorization of Agreement.     Subject to the applicable provisions of the Bankruptcy Code and the Bankruptcy Court's entry of the Sale Order, the Seller has all requisite corporate power and authority to execute and deliver this Agreement and the other Transaction Documents and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of the Seller.  Subject to the Bankruptcy Court's entry of the Sale Order, this Agreement has been, and each of the other Transaction Documents will be, at or prior to the Closing, duly and validly executed and delivered by the Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each other Transaction Document when so executed and delivered will constitute, the legal, valid and binding obligations of the Seller, enforceable against it in accordance with its respective terms, in each case, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity (collectively, "Bankruptcy Exceptions").

5.3     Conflicts; Consents of Third Parties.

(a)     Subject to the Bankruptcy Court's entry of the Sale Order and except to the extent excused by or unenforceable as a result of the filing of the Chapter 11 Case, the execution and delivery by the Seller of this Agreement or the other Transaction Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by the Seller with any of the provisions hereof or thereof will not (i) conflict with the organizational documents of the Seller; (ii) result in a breach of, or constitute a default (or an event which with the giving of notice or lapse of time or both would reasonably be expected to become a default) under any material Contract or material Permit to which the Seller is a party or by which any of the Purchased Assets are bound, or give to others any right of termination, amendment, acceleration or cancellation of, or result in the creation of a Lien on any of the Purchased Assets; (iii) conflict with or violate any Law or Order applicable to the Seller or by which any of the Purchased Assets are bound; provided that in the case of clauses (ii) and (iii) for such matters that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(b)     No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Governmental Body is required on the part of the Seller in connection with the execution and delivery of this Agreement or the Transaction Documents or the compliance by the Seller with any of the provisions hereof or thereof, or the consummation of the transactions contemplated hereby or thereby, except for (i) entry by the Bankruptcy Court of the Sale Order, and (ii) such matters that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

5.4     Taxes.  To the Knowledge of the Seller:

(a)     Subject to such exceptions that would not reasonably be expected to result in a Material Adverse Effect, all material Tax Returns required to be filed by or with respect to the Seller have been timely filed (taking into account any extension of time within which to file).

(b)      Subject to such exceptions that would not reasonably be expected to result in a Material Adverse Effect, all material amounts of Taxes of the Seller shown on any Tax Returns filed by or with respect to the Seller have been timely paid (other than Taxes being contested in good faith by appropriate proceedings).

(c)      Except as set forth on Schedule 5.4(c), there is no audit, examination, deficiency or refund litigation outstanding with respect to any material amount of Taxes of the Seller and no Taxing Authority has given written notice of the commencement of any audit, examination or deficiency litigation with respect to any such Taxes.

(d)      There are no Liens as a result of any material unpaid Taxes upon the Purchased Assets other than Permitted Liens.

(e)      The Seller has not engaged in any "listed transactions" as defined in Treasury Regulations Section 1.6011-4(b)(2).

(f)      Notwithstanding any representation or warranty in this Agreement to the contrary, (i) no representation or warranty is being made by the Seller as to the amount of any net operating loss, net operating loss carryover, tax credit, tax credit carryover or other Tax attributes of the Seller for federal, state, local or foreign Tax purposes, (ii) no representation or warranty is being made in this Section 5.4 with respect to any Post-Closing Tax Period, and (iii) this Section 5.4 represents the sole and exclusive representation and warranty of the Seller regarding Tax matters.

5.5      Title to Assets; Sufficiency of Assets; Real Property.

(a)      Subject to the entry of the Sale Order and the releases included therein, the Seller has good and valid title to, or, in the case of leased assets have good and valid leasehold interests in, all tangible personal property included in the Purchased Assets free and clear, as of the Closing, of all Liens (other than Permitted Liens), except as set forth in Schedule 5.5(a) or as would not reasonably be expected to result in a Material Adverse Effect.

(b)      Schedule 5.5(b) sets forth, in each case as of the date hereof, a complete list of all leases and subleases of real property to or by the Seller (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, individually, a "Real Property Lease" and collectively, the "Real Property Leases").  To the Knowledge of the Seller, the Seller has not received or provided any written or oral notice of any default or event that with notice or lapse of time, or both, would constitute a default by the Seller under any of the Real Property Leases, except for such defaults that are not effective under the Bankruptcy Code or, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(c)      The Seller does not own any real property.

5.6      Intellectual Property.  To the Knowledge of the Seller:

(a)      Schedule 5.6(a) identifies as of the date hereof: (i) each item of material Acquired Program Registered IP in which the Seller has or purports to have an ownership interest

18

of any nature (whether exclusively, jointly with another Person or otherwise); (ii) the jurisdiction in which such item of material Acquired Program Registered IP has been registered or filed and the applicable registration or serial number; and (iii) any other Person that has an ownership interest in such item of material Acquired Program Registered IP and the nature of such ownership interest.

(b)     As of the date hereof, no registrations or applications for the Acquired Program IP owned by the Seller have expired or been canceled or abandoned, other than for Acquired Program IP that is not material to the Acquired Program Assets that expired in accordance with the term of such rights or where the Seller have made a business judgment to permit such registrations or applications to expire, be canceled, or become abandoned.

(c)     Schedule 5.6(c) lists, as of the date hereof, each Contract pursuant to which: (i) the Seller licenses any material Intellectual Property or material Intellectual Property Right from any Person (other than licenses of non-customized software that are generally available to the public on standard terms); and (ii) any Person has been granted any license under, or otherwise has received or acquired any right (whether or not currently exercisable) or interest in, any material Acquired Program IP owned by the Seller.

(d)     Except as set forth on Schedule 5.6(d) and as would not be reasonably expected to result in a Material Adverse Effect, as of the date hereof, no Person has infringed, misappropriated or otherwise violated, and no Person is infringing, misappropriating or otherwise violating, any Acquired Program IP owned by the Seller.

(e)     Except as set forth on Schedule 5.6(e) and as would not be reasonably expected to result in a Material Adverse Effect, as of the date hereof, there is no pending Legal Proceeding or asserted claim (including any "cease and desist" letters and invitations to license) that the Seller (solely in respect of the Acquired Program Assets) has, during the one (1) year period prior to the date of this Agreement, infringed, violated or misappropriated, or is infringing or violating any Intellectual Property Rights of any third Person.

5.7     Litigation.  Except as set forth on Schedule 5.7, other than in connection with the Chapter 11 Case, as of the date hereof, to the Knowledge of the Seller, there are no Legal Proceedings pending or threatened that relates to and would reasonably be expected to have a Material Adverse Effect on any of the Purchased Assets.  The Seller is not subject to any Orders that would reasonably be expected to have a Material Adverse Effect.

5.8     Compliance with Laws.  Except as set forth in Schedule 5.8, the Seller (i) is in compliance with all Laws applicable to the Purchased Assets and the conduct of the Acquired Program Assets, except where the failure to be in compliance, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect and (ii) have not received any written notice of or been charged with the violation of any such Laws, except where such violation, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

5.9     Insurance.  Schedule 5.9 lists each material insurance policy maintained by or on behalf of the Seller as of the date hereof relating to the Acquired Program Assets (other than the

Excluded Insurance Policies) and a true and complete copy of each such policy has been made available to Buyer prior to the date hereof.  All such insurance policies are in full force and effect, and the Seller is not in material default with respect to any of its obligations under any of such material insurance policies.

5.10    Financial Advisors.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Seller in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment from the Buyer in respect thereof.

**ARTICLE VI**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

The Buyer hereby represents and warrants to the Seller that (which representations and warranties shall expire as of the Closing Date):

6.1    Organization and Good Standing.  The Buyer is a corporation or other entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, formation or organization.  The Buyer is duly qualified or authorized to do business as a foreign corporation or entity and is in good standing under the laws of each jurisdiction in which the conduct of its business or the ownership or leasing of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

6.2    Authorization of Agreement.  The Buyer has all requisite corporate power and authority to execute and deliver this Agreement and the other Transaction Documents and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of the Buyer.  This Agreement has been, and each of the other Transaction Documents will be, at or prior to the Closing, duly and validly executed and delivered by the Buyer and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each other Transaction Document when so executed and delivered will constitute, the legal, valid and binding obligations of the Buyer, enforceable against it in accordance with its respective terms, in each case, subject to applicable Bankruptcy Exceptions.

6.3    Conflicts; Consents of Third Parties.

(a)    The execution and delivery by the Buyer of this Agreement or the other Transaction Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by the Buyer with any of the provisions hereof or thereof will not (i) conflict with the organizational documents of the Buyer; (ii) result in a breach of, or constitute a default (or an event which with the giving of notice or lapse of time or both would reasonably be expected to become a default) under any material Contract or material Permit to which the Buyer is a party or by which any of the property or assets of the Seller is bound; (iii) conflict with or violate any Law or Order applicable to the Buyer or by which any of the properties or assets of the Buyer are bound; provided

20

that in the case of clauses (ii) and (iii) for such matters that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(b) No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Governmental Body is required on the part of the Buyer in connection with the execution and delivery of the Transaction Documents or the compliance by the Buyer with any of the provisions thereof, or the consummation of the transactions contemplated thereby, except for (i) entry by the Bankruptcy Court of the Sale Order and (ii) such matters that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

6.4    <u>Financial Ability</u>. The Buyer has, and will have at the Closing, all funds necessary to pay the Purchase Price and to consummate the transactions contemplated by the Transaction Documents, and has furnished to the Seller written evidence thereof. The Buyer has not incurred any obligation, commitment, restriction or liability of any kind, and is not contemplating or aware of any obligation, commitment, restriction or liability of any kind, in either case that would reasonably be expected to impair or adversely affect such resources. The Buyer affirms that it is not a condition to the Closing or to any of its other obligations under this Agreement that the Buyer obtain financing for or related to any of the transactions contemplated hereby.

6.5    <u>Litigation</u>. To the knowledge of the Buyer, there are no Legal Proceedings pending or threatened against or involving the Buyer relating to the Buyer that, if adversely determined, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, or that are reasonably expected to prohibit or restrain the ability of the Buyer to enter into the Transaction Documents or consummate the transactions contemplated thereby.

6.6    <u>Financial Advisors</u>. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Buyer in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment from the Seller in respect thereof.

6.7    <u>No Prior Activities</u>. Except for obligations incurred in connection with its incorporation or organization or the negotiation and consummation of this Agreement and the transactions contemplated hereby, the Buyer has not incurred any obligation or liability or engaged in any business or activity of any type or kind whatsoever or entered into any agreement or arrangement with any Person that would reasonably be expected to have an adverse effect on the ability of the Buyer to consummate the transactions contemplated hereby.

6.8    <u>Solvency; Surviving Corporation Post-Closing</u>. The Buyer is not entering into this Agreement or the transactions contemplated hereby with the actual intent to hinder, delay or defraud either present or future creditors. After giving effect to the transactions contemplated by this Agreement, at and immediately after the Closing, the Buyer: (a) will be solvent (in that both the fair value of its assets will not be less than the sum of its debts and that the present fair saleable value of its assets will not be less than the amount required to pay its probable liability on its recourse debts as they mature or become due); (b) will have adequate capital and liquidity with which to engage in its business; and (c) will not have incurred and does not plan to incur debts beyond its ability to pay as they mature or become due. The representation set forth in this <u>Section</u>

21

6.8 shall survive the Closing Date and shall continue in full force and effect in accordance with its terms.

6.9     Purchased Assets "AS IS;" Certain Acknowledgements.

(a)     The Buyer agrees, warrants and represents that (i) the Buyer is purchasing the Purchased Assets on an "AS IS" and "WITH ALL FAULTS" basis based solely on Buyer's own investigation of the Purchased Assets and (ii) neither the Seller nor any of their Representatives have made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Purchased Assets, any part of the Purchased Assets, the financial performance of the Purchased Assets or the Acquired Program Assets, or the physical condition of the Purchased Assets.  The Buyer further acknowledges that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by the Seller and the Buyer after good-faith arms-length negotiation in light of the Buyer's agreement to purchase the Purchased Assets "AS IS" and "WITH ALL FAULTS."   The Buyer agrees, warrants and represents that, except as set forth in this Agreement, the Buyer has relied, and shall rely, solely upon its own investigation of all such matters, and that the Buyer assumes all risks with respect thereto.  EXCEPT AS SET FORTH IN ARTICLE V OF THIS AGREEMENT, THE SELLING ENTITIES MAKE NO EXPRESS WARRANTY, NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, AND NO IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO THE SELLING ENTITIES, THE ACQUIRED SUBSIDIARIES, THE BUSINESS, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES, AND THE TRANSACTIONS CONTEMPLATED HEREBY. THE BUYER ACKNOWLEDGES AND AGREES THAT ALL REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN SHALL EXPIRE AT CLOSING AND THE SELLER SHALL NOT HAVE ANY LIABILITY, AND THE BUYER SHALL NOT HAVE ANY RECOURSE, FOLLOWING THE CLOSING IN CONNECTION THEREWITH.

(b)     The Buyer acknowledges and agrees that it (i) has had an opportunity to discuss the Seller, the Acquired Program Assets, the Purchased Assets, the Assumed Liabilities and the transactions contemplated hereby with the management of Seller and has been afforded the opportunity to ask questions of and receive answers from management of Seller, (ii) has had reasonable access to the books and records of the Seller, and (iii) has conducted its own independent investigation of the Seller, the Acquired Program Assets, the Purchased Assets, the Assumed Liabilities, and the transactions contemplated hereby.  In connection with the investigation by the Buyer, the Buyer has received or may receive from the Seller certain projections, forward-looking statements and other forecasts and certain business plan information. The Buyer acknowledges and agrees that neither the Seller nor any other Person will have or be subject to any Liability or indemnification obligation to the Buyer or any other Person resulting from the distribution to, or use by, the Buyer or any of its Affiliates or any of the Buyer's Representatives of any information provided to the Buyer or any of its Affiliates or any of the Buyer's Representatives by the Seller or any of the Seller's Representatives, including any information, documents, projections, forward-looking statements, forecasts or business plans or any other material made available in any "data room," any confidential information memoranda or any management presentations in expectation of or in connection with the transactions contemplated by this Agreement.

22

(c)     Except for the representations and warranties contained in ARTICLE V, the Buyer acknowledges that none of the Seller nor any other Person on behalf of the Seller makes any express or implied representation or warranty with respect to the Seller, the Acquired Program Assets, the Purchased Assets, the Assumed Liabilities, or the transactions contemplated hereby, or with respect to any information provided to Buyer or any of its Affiliates or Representatives, and the Seller hereby disclaim any other representations or warranties made by the Seller, the Acquired Subsidiaries or any other Person with respect to the execution and delivery of this Agreement, the Seller, the Acquired Program Assets, the Purchased Assets, the Assumed Liabilities and the transactions contemplated hereby.  The Buyer has not relied on any representation, warranty or other statement by any Person on behalf of the Seller, other than the representations and warranties of the Seller expressly contained in ARTICLE V.  The Buyer acknowledges and agrees that the representations and warranties set forth in ARTICLE V are made solely by the Seller, and no Affiliate of the Seller, Seller's Representative or other Person shall have any responsibility or Liability related thereto.

## ARTICLE VII
## COVENANTS OF THE PARTIES

7.1     Access to Information.  Prior to the Closing Date and subject to applicable Laws and Section 7.5, the Buyer shall be entitled, through its authorized Representatives, to have such reasonable access to the officers, properties, books and records of the Seller as the Buyer reasonably requests upon reasonable advance written notice in connection with the Buyer's efforts to consummate the transactions contemplated by this Agreement.  Any such access and examination shall be conducted during regular business hours and under reasonable circumstances and shall be subject to restrictions under applicable Law.  In connection with any such access and examination, the Buyer and its Representatives shall cooperate with the Seller and its Representatives and shall use their commercially reasonable efforts to minimize any disruption to the business of the Seller.  Notwithstanding anything herein to the contrary, no such access or examination shall be permitted to the extent that it would (i) unreasonably disrupt the operations of the Seller or (ii) require the Seller to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which the Seller are bound; provided, however, that the Seller shall request, but shall not be required to obtain, a waiver of any such confidentiality obligations upon the Buyer's reasonable request.  Notwithstanding anything to the contrary contained herein, prior to the Closing, (a) without the prior written consent of the Seller, the Buyer and its Representatives shall not contact or communicate with the employees, customers, suppliers, independent contractors, landlords, lessors, banks and or other business relations of the Seller in connection with, or relating in any way to, the transactions contemplated hereby, and provided that the Seller shall have the right to have a representative present during any such contact in the event that it consents to such contact and (b) the Buyer shall have no right to perform invasive or subsurface investigations of the properties or facilities of the Seller without the prior written consent of the Seller (which consent may be withheld for any reason).

7.2     Conduct of the Business Pending the Closing.  Prior to the Closing, except (i) as required by applicable Law or any Order of the Bankruptcy Court (or as reasonably necessary in connection with the Chapter 11 Case or the Auction) or (ii) as otherwise contemplated by this Agreement, or (iii) with the prior written consent of the Buyer (which consent shall not be unreasonably withheld, delayed or conditioned), the Seller shall conduct the Acquired Program

Assets in the ordinary course of business (taking into account in each case the fact that the Chapter 11 Case has commenced, the fact that the Acquired Program Assets is be operated while in bankruptcy, the fact that the operation of the Acquired Program Assets may require additional financing and the fact that the continuing operation of the Acquired Program Assets, including payments to suppliers, will be subject to the approval of the Bankruptcy Court).

7.3     <u>Regulatory Approvals</u>.  Subject to the terms and conditions herein provided, each of the parties agrees to use its reasonable best efforts to take, or cause to be taken, all action, and to do, or cause to be done as promptly as practicable, all things necessary, proper and advisable under applicable Laws to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement.  Subject to appropriate confidentiality protections, each party hereto shall furnish to the other parties such necessary information and reasonable assistance as such other party may reasonably request in connection with the foregoing.  Following the date of this Agreement, at the Buyer's expense, the Seller agrees to cooperate with the Buyer's reasonable requests to facilitate the transfer of any Permits that are, or relate to, the Purchased Assets to the Buyer, and will make any filings with applicable Governmental Bodies in connection therewith as reasonably requested by Buyer, provided that no such transfers shall delay or be a condition to Closing, nor shall such obligations prohibit the Seller from ceasing operations or winding up its affairs following the Closing.

7.4     <u>Further Assurances</u>.  Prior to the Closing, the Buyer, shall use reasonable best efforts to (a) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (b) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.  On and after the Closing, the Seller and the Buyer shall use their commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated hereby, including in order to more effectively vest in the Buyer all of the Seller's right, title and interest to the Purchased Assets, free and clear of all Liens (other than Permitted Liens).  Nothing in this <u>Section 7.4</u> shall (x) require the Seller to make any expenditure or incur any obligation on their own or on behalf of the Buyer, (y) prohibit the Seller from ceasing operations or winding up its affairs following the Closing, or (z) prohibit the Seller from taking such actions as are necessary to conduct the Auction, as are required by the Bankruptcy Court, or as would otherwise be permitted under <u>Section 7.2</u>.

7.5     <u>Confidentiality</u>.  The Buyer acknowledges that the information provided to them in connection with this Agreement and the transactions contemplated hereby is subject to the terms of the confidentiality agreement between the Seller and Buyer executed in August 2019 (the "<u>Confidentiality Agreement</u>"), the terms of which are incorporated herein by reference.  The Confidentiality Agreement shall terminate at the Closing.

7.6     <u>Preservation of Records</u>.  The Buyer shall preserve and keep the records held by them relating to the Acquired Program Assets for a period of seven (7) years from the Closing Date (or longer if required by applicable Law) and shall make such records (or copies) and reasonably appropriate personnel available, at reasonable times and upon reasonable advance notice, to the Seller as may be reasonably required by the Buyer in connection with any insurance

claims by, Legal Proceedings or Tax audits against, governmental investigations of, filing of Tax Returns by, making of any election relating to Taxes by, or compliance with legal requirements by, the Seller or any of its Affiliates.

7.7    <u>Publicity</u>.  Prior to the closing of the transaction contemplated by this Agreement, the Buyer shall not issue any press release or public announcement or comment concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the Seller, which approval will not be unreasonably withheld or delayed, unless and only to the extent, in the judgment of the Buyer upon the advice of counsel, disclosure is otherwise required by applicable Law (including the periodic reporting requirements under the Exchange Act); <u>provided</u> that, to the extent so required, the Buyer shall use its commercially reasonable efforts consistent with applicable Law to consult with the Seller with respect to the text thereof.  After the completion of the transactions contemplated by this Agreement, the Buyer may issue any press release or public announcement or comment concerning this Agreement or the transactions contemplated hereby that, in its sole and absolute discretion, it deems appropriate.

7.8    <u>Tax Matters</u>.

(a)    The Buyer and the Seller shall cooperate fully with each other in the conduct of any audit, litigation or other proceeding relating to Taxes involving the Purchased Assets or the Allocation.

(b)    Any sales, use, value added, property transfer, documentary, stamp, registration, recording or similar Tax payable in connection with the sale or transfer of the Purchased Assets and the assumption of the Assumed Liabilities ("<u>Transfer Taxes</u>") shall be borne by the Buyer.

(c)    The Seller shall be responsible for all Property Taxes levied with respect to the Purchased Assets attributable to any Pre-Closing Tax Period.  The Buyer shall be responsible for all Property Taxes levied with respect to the Purchased Assets attributable to any Post-Closing Tax Period.  All Property Taxes levied with respect to the Purchased Assets for any Straddle Period shall be apportioned between Buyer and the Seller based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period.  The Seller shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and the Buyer shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period.  Upon receipt of any bill for such Property Taxes, the Buyer or the Seller, as applicable, shall present a statement to the other setting forth the amount of reimbursement to which each is entitled under this <u>Section 7.8(c)</u> together with such supporting evidence as is reasonably necessary to calculate the proration amount.  The proration amount shall be paid by the party owing it to the other within ten (10) Business Days after delivery of such statement.

7.9    <u>Transfer of Purchased Assets</u>.  The Buyer will make all necessary arrangements for the Buyer to take possession of the Purchased Assets, and, at the Buyer's expense, to transfer same to a location operated by the Buyer, to the extent necessary, as promptly as practicable following the Closing.

      7.10   <u>Overbid Procedures; Adequate Assurance</u>.

      (a)   The Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to higher or better bids and Bankruptcy Court approval. The Buyer and the Seller acknowledge that the Seller must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice thereof to the creditors of the Seller and other interested parties, providing information about the Acquired Program Assets to prospective bidders, entertaining higher or better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an auction (the "<u>Auction</u>").

      (b)   The bidding procedures to be employed with respect to this Agreement and any Auction shall be those reflected in the Bidding Procedures Order. The Buyer acknowledges that the Seller and its Affiliates and Representatives are, and may continue, soliciting inquiries, proposals or offers for the Purchased Assets in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order. Further, the Buyer covenants and agrees to be bound by all of the terms and requirements of, and to comply with, the Bidding Procedures Order.

      (c)   Prior to the Sale Hearing, the Buyer shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assumed Agreements and Assumed Real Property Leases. The Buyer agrees that it will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Agreements and the Assumed Real Property Leases, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's Representatives available to testify before the Bankruptcy Court.

      (d)   If an Auction is conducted, and the Seller does not choose the Buyer as the Successful Bidder, but instead chooses the Buyer as the bidder as having submitted the next highest or otherwise best bid at the conclusion of such Auction (the "<u>Backup Bidder</u>"), the Buyer shall be the Backup Bidder and its bid shall be the last highest bid of the Buyer made at the Auction. If the Buyer is chosen as the Backup Bidder, the Buyer shall be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by the Buyer prior to or at the Auction) open and irrevocable until the earlier of: (i) the date of closing on the sale of the Purchased Assets to the Successful Bidder; and (ii) thirty (30) calendar days following the date of entry of the Order approving the sale of the Purchased Assets to the Successful Bidder (such date, the "<u>Outside Backup Date</u>"); *provided, however*, that if the Successful Bidder shall fail to close on its purchase of the Purchased Assets within the period set forth above, the Backup Bidder shall be deemed to be the Successful Bidder and the Seller will be authorized, without further Order of the Bankruptcy Court, to, and the Backup Bidder shall, consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by the Buyer prior to or at the Auction).

## ARTICLE VIII
## CONDITIONS TO CLOSING

8.1    <u>Conditions Precedent to Obligations of Buyer</u>.  The obligations of the Buyer to effect the sale and purchase of the Purchased Assets and to consummate the other transactions contemplated by this Agreement shall be subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by the Buyer in whole or in part to the extent permitted by applicable Law):

(a)    (1) (i) the representations and warranties of the Seller set forth in <u>ARTICLE V</u> (other than <u>Section 5.2</u> and those other representations and warranties that address matters as of a specific date) shall be true and correct as of the Closing Date as though then made at and as of the Closing Date (without giving effect to materiality, Material Adverse Effect, or similar phrases in the representations and warranties), and (ii) the representations and warranties of the Seller set forth in <u>ARTICLE V</u> that address matters as of a specific date (other than <u>Section 5.2</u>) shall be true and correct as of such dates (without giving effect to materiality, Material Adverse Effect, or similar phrases in the representations and warranties), except where the failure of such representations and warranties referenced in the immediately preceding clauses (i) and (ii) to be so true and correct, individually or in the aggregate, has not had a Material Adverse Effect; (2) the representations and warranties set forth in <u>Section 5.2</u> shall be true and correct in all material respects as of the Closing Date as though made at and as of the Closing Date (except for representations and warranties set forth in <u>Section 5.2</u> which address matters only as of a specific date, which representations and warranties shall continue as of the Closing Date to be true and correct as of such specific date in all material respects); and (3) the Buyer shall have received a certificate signed by an executive officer of the Seller, dated the Closing Date, to the foregoing effect;

(b)    the Seller shall have performed and complied in all material respects with all covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date, and the Buyer shall have received a certificate signed by an executive officer of the Seller, dated the Closing Date, to the foregoing effect;

(c)    there shall not be in effect any Law or Order of a Governmental Body having competent jurisdiction over the business of the Seller (other than a *de minimis* portion thereof) prohibiting the consummation of the transactions contemplated by this Agreement;

(d)    the Bankruptcy Court shall have entered the Sale Order, which Order shall not be subject to stay pending appeal; and

(e)    the Buyer shall have received the other items to be delivered to it pursuant to <u>Section 4.2</u>.

8.2    <u>Conditions Precedent to Obligations of the Seller</u>.  The obligations of the Seller to effect the sale and purchase of the Purchased Assets and to consummate the other transactions contemplated by this Agreement shall be subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by the Seller in whole or in part to the extent permitted by applicable Law):

27

(a)       (1)(i) the representations and warranties of the Buyer set forth in <u>ARTICLE VI</u> (other than <u>Section 6.2</u> and those other representations and warranties that address matters as of a specific date) shall be true and correct as of the Closing Date as though then made at and as of the Closing Date (without giving effect to materiality or similar phrases in the representations and warranties) and (ii) the representations and warranties of the Buyer set forth in <u>ARTICLE VI</u> that address matters as of a specific date (other than <u>Section 6.2</u>) shall be true and correct as of such dates (without regard to materiality or similar phrases in the representations and warranties), except where the failure of such representations and warranties referenced in the immediately preceding clauses (i) and (ii) to be so true and correct, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect on the ability of the Buyer to consummate the transactions contemplated hereby; (2) the representations and warranties set forth in <u>Section 6.2</u> shall be true and correct in all material respects as of the Closing Date as though made at and as of the Closing Date (except for representations and warranties set forth in <u>Section 6.2</u> which address matters only as of a specific date, which representations and warranties shall continue as of the Closing Date to be true and correct in all material respects as of such specific date); and (3) the Seller shall have received a certificate signed by an executive officer of the Buyer, dated the Closing Date, to the foregoing effect;

(b)       the Buyer shall have performed and complied in all material respects with all covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date, and the Seller shall have received a certificate signed by an officer of the Buyer, dated the Closing Date, to the foregoing effect;

(c)       there shall not be in effect any Law or Order of a Governmental Body having competent jurisdiction over the business of the Seller (other than a *de minimis* portion thereof) prohibiting the consummation of the transactions contemplated by this Agreement;

(d)       the Bankruptcy Court shall have entered the Sale Order, which Order shall not be subject to stay pending appeal; and

(e)       the Seller shall have received the other items to be delivered to it pursuant to <u>Section 4.3</u>.

8.3       <u>Frustration of Closing Conditions</u>.  Neither the Buyer nor the Seller may rely on the failure of any condition set forth in <u>Sections 8.1</u> or <u>8.2</u>, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

**ARTICLE IX**
**TERMINATION; WAIVER**

9.1       <u>Termination</u>.

(a)       This Agreement may be terminated at any time prior to the Closing:

(i)       by mutual written consent of the Seller and the Buyer;

(ii)       by the Seller or the Buyer, at any time, if (A) there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise

28

prohibited (unless the consummation of the transactions contemplated hereby in violation of such Law would not reasonably be expected to have a Material Adverse Effect); (B) consummation of the transactions contemplated hereby would violate any non-appealable Order of any Governmental Body having competent jurisdiction; (C) the Buyer is chosen at the Auction to be the Successful Bidder and the Outside Date has passed; (D) the Buyer is chosen at the Auction to be the Backup Bidder (and the Buyer does not become the Successful Bidder on or before the Outside Backup Date) and the Outside Backup Date has passed; (E) an Alternative Transaction is consummated; or (F) the Chapter 11 Case is dismissed or converted to cases under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement;

provided, however, that the party seeking to terminate this Agreement pursuant to this Section 9.1(a)(ii) shall have used its commercially reasonable efforts to avoid and shall not have been a principal cause of the occurrence of the foregoing conditions;

(iii)    by the Seller, at any time, if (A) any of the representations and warranties of Buyer contained in ARTICLE VI shall be inaccurate as of the Closing Date, or shall have become inaccurate as of a date subsequent to the date of this Agreement (as if made on and as of such subsequent date) such that the condition set forth in Section 8.2(a) would not then be satisfied; or (B) the Buyer shall have failed to perform or comply with any of the covenants or agreements contained in this Agreement to be performed and complied with by the Buyer such that the condition set forth in Section 8.2(b) would not then be satisfied;

provided, however, that if an inaccuracy in any of the representations and warranties of the Buyer or a failure to perform or comply with a covenant or agreement by the Buyer is curable by the Buyer within ten (10) days after the date of written notice from the Seller to the Buyer of the occurrence of such inaccuracy or failure, then the Seller may not terminate this Agreement under this Section 9.1(a)(iii) on account of such inaccuracy or failure (x) prior to delivery of such written notice to the Buyer or during the ten (10) day period commencing on the date of delivery of such notice or (y) following such ten (10) day period, if such inaccuracy or failure shall have been fully cured during such ten (10) day period; or

(iv)    by the Buyer, at any time, if (A) any of the representations and warranties of the Seller contained in ARTICLE V shall be inaccurate as of the Closing Date, or shall have become inaccurate as of a date subsequent to the date of this Agreement (as if made on and as of such subsequent date) such that the condition set forth in Section 8.1(a) would not then be satisfied; or (B) the Seller shall have failed to perform or comply with any of its respective covenants or agreements contained in this Agreement to be performed and complied with by it such that the condition set forth in Section 8.1(b) would not then be satisfied;

provided, however, that if an inaccuracy in any of the representations and warranties of the Seller or a failure to perform or comply with a covenant or agreement by any of the Seller is curable by it within ten (10) days after the date of written notice from the Buyer to the Seller of the occurrence of such inaccuracy or failure, then the Buyer may not terminate this Agreement under this Section

9.1(a)(iv) on account of such inaccuracy or failure (y) prior to delivery of such written notice to the Seller or during the ten (10) day period commencing on the date of delivery of such notice or (z) following such ten (10) day period, if such inaccuracy or failure shall have been fully cured during such ten (10) day period.

(b)    This Agreement shall terminate automatically in the event that the Buyer is not chosen at the Auction to be the Successful Bidder or the Backup Bidder.

9.2    Procedure and Effect of Termination.

(a)    In the event of termination of this Agreement by either Seller or Buyer pursuant to Section 9.1, written notice thereof shall forthwith be given by the terminating party to the other party, specifying the provision hereof pursuant to which such termination is made, and this Agreement shall thereupon terminate and become void and of no further force and effect, and the transactions contemplated hereby shall be abandoned without further action by any of the parties hereto; provided, however, that (i) no party hereto shall be relieved of or released from any Liability arising from any willful, knowing or intentional breach by such party hereto of any provision of this Agreement and (ii) this Section 9.2, ARTICLE X, and the Confidentiality Agreement shall remain in full force and effect and survive any termination of this Agreement.

(b)    The Deposit will be returned to the Buyer (i) within five (5) Business Days following the date of entry of the Order approving the sale of the Purchased Assets to the Successful Bidder if this Agreement terminates pursuant to Section 9.1(b), or (ii) within three (3) Business Days after the Outside Backup Date if the Buyer is selected as the Backup Bidder at the Auction (and the Buyer does not become the Successful Bidder on or before the Outside Backup Date).

(c)    If this Agreement or the transactions contemplated herein are terminated other than by the Seller pursuant to Section 9.1(a)(iii), the Deposit shall be returned to the Buyer within two (2) Business Days following written notice of termination in accordance with Section 9.2(a).

9.3    Extension; Waiver.  At any time prior to the Closing, the Seller, on the one hand, or the Buyer, on the other hand, may, without application to or Order of the Bankruptcy Court (a) extend the time for the performance of any of the obligations or other acts of the Buyer (in the case of an agreed extension by the Seller) or the Seller (in the case of an agreed extension by the Buyer), (b) waive any inaccuracies in the representations and warranties of the Buyer (in the case of a wavier by the Seller) or the Seller (in the case of a waiver by the Buyer) contained herein or in any document delivered pursuant hereto, (c) waive compliance with any of the agreements of the Buyer (in the case of a wavier by the Seller) or the Seller (in the case of a waiver by the Buyer) contained herein, or (d) waive any condition to its obligations hereunder.  Any agreement on the part of the Seller, on the one hand, or the Buyer, on the other hand, to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of the applicable waiving party (without application to or Order of the Bankruptcy Court).  The failure or delay of any party hereto to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of those rights, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any rights hereunder.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

10.1    <u>Expenses</u>.  The Seller and the Buyer shall each be responsible for the fees and expenses incurred by it, or on behalf of it, in connection with, or in anticipation of, this Agreement and the consummation of the transactions contemplated hereby.

10.2    <u>Amendment and Modification</u>.  This Agreement may be amended, modified or supplemented only by a written instrument signed on behalf of each of the Seller and the Buyer, but without further application to or Order of the Bankruptcy Court.

10.3    <u>Survival</u>.  None of the representations and warranties of the parties hereto in this Agreement, in any instrument delivered pursuant to this Agreement, or in the Schedules or Exhibits attached hereto shall survive the Closing, and no party hereto shall, or shall be entitled to, make any claim or initiate any action against any other party hereto with respect to any such representation or warranty from or after the Closing.  None of the covenants or agreements of the parties in this Agreement shall survive the Closing, and no party hereto shall, or shall be entitled to, make any claim or initiate any action against any other party hereto with respect to any such covenant or agreement from or after the Closing, other than (a) the covenants and agreements of the parties contained in this <u>ARTICLE X</u> and in <u>ARTICLE III</u> and <u>ARTICLE IV</u> and (b) those other covenants and agreements contained herein that by their terms apply, or that are to be performed in whole or in part, after the Closing, which shall survive the consummation of the transaction contemplated by this Agreement until fully performed.

10.4    <u>Notices</u>.  All notices or other communications required or permitted under, or otherwise made in connection with, this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when delivered in person, (b) upon confirmation of receipt when transmitted by electronic mail, (c) upon receipt after dispatch by registered or certified mail, postage prepaid, or (d) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery), in each case, addressed as follows (or to such other addresses as the addressees shall indicate in accordance with the provisions hereof):

      (a)    If to the Seller, to:

            Sienna Biopharmaceuticals, Inc.
            30699 Russell Ranch Road, Suite 140
            Westlake Village, California 91362
            Email:  tandrews@siennabio.com
            Attention:  Tim Andrews, General Counsel and Secretary

            with a copy (which shall not constitute notice or
            constructive notice) to:

            Latham & Watkins LLP
            355 South Grand Avenue
            Los Angeles, California 90071-1560
            Email: brian.cuneo@lw.com; ted.dillman@lw.com
            Attention: Brian Cuneo & Ted Dillman

(b)    If to the Buyer, to:

Sebacia Inc.
2905 Premiere Parkway, Suite 150
Duluth, GA 30097
Attention:  Charles Abraham, Chief Executive Officer
Email: cabraham@sebacia.com

with a copy (which shall not constitute notice or
constructive notice) to:

Marshack Hays LLP
870 Roosevelt
Irvine, CA 92620
Attention: David Wood & Matthew Grimshaw
Email:  dwood@marshackhays.com;
mgrimshaw@marshackhays.com

10.5    Assignment.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto (whether by operation of law or otherwise) without the prior written consent of the other parties hereto, and any such assignment shall be null and void; provided that the rights of the Buyer under this Agreement may be assigned by the Buyer, without the prior written consent of the Seller, to one or more designees, so long as the Buyer shall continue to remain obligated in full hereunder.  No assignment by any party hereto (including an assignment by Buyer to any designee) shall relieve such party of any of its obligations hereunder. Subject to the foregoing, this Agreement and all of the provisions hereof shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns, including, in the case of the Seller, any trustee of the Chapter 11 Case or any subsequent case under Chapter 7 of the Bankruptcy Code.

10.6    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto.  Upon a determination that any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

10.7    Governing Law.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and all claims and causes of action arising out of, based upon, or related to this Agreement or the negotiation, execution or performance hereof, shall be governed by, and construed, interpreted and enforced in accordance with, the Laws of the State of Delaware, without regard to choice or conflict of law principles that would result in the application of any Laws other than the Laws of the State of Delaware.

US-DOCS\111662347.4

10.8    <u>Acknowledgement and Release</u>.  The Buyer acknowledges that the Seller is the sole Person bound by, or liable with respect to, the obligations and Liabilities of the Seller under this Agreement and the other documents to be delivered in connection herewith, and that no Affiliate of the Seller or any of their respective Subsidiaries or any current or former officer, director, stockholder, agent, attorney, employee, Representative, advisor or consultant of the Seller or any such other Person shall be bound by, or liable with respect to, any aspect of this Agreement and the other documents to be delivered in connection herewith.

10.9    <u>Submission to Jurisdiction; WAIVER OF JURY TRIAL</u>.

(a)    Any action, claim, suit or Legal Proceeding arising out of, based upon or relating to this Agreement or the transactions contemplated hereby and the proceedings related thereto shall be brought solely in the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court).  Each party hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) in respect of any action, claim, suit or Legal Proceeding arising out of, based upon or relating to this Agreement or any of the rights and obligations arising hereunder, and agrees that it will not bring any action arising out of, based upon or related thereto in any other court; *provided*, *however*, that, if the Chapter 11 Case is dismissed, any action, claim, suit or Legal Proceeding arising out of, based upon or relating to this Agreement or the transactions contemplated hereby shall be heard and determined solely in the Chancery Court of the State of Delaware and any state appellate court therefrom within the State of Delaware (or, if the Chancery Court of the State of Delaware declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware and any direct appellate court therefrom).  Each party hereto hereby irrevocably submits to the exclusive jurisdiction of such courts in respect of any action, claim, suit or Legal Proceeding arising out of, based upon or relating to this Agreement or any of the rights and obligations arising hereunder, and agrees that it will not bring any action arising out of, based upon or related thereto in any other court.  Each party hereto hereby irrevocably waives, and agrees not to assert as a defense, counterclaim or otherwise, in any such action, claim, suit or Legal Proceeding, (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve process in accordance with <u>Section 10.4</u>, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and (c) to the fullest extent permitted by applicable Law, any claim that (i) the suit, action or Legal Proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, action or Legal Proceeding is improper, or (iii) this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith, or the subject matter hereof or thereof, may not be enforced in or by such courts.  Each party hereto agrees that notice or the service of process in any action, claim, suit or Legal Proceeding arising out of, based upon or relating to this Agreement or any of the rights and obligations arising hereunder or thereunder, shall be properly served or delivered if delivered in the manner contemplated by <u>Section 10.4</u>.

(b)    EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY AND ALL RIGHT SUCH PARTY MAY HAVE TO TRIAL BY JURY IN ANY ACTION, CLAIM, SUIT OR LEGAL

PROCEEDING BETWEEN THE PARTIES HERETO ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE HEREOF.

10.10  <u>Counterparts</u>.  This Agreement may be executed by facsimile or pdf format and in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement, and which shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, pdf format or otherwise) to the other parties hereto.

10.11  <u>Incorporation of Schedules and Exhibits</u>.  All Schedules and all Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

10.12  <u>Entire Agreement</u>.  This Agreement (including all Schedules and all Exhibits), the Transaction Documents and the Confidentiality Agreement constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings among the parties hereto with respect thereto.

10.13  <u>Remedies</u>.  The parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or was otherwise breached and that monetary damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement.  It is accordingly agreed that, prior to any valid termination of this Agreement as provided in <u>Section 9.1</u>, the parties hereto shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, and any such injunction shall be in addition to any other remedy to which any party hereto is entitled, at law or in equity.

10.14  <u>Bulk Sales or Transfer Laws</u>.  The Buyer hereby waives compliance by the Seller with the provisions of the bulk sales or transfer laws of all applicable jurisdictions.  The Seller agree to cooperate with the Buyer, upon the reasonable request of the Buyer and at the Buyer's expense, in making any bulk sales filings the Buyer may, in its sole discretion, decide to file.

10.15  <u>Mutual Drafting; Headings; Information Made Available</u>.  The parties hereto participated jointly in the negotiation and drafting of this Agreement and the language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent.  If an ambiguity or question of intent or interpretation arises, then this Agreement will accordingly be construed as drafted jointly by the parties hereto, and no presumption or burden of proof will arise favoring or disfavoring any party hereto by virtue of the authorship of any of the provisions of this Agreement.  The descriptive headings and table of contents contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.  To the extent this Agreement refers to information or documents to be made available (or delivered or provided) to Buyer or its Representatives, the Seller shall be deemed to have satisfied such obligation if the Seller or any of its Representatives has made such information or document available (or delivered or provided such information or

document) to the Buyer or any of its Representatives in an electronic data room or via electronic mail prior to the date of this Agreement.

10.16   <u>Schedules</u>.  It is expressly understood and agreed that (a) the disclosure of any fact or item in any section of the Schedules shall be deemed disclosure with respect to any other section or subsection of this Agreement or the Schedules, (b) the disclosure of any matter or item in the Schedules shall not be deemed to constitute an acknowledgement that such matter or item is required to be disclosed therein, and (c) the mere inclusion of an item in the Schedules as an exception to a representation or warranty shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has had or would be reasonably likely to have a Material Adverse Effect.

10.17   <u>No Third Party Beneficiaries</u>.  Except for provisions expressly providing rights to the Representatives of the parties hereto, this Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment at all or for any specified period.

* * * * *

US-DOCS\111662347.4

**IN WITNESS WHEREOF**, the parties hereto have caused this Asset Purchase Agreement to be executed as of the date first written above.

**SELLER:**

SIENNA BIOPHARMACEUTICALS, INC.

By: _____

    Name: Frederick Beddingfield III
    Title:   Chief Executive Officer

**BUYER:**

SEBACIA INC.

By: _____

     Name: Charles Abraham
     Title:   Chief Executive Officer

[Signature Page to Asset Purchase Agreement]

**Exhibit A-2**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------- x
                                                        :
In re:                                                  :   Chapter 11
                                                        :
SIENNA BIOPHARMACEUTICALS, INC.,                        :   Case No. 19-12051 (MFW)
                                                        :
           Debtor.¹                                     :
                                                        :   Ref Docket Nos. 142, 163, 205, 206, 231, 232, and __
------------------------------------------------------- x
```

**ORDER (A) AUTHORIZING AND APPROVING (1) THE SALE OF SUBSTANTIALLY
ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS AND (2) THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES IN CONNECTION THEREWITH,
AND (B) GRANTING RELATED RELIEF**

Sienna Biopharmaceuticals, Inc., as debtor and debtor in possession in the above-captioned

chapter 11 case (the "**Debtor**"), pursuant to, among other things:

(i)       sections 105, 363 and 365 of title 11 of the United States Code
(the "**Bankruptcy Code**") and Rules 2002, 6004, 6006, and 9014 of the Federal
Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**");

(ii)      the *Motion of Debtor for Entry of Order (I)(A) Establishing Bidding
Procedures, Assumption and Assignment Procedures, and Stalking Horse
Procedures for Sale of Substantially All Assets, (B) Scheduling Auction and
Sale Hearing, and (C) Approving Form and Manner of Notice Thereof,
(II) Approving Sale of Substantially All Assets Free and Clear of Liens, Claims,
Encumbrances, and Other Interests, (III) Authorizing Assumption and
Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting
Related Relief*, filed on October 22, 2019 [Docket No. 142] (the "**Motion**");

(iii)     the *Notice of Possible Assumption and Assignment of Certain Executory
Contracts and Unexpired Leases*, filed on November 1, 2019 [Docket No. 163]
(the "**Cure Notice**");

(iv)      the *Order (I)(A) Establishing Bidding Procedures, Assumption and
Assignment Procedures, and Stalking Horse Procedures for Sale of
Substantially All Assets, (B) Scheduling Auction and Sale Hearing, and (C)*

---

¹   The last four digits of the Debtor's federal tax identification number are 4627.  The Debtor's mailing address is
30699 Russell Ranch Road, Suite 140, Westlake Village, California 91362.

*Approving Form and Manner of Notice Thereof; (II) Approving Sale of Substantially All Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (III) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief*, filed on November 13, 2019 [Docket No. 205] (the "**Bidding Procedures Order**");

(v)         the *Notice of Sale, Bidding Procedures, Auction and Sale Hearing*, entered on November 13, 2019 [Docket No. 206] (the "**Auction and Sale Notice**");

(vi)        the *Notice of Filing of Proposed Sale Order*, filed on November 29, 2019 [Docket No. 231];

(vii)    the *Notice of Auction*, filed on December 3, 2019 [Docket No. 232];

(viii)    the *Notice of Successful Bidder*, filed on [ ⬤ ], 2019 [Docket No. [ ⬤ ];

seeks entry of this order (this "**Sale Order**"): (a) approving the Sale of all of the Debtor's right, title and interest in and to the Purchased Assets (as defined in the Asset Purchase Agreement), free and clear of all Interests (as defined below) (the "**Sale**") to the Buyer (as defined below) pursuant to the terms and conditions of the Asset Purchase Agreement (as defined below); (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (c) granting certain related relief; after holding a hearing on November 12, 2019 (the "**Bidding Procedures Hearing**"), this Court entered the Bidding Procedures Order on November 13, 2019 [Docket No. 205]; and Sebacia, Inc. (the "**Buyer**") having been selected as the Successful Bidder; and upon the Buyer and the Debtor having entered into that certain Asset Purchase Agreement, dated as of December 5, 2019, a copy of which is attached hereto as Exhibit A (as may be amended, modified, or supplemented in accordance with the terms of this Sale Order and such agreement, the "**Asset Purchase Agreement**");[2] and this Court having conducted a hearing on the Motion on December 10, 2019 (the "**Sale Hearing**"); and all parties in interest having been heard, or having had the opportunity to be heard, regarding the Motion, the Asset Purchase Agreement, and this

---

2   Capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement or, if not defined therein, in the Motion.

25666806.1
US-DOCS\111618248.6

Sale Order; and this Court having reviewed and considered the Motion and all objections thereto, and the arguments of counsel made, and the evidence adduced, at the Bidding Procedures Hearing and the Sale Hearing; and upon the entire record of the Bidding Procedures Hearing and the Sale Hearing, and after due deliberation thereon, and good cause appearing therefor:

**THE COURT HEREBY FINDS THAT:**[3]

**Jurisdiction, Final Order, and Statutory Predicates**

A.      This Court has jurisdiction to hear and determine the Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of the Debtor's above-captioned chapter 11 case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

C.      The statutory predicates for the relief sought in the Motion are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and the applicable Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**Notice of the Sale, Auction and the Cure Payments**

D.      Actual written notice of the Sale Hearing, the Auction, the Motion, the Sale, the assumption, assignment, and/or transfer of the Assumed Agreements and Assumed Real Property Leases (collectively, the "**Assigned Contracts**"), and the entry of this Sale Order has been afforded to all known interested Persons entitled to receive such notice, including, but not limited to, the following parties: (i) counsel to the official committee of unsecured creditors (the "**Creditor's Committee**"); (ii) counsel to Silicon Valley Bank (the "**Prepetition Lender**"); (iii) the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"); (iv) the Securities and Exchange Commission; (v) the Office of the United States Attorney for the District of Delaware; (vi) the offices of the attorneys general for the states in which the Debtor operates; (vii) the Internal Revenue Service; (viii) all federal, state, and local regulatory or taxing authorities or recording offices that have a reasonably known interest in the Purchased Assets; (ix) all entities known to have asserted any interest in any of the Purchased Assets; (x) all entities known to have expressed an interest in a transaction with respect to some or all of the Purchased Assets during the past 12 months; (xi) all known creditors of the Debtor; and (xii) those parties who have made the appropriate filings requesting notice of all pleadings in this chapter 11 case.

E.      The Debtor published notice of the Motion, the Bidding Procedures, the time and place of the proposed Auction, the time and place of the Sale Hearing, and the time for filing an objection to the Motion (i) on the website maintained by the Debtor's claims and noticing agent, Epiq Corporate Restructuring, LLC, promptly after entry of the Bidding Procedures Order and (ii) in The Wall Street Journal on November 19, 2019.

F.      In accordance with the provisions of the Bidding Procedures Order, the Debtor has served the Cure Notice upon all counterparties to the Assigned Contracts, setting forth: (i) the

4

contract(s) and/or lease(s) that may be assumed and assigned to a purchaser of the Debtor's assets at the conclusion of the Sale Hearing, (ii) the determination of amounts necessary to cure all monetary defaults thereunder (the "**Cure Amounts**"), (iii) the date of the Sale Hearing and that objections to any Cure Amount or to assumption and assignment of any contract or unexpired lease will be heard at the Sale Hearing or at a later hearing, as determined by the Debtor; and (iv) the deadline by which the counterparty must file an objection to the Cure Amount or to the assumption and assignment of its contract or unexpired lease.

G.     The service of such Cure Notice (i) was good, sufficient, and appropriate under the circumstances of this chapter 11 case; (ii) provided such counterparties with a full and fair opportunity to object to such assumption, assignment, or transfer and to the proposed Cure Amount set forth in the Cure Notice; and (iii) was in compliance with the Bidding Procedures Order and the applicable provisions of the Bankruptcy Code, Bankruptcy Rules and Local Rules. Accordingly, no other or further notice need be given in connection with such assumption, assignment, or transfer or with respect to the amount of Cure Payments.

H.     As evidenced by the affidavits of service previously filed with this Court [Docket Nos. 193, 230, 235]: (i) due, proper, timely, adequate, and sufficient notice of the Motion, the Auction, the Bidding Procedures Hearing, the Sale Hearing, the assumption and assignment of the Assigned Contracts, the Sale and the entry of this Sale Order has been provided to all parties in interest; (ii) such notice was, and is, good, sufficient, and appropriate under the circumstances of this chapter 11 case, provided a fair and reasonable opportunity for parties in interest to object, and to be heard, with respect thereto, and was provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, and 9014, and

25666806.1
US-DOCS\111618248.6

the applicable Local Rules; and (iii) no other or further notice of with respect to such matters is necessary or shall be required.

## Business Judgment

I.      The Debtor has demonstrated good, sufficient, and sound business purposes and justifications for, and compelling circumstances to promptly consummate, the Sale and the other transactions contemplated by the Asset Purchase Agreement and the Transaction Documents, including, without limitation, the assumption, assignment, and/or transfer of the Assigned Contracts (collectively, the "**Transactions**") pursuant to sections 105, 363, and 365 of the Bankruptcy Code, prior to and outside of a plan of reorganization, and such action is an appropriate exercise of the Debtor's business judgment and in the best interests of the Debtor, its estate, and its creditors.  Such business reasons include, but are not limited to, the fact that: (i) there is substantial risk of depreciation of the value of the Purchased Assets if the Sale is not consummated promptly; (ii) the Asset Purchase Agreement and the Closing will present the best opportunity to maximize the value of the Debtor's estate; and (iii) unless the Sale is concluded expeditiously as provided for in this Sale Order and pursuant to the Asset Purchase Agreement, potential creditor recoveries may be substantially diminished.

## Good Faith of the Buyer; No Collusion

J.      The Buyer is not an insider (as that term is defined in section 101(31) of the Bankruptcy Code) of the Debtor.

K.      The Buyer is purchasing the Purchased Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to, and granted pursuant to paragraph 26 below, the full rights, benefits, privileges, and protections of that provision, and has otherwise proceeded in good faith in all respects in connection with the

Transaction in that, *inter alia*: (i) the Buyer recognized that the Debtor was free to deal with any other party interested in acquiring the Purchased Assets; (ii) the Buyer complied with the provisions in the Bidding Procedures Order; (iii) the Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures Order; (iv) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; (v) no common identity of directors or controlling stockholders exists between the Buyer and the Debtor; and (vi) the negotiation and execution of the Asset Purchase Agreement and Transaction Documents were at arms' length and in good faith.

L.       None of the Debtor, the Buyer, any other party in interest, or any of their respective Representatives has engaged in any conduct that would cause or permit the Asset Purchase Agreement or any of the Transaction Documents, or the consummation of the Transaction, to be avoidable or avoided, or for costs or damages to be imposed, under section 363(n) of the Bankruptcy Code, or has acted in bad faith or in any improper or collusive manner with any Person in connection therewith.

## Highest or Otherwise Best Offer

M.       In accordance with the Bidding Procedures Order, the Asset Purchase Agreement was deemed a Qualified Bid and was eligible to participate in an auction for the Purchased Assets.

N.       The Debtor conducted an auction process in accordance with, and has otherwise complied in all material respects with, the Bidding Procedures Order, and accordingly has afforded a full, fair, and reasonable opportunity for any Person or entity to make a higher or otherwise better offer to purchase the Purchased Assets.

O.       The Asset Purchase Agreement constitutes the highest or otherwise best offer for the Purchased Assets and represents a fair and reasonable offer to purchase the Purchased Assets

under the circumstances of this chapter 11 case.  No other Person or entity or group of entities has offered to purchase the Purchased Assets for greater economic value to the Debtor's estate than the Buyer.

P.    The Transactions described in the Asset Purchase Agreement were a material inducement for, and an express condition of, the Buyer's willingness to enter into the Asset Purchase Agreement, and will provide a greater benefit to the Debtor, its estate, and its creditors than in the absence of the Transactions.

## No Fraudulent Transfer

Q.    The Asset Purchase Agreement and Transaction Documents were not entered into, and the Transactions are not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtor under applicable law, and none of the Parties to the Asset Purchase Agreement or parties to any of the Transaction Documents are consummating the Transactions with any fraudulent or otherwise improper purpose.  The Purchase Price for the Purchased Assets constitutes reasonably equivalent value, fair consideration and fair value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, the Uniform Fraudulent Conveyance Act, and any other applicable laws of the United States, any state, territory, or possession or the District of Columbia.

## Validity of Transfer

R.    The Debtor has full corporate power and authority (i) to perform all of its obligations under the Asset Purchase Agreement and the Transaction Documents and (ii) to consummate the Transactions.  Subject to the entry of this Sale Order, no further consents or approvals are required for the Debtor to consummate the Transactions or otherwise perform its obligations under the Asset Purchase Agreement or the Transaction Documents, except in each

8

case as otherwise expressly set forth in the Asset Purchase Agreement or applicable Transaction Documents.

S.      As of the Closing Date, the transfer of the Purchased Assets to the Buyer, including, without limitation, the assumption, assignment, and transfer of the Assigned Contracts, will be a legal, valid, and effective transfer thereof, and will vest the Buyer with all right, title, and interest of the Debtor in and to the Purchased Assets, free and clear of all Interests accruing or arising any time prior to the Closing Date, except as expressly set forth in the Asset Purchase Agreement.

### Section 363(f) Is Satisfied

T.      The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby if the sale of the Purchased Assets, including the assumption, assignment, and transfer of the Assigned Contracts to the Buyer were not free and clear of all Interests of any kind or nature whatsoever (except as expressly set forth in the Asset Purchase Agreement with respect to the Permitted Liens and Assumed Liabilities), or if the Buyer, any of its respective Affiliates or Subsidiaries, or any of their respective Representatives, would, or in the future could, be liable for any of such Interests (except as expressly set forth in the Asset Purchase Agreement with respect to the Permitted Liens and Assumed Liabilities).

U.      The Debtor may sell or otherwise transfer the Purchased Assets free and clear of all Interests because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  Those holders of Interests against the Debtor, its estate, or any of the Purchased Assets who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of such Interests who did object fall within one or more of the

other subsections of section 363(f) and are adequately protected by the terms of this Sale Order, including, as applicable, by having their Interests, if any, attach to the proceeds of the Sale attributable to the Purchased Assets in which such creditor alleges or asserts an Interest, in the same order of priority, with the same validity, force, and effect, that such creditor had immediately prior to consummation of the Sale, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

V.      As used in this Sale Order, the terms "**Interest**" and "**Interests**" include all of the following, in each case, to the extent against or with respect to the Debtor, or in, on, or against, or with respect to any of the Purchased Assets: liens (as defined in section 101(37) of the Bankruptcy Code, and whether consensual, statutory, possessory, judicial, or otherwise), claims (as defined in section 101(5) of the Bankruptcy Code) ("**Claims**"), debts (as defined in section 101(12) of the Bankruptcy Code), encumbrances, obligations, liabilities, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, rights, or interests of any kind or nature whatsoever, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of this chapter 11 case, and whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to, (a) mortgages, deeds of trust, pledges, charges, security interests, hypothecations, encumbrances, easements, servitudes, leases, subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of setoff (except for setoffs validly exercised before the Petition Date), rights of use or possession, subleases, leases,

25666806.1
US-DOCS\111618248.6

conditional sale arrangements, deferred purchase price obligations, or any similar rights; (b) all claims, including, without limitation, all rights or causes of action (whether in law or equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff (except for setoffs validly exercised before the Petition Date), indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtor or any other person, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of this chapter 11 case, and whether imposed by agreement, understanding, law, equity, or otherwise; (c) all debts, liabilities, obligations, contractual rights and claims, and labor, employment, and pension claims; (d) any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtor's or the Buyer's interest in the Purchased Assets, or any similar rights; (e) any rights under labor or employment agreements; (f) any rights under pension, multiemployer plan (as such term is defined in section 3(37) or section 4001(a)(3) of the Employment Retirement Income Security Act of 1974 (as amended, "**ERISA**")), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtor or any multiemployer plan to which the Debtor has at any time contributed to or had any liability or potential liability; (g) any other employee claims related to worker's compensation, occupation disease, or unemployment or temporary disability, including, without limitation, claims that might otherwise arise under or pursuant to (i) ERISA, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Age Discrimination and Employment Act

11

of 1967 and the Age Discrimination in Employment Act, each as amended, (vii) the Americans

with Disabilities Act of 1990, (viii) the Consolidated Omnibus Budget Reconciliation Act of 1985,

as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of

ERISA and Section 4980B of the Internal Revenue Code of any similar state law, (ix) state

discrimination laws, (x) state unemployment compensation laws or any other similar state laws,

(xi) any other state or federal benefits or claims relating to any employment with the Debtor or any

of its predecessors, or (xii) the WARN Act (29 U.S.C. §§ 2101, et seq.) or any state or other laws

of similar effect; (h) any bulk sales or similar law; (i) any tax statutes or ordinances, including,

without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under

or out of, in connection with, or in any way relating to the operation of the Purchased Assets before

the closing of a Sale; (j) any unexpired and executory contract or unexpired lease to which the

Debtor is a party that is not assumed; (k) any other excluded liabilities under the Asset Purchase

Agreement; and (l) Interests arising under or in connection with any acts, or failures to act, of the

Debtor or any of its predecessors, affiliates, or subsidiaries, including, but not limited to, Interests

arising under any doctrines of successor liability (to the greatest extent permitted by applicable

law), or transferee or vicarious liability, violation of the Securities Act, the Exchange Act, or other

applicable securities laws or regulations, breach of fiduciary duty, or aiding or abetting breach of

fiduciary duty, or any similar theories under applicable law or otherwise.

### Not a Successor; Not a Sub Rosa Plan

W.      The Buyer shall not be deemed, as a result of any action taken in connection with

the Transactions, to: (1) be a successor (or other such similarly situated party) to the Debtor (other

than with respect to the Assumed Liabilities as expressly stated in the Asset Purchase Agreement);

or (2) have, *de facto* or otherwise, merged or consolidated with or into the Debtor.

12

X.      The Sale does not constitute a *de facto* plan of reorganization or liquidation or an element of such a plan for the Debtor, as it does not and does not propose to: (i) impair or restructure existing debt of, or equity interests in, the Debtor; (ii) impair or circumvent voting rights with respect to any future plan proposed by the Debtor; (iii) circumvent chapter 11 plan safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; or (iv) classify claims or equity interests, compromise controversies, or extend debt maturities.

**Assumption, Assignment and/or Transfer of the Assigned Contracts**

Y.      The assumption, assignment, and/or transfer of the Assigned Contracts to the Buyer pursuant to the terms of this Sale Order is integral to the Asset Purchase Agreement and is in the best interests of the Debtor and its estate, creditors, and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtor.

Z.      To the extent necessary or required by applicable law, the Buyer (on behalf of the Debtor) has or will have as of the Closing Date: (i) cured, or provided adequate assurance of cure, of any default existing prior to the Closing Date with respect to the Assigned Contracts, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code, and (ii) provided compensation, or adequate assurance of compensation, to any party for any actual pecuniary loss to such party resulting from such default, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  The respective amounts set forth on Schedule 1 annexed to the Debtor's Cure Notice (or any Supplemental Cure Notice(s) served in accordance with the Assumption and Assignment Procedures or any order of the Bankruptcy Court) are the sole amounts necessary under sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code to cure all such monetary defaults and pay all actual pecuniary losses under the Assigned Contracts.

25666806.1
US-DOCS\111618248.6

AA.     The promise of the Buyer to perform the obligations first arising under the Assigned Contracts after their assumption and assignment to the Buyer constitutes adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the counterparties to such Assigned Contracts.  Any objections to the foregoing, the determination of any Cure Amount, or otherwise related to or in connection with the assumption, assignment, or transfer of any of the Assigned Contracts to the Buyer are hereby overruled on the merits or otherwise treated as set forth in paragraph 3 below.  Those non-Debtor parties to Assigned Contracts who did not object to the assumption, assignment, or transfer of their applicable Assigned Contract, or to their applicable Cure Amount, are deemed to have consented thereto for all purposes of this Sale Order.

BB.     The Buyer shall maintain certain rights to modify the list of the Assigned Contracts, after the date of this Sale Order and up to the Closing in accordance with the terms of the Asset Purchase Agreement.  Such modification rights include, but are not limited to, the right of the Buyer, prior to the Closing and subject to the notice requirements in the Bidding Procedures Order, to amend or revise the Assumed Contracts and Leases Schedule in order to add or eliminate any Non-Real Property Contract or Real Property Lease to or from such Schedule.  The Buyer would not have agreed to the Transactions without such modification rights.  The notice and opportunity to object provided to counterparties to the Assigned Contracts and to other parties in interest, as set forth in the Assumption and Assignment Procedures, fairly and reasonably protects any rights that such counterparties and other parties in interest may have with respect to such Non-Real Property Contracts or Real Property Leases.

## **Compelling Circumstances for an Immediate Sale**

CC.      To maximize the value of the Purchased Assets and resources in this chapter 11 case, it is essential that the Sale of the Purchased Assets be approved and consummated promptly. Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004 and 6006 with regards to the Transactions contemplated by this Sale Order, the Asset Purchase Agreement, and the Transaction Documents.

DD.      The consummation of the Transactions is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105, 363, and 365 of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Transactions.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

## **General Provisions**

1.      The Motion, and the relief requested therein, are granted and approved, and the Transactions contemplated thereby and by the Asset Purchase Agreement and Transaction Documents are approved, in each case as set forth in this Sale Order.

2.      This Court's findings of fact and conclusions of law set forth in the Bidding Procedures Order are incorporated herein by reference.

3.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived, resolved, adjourned, or otherwise settled as set forth herein, as announced to this Court at the Sale Hearing or by stipulation filed with this Court, and all reservations of rights included therein, are hereby denied and overruled on the merits.

25666806.1
US-DOCS\111618248.6

**Approval of Asset Purchase Agreement; Binding Nature**

4.      The Asset Purchase Agreement and the Transaction Documents, and all of the terms and conditions thereof, are hereby approved as set forth herein.

5.      The consideration provided by the Buyer for the Purchased Assets under the Asset Purchase Agreement is fair and reasonable and shall be deemed for all purposes to constitute reasonably equivalent value, fair value, and fair consideration under the Bankruptcy Code and any other applicable law, and the Transactions may not be avoided, or costs or damages imposed or awarded, under section 363(n) or any other provision of the Bankruptcy Code.

6.      Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtor is authorized and empowered to, and shall, take any and all actions necessary or appropriate to (a) consummate the Sale and the other Transactions pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement and the Transaction Documents and otherwise comply with the terms of this Sale Order, and (b) execute and deliver, perform under, consummate, implement, and take any and all other acts or actions as may be reasonably necessary or appropriate to the performance of its obligations as contemplated by the Asset Purchase Agreement and the Transaction Documents, in each case without further notice to or order of this Court.   The Transactions authorized herein shall be of full force and effect, regardless of the Debtor's lack or purported lack of good standing in any jurisdiction in which the Debtor is formed or authorized to transact business.

7.      This Sale Order shall be binding in all respects upon the Debtor, its estate, all creditors, all holders of equity interests in the Debtor, all holders of any Claim(s) (whether known or unknown) against the Debtor, any holders of Interests against, in or on all or any portion of the Purchased Assets, all non-Debtor parties to the Assigned Contracts, the Buyer, and all successors

16

and assigns of the foregoing, including, without limitation, any trustee, if any, subsequently appointed in this chapter 11 case or upon a conversion to chapter 7 under the Bankruptcy Code of this chapter 11 case.

**Transfer of Purchased Assets Free and Clear of Interests; Injunction**

8.      Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, the Debtor is authorized and directed to transfer the Purchased Assets, including but not limited to the Assigned Contracts, to the Buyer on the Closing Date in accordance with the Asset Purchase Agreement and Transaction Documents.  Upon and as of the Closing Date, such transfer shall constitute a legal, valid, binding, and effective transfer of such Purchased Assets and the Buyer shall take title to and possession of such Purchased Assets free and clear of all Interests (except as expressly set forth in the Asset Purchase Agreement with respect to the Permitted Encumbrances and Assumed Liabilities).

9.      All such Interests shall attach solely to the proceeds of the Sale with the same validity, priority, force, and effect that they now have as against the Purchased Assets, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.  This Sale Order shall be effective as a determination that, on and as of the Closing, all Interests of any kind or nature whatsoever (except as expressly set forth in the Asset Purchase Agreement with respect to the Permitted Liens and Assumed Liabilities) have been unconditionally released, discharged, and terminated in, on, or against the Purchased Assets (but not the proceeds thereof).  The provisions of this Sale Order authorizing and approving the transfer of the Purchased Assets free and clear of Interests shall be self-executing, and neither the Debtor nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.

17

10.      Except as expressly permitted by the Asset Purchase Agreement or this Sale Order, all Persons holding Interests (other than the Permitted Liens and Assumed Liabilities) are hereby forever barred, estopped, and permanently enjoined from asserting their respective Interests against the Buyer, any of its respective Affiliates and Subsidiaries, and any of their respective Representatives, and each of their respective property and assets, including, without limitation, the Purchased Assets.  On and after the Closing Date, the Buyer shall be authorized to execute and file such documents, and to take all other actions as may be necessary, on behalf of each holder of an Interest to release, discharge, and terminate such Interests in, on and against the Purchased Assets (but not the proceeds thereof) as provided for herein, as such Interests may have been recorded or may otherwise exist.  On and after the Closing Date, and without limiting the foregoing, the Buyer shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect, or otherwise notice any Interest that is extinguished or otherwise released pursuant to this Sale Order.  This Sale Order constitutes authorization under all applicable jurisdictions and versions of the Uniform Commercial Code and other applicable law for the Buyer to file UCC and other applicable termination statements with respect to all security interests in, liens on, or other Interests in the Purchased Assets.

11.      On and after the Closing, the Persons holding an Interest (other than a Permitted Lien or an Assumed Liability) shall execute such documents and take all other actions as may be reasonably necessary to release their respective Interests in the Purchased Assets (but not the proceeds thereof), as such Interests may have been recorded or otherwise filed.  The Buyer may, but shall not be required to, file a certified copy of this Sale Order in any filing or recording office in any federal, state, county, or other jurisdiction in which the Debtor is incorporated or has real

18

or personal property, or with any other appropriate clerk or recorded with any other appropriate recorder, and such filing or recording shall be accepted and shall be sufficient to release, discharge, and terminate any of the Interests as set forth in this Sale Order as of the Closing Date. All Persons that are in possession of any portion of the Purchased Assets on the Closing Date shall promptly surrender possession thereof to the Buyer at the Closing.

12.    The transfer of the Purchased Assets to the Buyer pursuant to the Asset Purchase Agreement and Transaction Documents does not require any consents other than specifically provided for in the Asset Purchase Agreement or as provided for herein.

13.    This Sale Order is and shall be binding upon and govern the acts of all Persons (including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, and federal, state, and local officials) who may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease. Each of the foregoing Persons shall accept for filing any and all of the documents and instruments necessary and appropriate to release, discharge, and terminate any of the Interests or to otherwise consummate the Transactions contemplated by this Sale Order, the Asset Purchase Agreement, or any Transaction Document.

### Assigned Contracts; Cure Payments

14.    Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing Date, the Debtor's assumption, assignment and transfer to the Buyer of the Assigned Contracts is hereby authorized and approved in full subject to the terms set forth below. Subject to the payment of Cure Amounts (or a reserve for Cure Amounts claimed by

a counterparty to an Assigned Contract as set forth below) in accordance with the Asset Purchase Agreement, the Debtor shall, on or prior to the Closing, cure any and all other defaults and breaches under the Assigned Contracts so that such Non-Real Property Contracts and/or Real Property Leases may be assumed by the Debtor and assigned to Buyer on the Closing Date in accordance with this Sale Order, the Asset Purchase Agreement, and the Transaction Documents.  To the extent the Debtor is responsible for payment of any amounts pursuant to the terms of the Asset Purchase Agreement or Transaction Documents, the Buyer may, upon prior written notice to the Debtor and in the Buyer's sole discretion, (i) pay such amount(s) on behalf of the Debtor, in which case the Debtor shall have no further responsibility therefor and (ii) offset such amount(s) against any amount(s) Buyer may owe the Debtor (including by deducting such amounts, at the Closing, from the Purchase Price or, without duplication, recovering such amounts from the Cash Purchase Price); *provided*, *however*, that to the extent the Debtor objects to the foregoing, this Court shall retain jurisdiction over such dispute.  Notwithstanding the foregoing, to the extent that the Buyer exercises its right under the Asset Purchase Agreement to eliminate any Assigned Contract from the Assumed Contracts and Leases Schedule prior to the Closing Date, such contract shall not be assumed or assigned by the Debtor.

15.    Upon and as of the Closing, the Debtor is authorized and empowered to, and shall, assume, assign, and/or transfer each of the Assigned Contracts to the Buyer free and clear of all Interests (except as expressly set forth in the Asset Purchase Agreement with respect to the Permitted Liens and Assumed Liabilities).  The payment of the applicable Cure Amounts (if any), or the reservation by the Buyer (on behalf of the Debtor) of an amount of cash that is equal to the lesser of (i) the amount of any cure or other compensation asserted by the applicable counterparty to such Assigned Contract as required under section 365 of the Bankruptcy Code or (ii) the amount

20

approved by order of this Court to reserve for such payment (such lesser amount, the "**Alleged Cure Claim**") shall, pursuant to section 365 of the Bankruptcy Code and other applicable law, (a) effect a cure, or provide adequate assurance of cure, of all defaults existing thereunder as of the Closing Date and (b) compensate, or provide adequate assurance of compensation, for any actual pecuniary loss to such non-Debtor party resulting from such default.  Accordingly, on and as of the Closing Date, other than such payment or reservation, neither the Debtor nor the Buyer shall have any further liabilities or obligations to the non-Debtor parties to the Assigned Contracts with respect to, and the non-Debtor parties to the Assigned Contracts shall be forever enjoined and barred from seeking, any additional amounts or Claims that arose, accrued, or were incurred at any time on or prior to the Closing Date on account of the Debtor's cure or compensation obligations arising under section 365 of the Bankruptcy Code.  The Buyer has provided adequate assurance of future performance under the relevant Assigned Contracts within the meaning of section 365(f) of the Bankruptcy Code.

16.     To the extent any provision in any Assigned Contract assumed or assumed and assigned (as applicable) pursuant to this Sale Order (including, without limitation, any "change of control" provision) (a) prohibits, restricts, or conditions, or purports to prohibit, restrict, or condition, such assumption or assignment or (b) is modified, breached, or terminated, or deemed modified, breached, or terminated by any of the following: (i) the commencement of this chapter 11 case, (ii) the insolvency or financial condition of the Debtor at any time before the closing of this chapter 11 case, (iii) the Debtor's assumption or assumption and assignment (as applicable) of such Assigned Contract, or (iv) the consummation of the Transactions, then such provision shall be deemed modified so as to not entitle the non-Debtor party thereto to prohibit, restrict, or condition such assumption or assignment, to modify or terminate such Assigned Contract, or to

21

exercise any other default-related rights or remedies with respect thereto, including, without limitation, any such provision that purports to allow the non-Debtor party thereto to recapture such Assigned Contracts, impose any penalty thereunder, condition any renewal or extension thereof, impose any rent acceleration or assignment fee, or increase or otherwise impose any other fees or other charges in connection therewith.   All such provisions constitute unenforceable anti-assignment provisions that are void and of no force and effect pursuant to sections 365(b), 365(e), and 365(f) of the Bankruptcy Code.

17.     All requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to the Buyer of the Assigned Contracts have been satisfied.  Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title, and interest of the Debtor in and under the Assigned Contracts, and each Assigned Contract shall be fully enforceable by the Buyer in accordance with its respective terms and conditions, except as limited or modified by the provisions of this Sale Order.  Upon and as of the Closing, the Buyer shall be deemed to be substituted for the Debtor as a party to the applicable Assigned Contracts and, accordingly, the Debtor shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contracts.

18.     Upon the payment of the applicable Cure Amount or the reservation of the Alleged Cure Claim, if any, the Assigned Contracts will remain in full force and effect, and no default shall exist, or be deemed to exist, under the Assigned Contracts as of the Closing Date nor shall there exist, or be deemed to exist, any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

19.     The rights of the Buyer to modify the list of the Assigned Contracts after the date of this Sale Order and up to the earlier of (a) one (1) Business Day prior to the Closing Date as set forth in the Asset Purchase Agreement and (b) any applicable deadline under the Bankruptcy Code (including confirmation of a plan of reorganization or liquidation) are hereby approved.  Moreover, with respect to any Non-Real Property Contract or Real Property Lease that is not assumed and assigned to the Buyer on the Closing Date and provided such Non-Real Property Contract or Real Property Lease has not been rejected by Debtor after the Closing Date pursuant to section 365 of the Bankruptcy Code, upon written notice(s) from the Buyer to the Debtor given at any time after the Closing Date, the Debtor is hereby authorized to take all actions reasonably necessary to assume and assign to the Buyer pursuant to section 365 of the Bankruptcy Code any such Non-Real Property Contract(s) and/or Real Property Lease(s) as set forth in such notice(s) with any Cure Amount applicable thereto, which shall be determined by this Court after notice and a hearing in the event of a dispute, satisfied in accordance with the Asset Purchase Agreement. Notwithstanding anything in this Sale Order to the contrary, on the date any such Non-Real Property Contract or Real Property Lease is assumed and assigned to the Buyer, such Non-Real Property Contract or Real Property Lease shall thereafter be deemed a Purchased Asset for all purposes under this Sale Order and the Asset Purchase Agreement.

20.     All counterparties to the Assigned Contracts shall be deemed to have consented to such assumption and assignment under section 365(c)(1)(B) of the Bankruptcy Code and the Buyer shall enjoy all of the Debtor's rights, benefits, and privileges under each such Assigned Contract as of the applicable date of assumption and assignment without the necessity to obtain any non-Debtor parties' written consent to the assumption or assignment thereof.

25666806.1
US-DOCS\111618248.6

21.     Nothing in this Sale Order, the Motion, or in any notice or any other document is or shall be deemed an admission by the Debtor that any Assigned Contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code.

22.     The failure of the Debtor or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions or of its respective rights to enforce every term and condition of the Assigned Contracts.

**Additional Injunction; No Successor Liability**

23.     Effective upon the Closing Date and except as expressly set forth in the Asset Purchase Agreement with respect to the Permitted Encumbrances and Assumed Liabilities, all Persons are forever prohibited and permanently enjoined from (i) commencing or continuing in any manner any action or other proceeding, the employment of process, or any act (whether in law or equity, in any judicial, administrative, arbitral, or other proceeding) to collect or recover any Interest; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order with respect to an Interest, (iii) creating, perfecting, or enforcing any Interest, or (iv) asserting any right of subrogation of any kind with respect to an Interest, in each case as against the Buyer, or any of its respective Affiliates or Subsidiaries, or any of their respective Representatives, or any of their respective property or assets, including the Purchased Assets.

24.     The Transactions contemplated by the Asset Purchase Agreement and the Transaction Documents do not cause there to be, and there is not, (i) a consolidation, merger, or *de facto* merger of the Buyer with or into the Debtor or the Debtor's estate, or vice versa; (ii) a substantial continuity between the Buyer and the Debtor or the Debtor's estate, (iii) a common identity between the Buyer and the Debtor or the Debtor's estate, or (iv) a mere continuation of the Debtor or the Debtor's estate with the Buyer.

24

25.     Except as expressly set forth in the Asset Purchase Agreement with respect to the Permitted Encumbrances and Assumed Liabilities, the transfer of the Purchased Assets, including, without limitation, the assumption, assignment, and transfer of any Assigned Contract, to the Buyer shall not cause or result in, or be deemed to cause or result in, the Buyer, any of its respective Affiliates or Subsidiaries, or any of their respective Representatives, having any liability, obligation, or responsibility for, or any Purchased Assets being subject to or being recourse for, any Interest whatsoever, whether arising under any doctrines of successor, transferee, or vicarious liability, breach of fiduciary duty, aiding or abetting breach of fiduciary duty, or otherwise, whether at law or in equity, directly or indirectly, and whether by payment or otherwise.

## Good Faith

26.     The Transactions contemplated by this Sale Order, the Asset Purchase Agreement, and Transaction Documents are undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale and other Transactions shall not alter, affect, limit, or otherwise impair the validity of the Sale or such other Transactions (including the assumption, assignment, and/or transfer of the Assigned Contracts), unless such authorization and consummation are duly stayed pending such appeal.  The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and is hereby granted, the full rights, benefits, privileges, and protections of section 363(m) of the Bankruptcy Code.

## Other Provisions

27.     The Buyer is hereby authorized, in its discretion, in connection with consummation of the Transactions, to allocate the Purchased Assets, Assumed Liabilities, and Assigned Contracts

25666806.1
US-DOCS\111618248.6

among its Affiliates, Subsidiaries, designees, assignees, and/or successors in a manner as it, in its discretion, deems appropriate, and such Person shall be entitled to all of the rights, benefits, privileges, and protections of the Buyer as are accorded to the Buyer under this Sale Order, and the Debtor shall, to the extent set forth in the Asset Purchase Agreement and Transaction Documents, cooperate with and take all actions reasonably requested by Buyer to effectuate any of the foregoing.  The Buyer is authorized to designate one or more designees to acquire the Purchased Assets, including, without limitation, any Assigned Contracts, in accordance with the Asset Purchase Agreement; in the event that the Buyer designates any designee to acquire any Purchased Assets, including, without limitation, any Assigned Contracts, then any reference to the "Buyer" in this Sale Order shall be deemed to be a reference to "the Buyer and/or such applicable designee," unless the context requires otherwise.  Upon the transfer of any Purchased Asset or Assigned Contract to, or the assumption of any Assumed Liability by, a designee, such designee shall be solely responsible for such Purchased Asset, Assumed Liability, or Assigned Contract (including performance thereunder), as applicable.

28.    Pursuant to Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the stays provided in Bankruptcy Rules 6004(h) and 6006(d) are hereby expressly waived and shall not apply.  Accordingly, the Debtor is authorized and empowered to close the Sale and other Transactions immediately upon entry of this Sale Order.

29.    Nothing in this Sale Order shall modify or waive any closing conditions or termination rights set forth in the Asset Purchase Agreement, and all such conditions and rights shall remain in full force and effect in accordance with their terms.

25666806.1
US-DOCS\111618248.6

30.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Transactions.

31.     All such obligations shall constitute allowed administrative claims against the Debtor with administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code.   All such obligations shall be subject to the provisions of this Court's *Final Order (I) Authorizing Postpetition Use of Collateral, (II) Granting Adequate Protection, and (III) Granting Related Relief* [Docket No. 127] (the "**Cash Collateral Order**").  Until satisfied in full in cash, all such obligations shall continue to have the protections provided in this Sale Order and shall not be discharged, modified, or otherwise affected by any reorganization plan for the Debtor.

32.     The failure specifically to include any particular provision of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Asset Purchase Agreement be authorized and approved in its entirety.

33.     The Asset Purchase Agreement and Transaction Documents may be modified, amended, or supplemented in a writing signed by the parties thereto, following notice to the U.S. Trustee, the Creditors' Committee and the Prepetition Lender, and in accordance with the terms thereof, provided that that any such modification, amendment, or supplement does not have a material adverse effect on the Debtor's estate or its creditors, without further notice to or order of this Court.

34.     This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b), to, among other things, (i) interpret, implement, and enforce the terms and provisions of this Sale Order, the Asset Purchase Agreement, the Transaction Documents, and any amendments thereto and any waivers and consents given thereunder, (ii) compel delivery of the Purchased

Assets to the Buyer, (iii) enforce the injunctions and limitations of liability set forth in this Sale Order, and (iv) enter any orders under sections 363 and 365 of the Bankruptcy Code with respect to the Assigned Contracts.

35.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

36.     The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to implement the provisions of this Sale Order and the terms and conditions of the Asset Purchase Agreement and the Transaction Documents.

37.     The rules of construction set forth in section 1.2 of the Asset Purchase Agreement shall apply to this Sale Order, *mutatis mutandis*.

38.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) this chapter 11 case, (b) any subsequent chapter 7 case into which the chapter 11 case may be converted, or (c) any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Sale Order.  To the extent of any such conflict or derogation, the terms of this Sale Order shall govern.

39.     To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion, the terms of this Sale Order shall govern; *provided* that nothing contained herein shall be alter any provisions of the Cash Collateral Order.

25666806.1
US-DOCS\111618248.6

40.     To the extent there are any inconsistencies between the terms of this Sale Order or the Bidding Procedures Order, on the one hand, and the Asset Purchase Agreement or any Transaction Document, on the other hand, the terms of this Sale Order and the Bidding Procedures Order shall govern, as applicable.

29

## **EXHIBIT A**

**Asset Purchase Agreement**

25666806.1
US-DOCS\111618248.6